**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA    )
                                     )
           v.                      )       Case No. 1:07cr26
                                     )
MARJORIE DIEHL ARMSTRONG   )

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

McLAUGHLIN, SEAN J., District J.,

      Defendant, Marjorie Diehl-Armstrong, is charged in this case with one count each of conspiracy to commit armed bank robbery, bank robbery, and carrying and using a firearm during and in relation to a crime of violence. On January 24, 2008, Defense Counsel filed a motion for a hearing to determine the Defendant's competency, noting that Dr. Robert L. Sadoff had examined the Defendant and concluded within reasonable medical certainty that the Defendant is not competent to stand trial on the charges against her. Pursuant to 18 U.S.C. § 4141(b) and 4247(b) and (c), this Court ordered that the Defendant be committed to the custody of the Attorney General for further psychological or psychiatric testing.

      Defendant was designated to the Metropolitan Correctional Center of New York, where she was examined by William J. Ryan, Ph.D., a licensed psychologist employed by the Federal Bureau of Prisons. On April 15, 2008, Dr. Ryan completed his report, concluding that the Defendant is competent to stand trial.

      This Court held a two-day hearing from May 21-22, 2008, during which time it heard testimony from several expert and lay witnesses and received voluminous medical records. The parties have since submitted their respective proposed findings of fact and conclusions of law and the matter is now ripe for adjudication.

# I. BACKGROUND FACTS[1]

*Defendant's Early Medical History*

Defendant is a 59-year old female currently serving a prison term for third-degree murder in a separate criminal matter. She holds a master's degree in counseling and is considered to be very intelligent.

The evidentiary record, which is quite extensive, reveals that Defendant has had a long history of mental health issues dating back to at least her early adulthood. She has reported to evaluators that she suffered from anorexia nervosa during her adolescent years. (*See* Ex. 2, p. 4; Ex. 17, p. 1; Ex. A-920.)

From December of 1973 through June of 1974 she received treatment through Hamot Community Mental Health Services. Her presenting problems included "nervousness, tension and anxiety, and an expressed inability to have close gratifying relationships." (Ex. 12.) The focus of her treatment was individual therapy, but it was perceived that she was defensive and showed little commitment to making any changes and, therefore, her improvement was considered doubtful. Her final diagnosis was passive-aggressive personality with hysterical features. (*Id.*)

Between May 5, 1976 and July 29, 1977 she was seen 38 times by Robert B. Callahan, M.D.. (Ex. A-845.) At the time of her initial evaluation, she was felt to have multiple depressive symptoms and to be incapable of holding employment. (*Id.*) Dr. Callahan treated Defendant with individual psychotherapy and Tofranil, which he felt produced moderate success. (*Id.*) His final diagnosis was Manic Depressive Disorder – depressed type[2] and Cyclothymic Disorder. (Ex. A-849.)

Treatment notes from 1981 indicate that Defendant was referred to St. Vincent

---

[1] References to the United States' exhibits are numerical, while reference to defense exhibits are in letter form.

[2] Manic Depressive Disorder is the diagnostic term previously used for what is currently known as Bipolar Disorder. (Tr. 5/21/08 [71] at p. 122.)

Health Center for complaints of depression. (Ex. A-896.) She was seen on August 6, 1981 and the clinical impression at that time was Cyclothymic Disorder[3] and Manic Episode. (*Id*.) She was seen again on December 15, 1981, at which time her presenting problems were depression, difficulty in interpersonal relationships, and severely impaired social and occupational functioning. (Ex. 14; Ex. A-900.) Clinical impressions at that time were "Persistent depression – possible hypomanic episodes" as well as "Mixed Personality Disorder (rigid, manipulative, angry, deceitful)." (*Id*.)

The evidence shows that the Defendant made attempts in the early 1980's to secure Social Security Disability Insurance benefits based upon her mental health problems. On December 15, 1981 the Defendant sent a letter to her treating psychiatrist, Paul Francis, M.D., which states, in relevant part:

> Please fill out the enclosed form and return it to me as soon as possible. ...
>
> I submitted the letter documenting the severe TMJ (myofacial [sic] pain syndrome) problem, but was notified this was not enough. Bureaucratic requirements need to mention "permanent disability."
>
> Obviously, they ignored the dentist's use of "permanent disability." I have spent a lot of time and money over the last year or so trying to get the small amount which I feel I deserve. I am really frustrated. After all I can't even get a small rebate much less any disability from social security. ...
> Being on welfare is degrading and doesn't really reflect my problems. Will you help me by documenting as best you can that I have a "permanent disability" psychologically? ...
>
> I am having a lot of anxiety. My financial situation would be improved if I was to receive this little compensation, I would be much better off psychologically. ...

---

[3] According to the DSM-IV-TR, the essential feature of Cyclothymic Disorder is a chronic, fluctuating mood disturbance involving numerous periods of hypomanic symptoms and numerous periods of depressive symptoms; however, the hypomanic and depressive symptoms are of insufficient number, severity, pervasiveness, or duration to meet the full criteria for either a Manic Episode or a Major Depressive Episode. DSM-IV-TR at 398. As Dr. Sadoff describes it, "Cyclothymic [Disorder] is when the heights [and] the troughs are not as deep as they are in the bipolar disorder." (Tr. 5/21/08 [71] at p. 213.)

> Please help me. I can't afford a lawyer for this. This wouldn't cause me to "give up." You are the only one to whom I can turn....

(Ex. 6.)

Thereafter, on December 22, 1981 Dr. Francis completed a form stating that Defendant had "Persistent depression and associated symptoms for over 10 years. Long standing difficulties with interpersonal relationships and severe impairments in social and occupational functioning. Personality style manifested by rigidity and hostility." (Ex. 13.) Dr. Francis diagnosed Dysthymic Disorder[4] and Mixed Personality Disorder and assigned Defendant a poor prognosis because of the "chronicity" of Defendant's problems and the fact that previous therapy had produced no sustained benefit for her. (*Id.*)

On June 2, 1982, a client advocate at St. Vincent reported that Defendant had registered a complaint based on Dr. Francis' unwillingness to provide a more detailed report to the Social Security Administration in support of Defendant's SSI claim. (Ex. 4.) According to this report, Dr. Francis had refused the request because the Defendant had not been seen since November of 1981 and a re-evaluation would therefore be necessary to re-evaluate the Defendant's current mental health condition. However, Dr. Francis was unwilling to schedule another appointment with the Defendant due to her history of missed appointments and failure to comply with treatment recommendations. (*Id.*) The report reflects that other options were discussed with the Defendant, including evaluation by another psychiatrist at St. Vincent. (*Id.*)

---

[4] Dysthymic disorder is a major mental illness whose essential feature is a chronically depressed mood that occurs for most of the day more days that not for at least two years. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEST REVISED ("DSM-IV-TR") 376 (4th ed. 2000).

Defendant ultimately agreed to be seen by Dr. Pandya[5] at St. Vincent Community Mental Health Center and was evaluated on August 25, 1982.  At that time she complained of, among other things, over-eating, over-sleeping, gaining weight, having crying spells, and experiencing feelings of procrastination over the course of the prior month.  Prior to that point she had reportedly been in a "manic" state and had had great energy.  Dr. Pandya diagnosed the Defendant with Manic Depressive Disorder – depressed type, and cyclothymic personality.  (Ex. A-919-920.)

Defendant's efforts to obtain Social Security Disability Insurance benefits continued into 1983, as documented by correspondence from Northwestern Legal Services and various outpatient treatment forms from St. Vincent Community Mental Health Center.  Collectively, these documents evidence the Defendant's continued attempts to obtain, and her anger over being denied, social security and welfare benefits.  (Ex. 5, 7-10.)

A St. Vincent form entitled "Summary of Appeal to Client Advocate" and dated May 17-20, 1983, is illustrative.  (Ex. 11.)  That document indicates that the Defendant had been referred to the client advocate based on complaints that her then-treating psychiatrist, Dr. Choksi, had failed to fill out a disability evaluation form in a manner that would qualify her for disability and public housing.  (*Id*.)  It was noted that the Defendant had lodged similar complaints against Dr. Francis and, as a result, had been transferred to Dr. Pandya and, later, to Dr. Choksi.  (*Id*.)  The Summary of Appeal form indicates that, while Dr. Choksi believed Defendant to have severe psychiatric problems, he could not go further in his assessment because of insufficient time with the Defendant and because it was "difficult to assess the actual extent of the disability" considering the

---

[5] Because many of the medical records are handwritten, it is difficult to discern the precise spelling of this doctor's name.  The Defendant's Proposed Findings of Fact and Conclusions of Law refer to this individual as "Dr. Pranja," as do the transcripts.  However, it appears that the correct spelling is "Pandya," and we will therefore use this spelling throughout these Findings of Fact and Conclusions of Law.

fact that "all her verbalizations in [appointments] are geared toward 'proving' her disability." (*Id*.) The document suggests that the Defendant had been offered in-patient services in order to provide for a more extensive evaluation; however, she declined this option. Defendant had also declined to obtain a private evaluation. She was reluctant to return to either Dr. Pandya or Dr. Choksi, and Dr. Francis had refused to accept her back as a patient; therefore, it was perceived that the Defendant had very few options left. (*Id*.) According to the Summary of Appeal form, the client advocate advised the Defendant to continue treatment with Dr. Pandya, but it was "[e]mphasized that this in no way implied that we would make a more extreme report to SSI." (*Id*.) Ultimately, the Defendant agreed to a tentative appointment with Dr. Pandya, but it was noted that, throughout her contacts with the client advocate, the Defendant had been at times hostile and abusive, and the final contact had ended with the Defendant engaging in much verbal abuse and hanging up. (*Id*.)

On March 30, 1984, the Defendant was seen once more by Dr. Francis. Treatment notes indicate that Dr. Francis felt her problem was "primarily characterological" and his treatment recommendation, as in the past, was for the Defendant to receive outpatient therapy. The notes further indicate that the Defendant was "seen by assessment today to offer evaluation [and] referral by them; reportedly she became angry [and] left. Wanted the doctor to sign some papers." (Ex. 15.)

*The Robert Thomas Homicide*

On August 1, 1984, Defendant was arrested on charges of homicide in the killing of her then-boyfriend, Robert Thomas. Upon her arrest, she was lodged at the Erie County Prison. When law enforcement officers searched the Defendant's home, they uncovered a bizarre inventory of food stuffs including, among other things, almost 400 pounds of butter and over 700 pounds of cheese, much of which was unrefrigerated and rotting. (Ex. B.)

In January of 1985, her parents retained Leonard G. Ambrose, III, Esq., to

6

represent her in connection with the Thomas homicide. Due to his concerns about the Defendant's mental state, Mr. Ambrose had the Defendant examined by Robert Sadoff, M.D. on two occasions during April of 1985. In addition, Dr. Sadoff referred the Defendant to Gerald Cooke, Ph.D., for psychological testing.

In a report dated June 7, 1985, Dr. Sadoff recounted that he had examined the Defendant on April 25 and April 29, 1985 for three hours and over one hour, respectively. He found that, during his examination, she was "clearly hypomanic" and "rambled with a flight of ideas typical of the manic patient." (Ex. A-861.) She could not stay focused on any particular subject for long and would refer to unrequested, extraneous material. (*Id.*) According to Dr. Sadoff, "[h]er response to a question may have taken one half to one hour when a simple response would have sufficed." (*Id.*) A mental status examination revealed that the Defendant had occasional sensory distortion and difficulty with perception. She would refer to voices and multiple thoughts that come at her simultaneously. (*Id.*) On the other hand, the Defendant's examination also revealed that she was very bright, had good memory and recall, could abstract proverbs, and could subtract serial numbers without difficulty. (Ex. A-862.) With regard to her competency, Dr. Sadoff found the following:

> When she becomes excessively hypomanic, as she has in my presence, she is not competent to communicate effectively. Although she appears very bright and appears to have good memory, she is currently suffering from a psychotic illness called bipolar disorder or manic depressive psychosis. This illness has rendered Marjorie Diehl incompetent to stand trial at the present time because of her inability to communicate effectively with counsel and her inability, because of the rapid thoughts that bombard her at once during her manic phase, to appreciate her position within this legal situation.

(*Id.*) Dr. Sadoff felt that the Defendant should be tried on Lithium and that, without such medication, it was unlikely that she would become competent to proceed legally in the foreseeable future. (*Id.*)

Defendant was re-examined by Dr. Sadoff on February 19, 1986. (Ex. A-867.) At the time of this examination, the Defendant's course of Lithium had reached the

7

therapeutic range. (*Id.*) Dr. Sadoff reported that, while her manic episodes had decreased, she continued to evidence manic behavior and rapid thought processes. (*Id*.) She still evidenced fairly rapid and pressured speech along with flight of ideas and, when asked open-ended questions, she would offer non-responsive, free associations. Moreover, the Defendant was now showing what Dr. Sadoff termed "a clear paranoid ideation against her attorneys" and himself, which Dr. Sadoff thought to be of delusional dimensions and evidence of psychotic thinking. (*Id*.) He noted that she could not cooperate effectively with either of her legal counsel in preparing her legal defense. (Ex. A-868.) Dr. Sadoff concluded that, while the Defendant had showed moderate improvement on Lithium in terms of her bipolar illness, she required a tranquilizer, in addition to the Lithium, to help control her paranoid ideations. (*Id*.)

Gerald Cooke, Ph.D., examined the Defendant on April 29, 1985 at which time he conducted a clinical interview and history and administered numerous psychological tests, including the Minnesota Multiphasic Personality Inventory, the Rorschach Inkblot Technique, and various subtests of the Wechsler Adult Intelligence Scale – Revised/Verbal Subscale. (Ex. 19.) Like Dr. Sadoff, Dr. Cooke found classic signs of hypomanic thinking and behavior during his interview with the Defendant. According to Dr. Cooke, the Defendant "jumped from one idea to another with a classic flight of ideas," was frequently repetitive but unaware of her repetitiveness, maintained an inappropriate affect, evidenced self-aggrandized thinking, and made frequent out-of-context reference to somatic complaints. (*Id*.) It was noted that, "[m]any times during the history she went off into circumstantial and tangential flight of ideas with rambling and never completed her basic statement or responded to the question that elicited this response." (*Id*.)

Results from psychological testing, Dr. Cooke found, were consistent with his impression from the clinical interview and history:

> The testing reveals Ms. Diehl to be an extremely emotionally labile and emotionally responsive individual who overreacts to the slightest emotional stimulation. Though her affect was hypomanic when I

8

> evaluated her, the testing done on the same day indicated a severe underlying depression accompanied by somatic symptoms. The testing also indicated her manic tendencies, and the co-existence of these tendencies simultaneously on the tests is consistent with the diagnosis of Cyclothymic Disorder and/or of Bipolar Illness (manic-depressive illness). The testing also indicates very tenuous control of impulses, extremely poor frustration tolerance, and a very poor ability to delay gratification of needs and impulses. She has difficulty censoring thoughts and ideas and they emerge in the type of hypomanic ideas described throughout. Though it is not immediately apparent on interview, the testing also shows a high degree of angry behavior which sometimes crosses the line into paranoid thinking. ... The testing also indicates that she can be very manipulative. She responds to her own needs with little thoughts for the feelings and needs of others and, when this is backed up by her generally negative perception of others, she can rationalize her behavior.

(Ex. 19.) Although the Defendant was not overtly psychotic during Dr. Cooke's evaluation, he felt that she was capable of psychotic-like losses of control and that this impression was supported by both the objective and projective personality testing. (*Id.*) According to Dr. Cooke, "[t]he testing clearly indicates that strong stimulation in the area of nurturance needs, sexuality, and/or anger can lead to psychotic-like episodes in which she is unable to control her feelings and behaviors." (*Id.*) Though the Defendant had tested in the bright-normal to superior range of intelligence, Dr. Cooke cautioned that this level of intellectual functioning was being measured in a way that was conflict free, and "though she may show good memory and judgment on intellectual tasks where her emotions do not interfere, those situations where she is emotionally involved can produce confusion, poor judgment, and inadequate memory." (*Id.*)

In summary, Dr. Cooke opined that the Defendant had "shown the seeds of severe mental illness" since her early childhood and that there was a sufficient basis, both in her history and testing, to justify a diagnosis of bipolar disorder. (Ex. 19.) He noted that it was difficult to state whether her mood swings would lead her to the point of psychosis, "involving either loss of contact with reality and/or psychotic misperceptions of reality." (*Id.*) Though she had not been psychotic at the time of his evaluation, the Defendant's performance on the psychological tests evidenced, to Dr. Cooke, "a potential for decompensation into psychotic behavior." (*Id.*) He concluded that she was "borderline incompetent" to stand trial in that her illness prevented her

9

from rationally assisting her attorney in her defense, and he therefore recommended that she be treated with both medication and therapy.  (*Id.*)

Defendant was examined by David Paul, M.D. on some 64 occasions between August 1, 1984 and September 3, 1987, while she was lodged at the Erie County Prison.  (Ex. A-875.)  Dr. Paul's many evaluations of the Defendant were at the request of prison staff, as he was the prison's psychiatrist at the time.  (Ex. A-869; Ex. E-6.)  Eventually, the trial court ordered Dr. Paul to examine the Defendant and render an opinion as to her competency to stand trial.  (Ex. E-9.)  Pursuant to Dr. Paul's request, the court also appointed Ted Urban, Ph.D., to perform psychological testing and to assist Dr. Paul in forming an opinion as to the Defendant's competency.  (Ex. E-8.)

In a report dated August 1, 1985, Dr. Paul provided a summary of his evaluations of the Defendant.  Following his initial evaluation of the Defendant, his Axis I impression was Bi-Polar Affective Disorder, Hypomanic phase.  (Ex. A-871.)

A pervasive theme throughout this report is Dr. Paul's observations of the Defendant's manipulative tendencies.  He notes, for example, that he evaluated the Defendant on January 16, 1985, at which time she was tearful and angry throughout the interview and ventilated about her fears of court and her supposedly inept legal representation.  (Ex. A-871.)  Dr. Paul characterized her as "somewhat manipulative" and observed that she "seemed to be trying to enlist my sympathy regarding how she claimed to be being treated."  (Ex. A-872.)  He further noted that the Defendant spontaneously sought his advice as to whether or not it would be to her advantage to be psychiatrically hospitalized, which prompted Dr. Paul to remind her that he could not appropriately render legal advice.  (*Id.*)  As Dr. Paul described in his report: "[i]t was around this point in time that the patient began relating to me primarily in a manipulative manner.  She seemed to see me as the person to contact to influence changes in prison policy on her behalf or, alternatively, to secure mental hospitalization for her." (*Id.*)  Dr. Paul noted, however, that none of the Defendant's letters were psychotic; rather they were "well put together and well reasoned."  (*Id.*)  Dr. Paul also recited an

incident in February of 1985 wherein the Defendant wrote him a letter, ostensibly in an attempt to get Dr. Paul to intervene with prison authorities on her behalf regarding matters of prison discipline. (Ex. A-872-873.) Dr. Paul noted that "[a]t this period of time, she was clearly being manipulative and did not seem to need me for my customary function." (Ex. A-873.)

Dr. Paul provided a follow-up report to the court on September 3, 1987. In that report, Dr. Paul noted that the Defendant had been cooperative, for the most part, during his 64 visits with her, but at times she had displayed psychotic features – such as pressured speech and flight of ideas – compatible with her diagnosis of Bipolar Affective Disorder, Circular Type. For most of this time the Defendant had been on medication which, according to Dr. Paul, did not make a significant difference in her presentation but did to some degree control her overt psychotic features. (Ex. A-875.) She had been on Lithium Carbonate from July of 1985 until April of 1987 when, due to the fact that the Defendant was being placed on a diuretic, her continued use of Lithium became hazardous and it was therefore discontinued. (Ex. A-875.)

Throughout his associations with the Defendant, Dr. Paul observed her abnormal suspiciousness of others as a "constant factor." (Ex. A-875.) He described each session as characteristically beginning with the Defendant's critique of her attorneys, whom she would portray as uncaring, unwilling to visit her or take her phone calls, dishonest, and hostile. (Ex. A-876.) According to the Defendant, her attorneys had accepted a substantial sum of money from her parents and wished to place her in a mental hospital so that they could keep the money and wash their hands of her. (*Id.*) Dr. Paul also noted reports from the Defendant's attorney, Mr. Ambrose, that the Defendant's refusal to answer some of their questions was making the construction of an adequate legal defense virtually impossible. (*Id.*) Accordingly, on July 28, 1987, Dr. Paul sat in on a meeting between the Defendant and her defense team. He documented his observations as follows:

The patient began this phase of the proceedings by venting great hostility toward her attorneys, calling them liars who want her in a mental hospital and stating that she didn't trust them, but stayed with them only because they have her money. This hostility tended to subside as the proceedings progressed, and she apparently surprised them by answering questions she had refused to answer in previous conferences. Her explanations tended to be complex, circuitous and rather confusing. She seemed to have no worries at all about her own credibility in court.

One of her attorneys pointed out that she had given false answers on a document in which the choices were "yes" or "no". [sic] She rationalized having done this on the basis of her perception of the clerk who presented her with the form as being "bored, stupid and non-professional" and that the form itself was "foolish" and, therefore, lying was alright. When attorneys faced her with the fact that she had, indeed, lied, she became angry and defensive and conducted a short monologue, the essence of which was that her attorneys were not much brighter than the clerk and that Dr. Sadoff is a "quack", [sic] who can't understand her situation, who lies at her attorneys' request, and whose professional qualifications are irrelevant.

When specifically questioned about things known to have happened, she tended to ramble and her logic was weak.

She displayed no pressure of speech. She was markedly paranoid, but not globally so. She was neither euphoric nor delusional. Her judgment was grossly defective.

(Ex. A-877.)

Dr. Paul concluded that, while the Defendant suffered from Bipolar Affective Disorder, Circular Type, she was neither depressed nor grossly psychotic. He cautioned, however, that "this only pertains when the pressure is minimal." (Ex. A-877.) He noted that the Defendant "has the typical manic's capacity for terribly poor judgment" and added that her "literality" hinders her ability to defend herself in court by causing her to freely state such things as her belief in astrology or voodoo without any understanding of the impression that might leave with a jury. (*Id.*) He closed by opining that, based on her illness and problems with self control and judgment, she was "quite incompetent" to stand trial and did not possess any substantial ability to attain competence in the foreseeable future. (Ex. A-878.)

Upon Dr. Paul's request, the trial court also ordered the Defendant to undergo psychological testing by Ted Urban, D.Ed. (Ex. A-881; E-940, 980.) Dr. Urban examined the Defendant on two occasions in August of 1987. As part of his examination, Dr. Urban conducted a clinical interview and history with the Defendant,

obtained a thorough history from Dr. Paul and Mr. Ambrose, and administered numerous psychological tests.

In his August 31, 1987 report to the trial court, Dr. Urban found that all the signs of hypomanic thinking and behavior were still strongly present in the Defendant. (Ex. A-884.) He observed in the Defendant an extreme flight of ideas with much tangential and irrelevant thinking. He noted that the Defendant's "ideas accelerate quickly once her guard is reduced by any stimuli or reference that causes feeling or emotion" and, once triggered, these emotions literally run away with her, causing her to quickly lose all sense of meaning or perspective and resulting in a "complete breakdown of rational thought to a point where she is totally lost and unable to get to the goal of thinking." (*Id*.) He noted that the Defendant's paranoid delusions were powerful and constantly reinforced and collided with her hypomanic thinking, with the result that even relatively innocuous subjects would become distorted in her mind. (*Id*.) Test results suggested to Dr. Urban that the Defendant is "highly prone to fake poorly in regular efforts to manipulate and influence others to her own selfish needs." (*Id*.) In fact, Dr. Urban found these efforts so poorly disguised as to be easily recognizable and confusing to other people. (*Id*.) Though the Defendant was not felt to be psychotic at the time of her evaluation, Dr. Urban felt that a psychotic loss of control in her perceptions could be easily triggered due to the extreme degree of her internal conflicts. Thus, he found "constant signs of potential for decompensation into psychosis with minimal pressures or when her hypomanic thoughts and feelings accelerate and reality boundaries are blurred." (*Id*.) He described her as "capable of [presenting] a good social facade and making a good initial impression," but predicted that "the manipulative, psychopathic features will surface in any longer interactions or under the slightest stress." (*Id*.)

Based on his evaluation, Dr. Urban diagnosed the Defendant with Bipolar Affective Disorder, Hypomanic Phase (Axis I) and Cyclothymic Personality Disorder (Axis II). (Ex. A-885.) He concluded that the Defendant continued to be severely impaired by her emotional disorder and that her impairment permeated all areas of

13

emotional controls as well as her capacity to function or relate adequately to others. "Closer, more meaningful or intense emotional contacts," he felt, would "result in greater distortion to her reactions." (*Id*.) Moreover, "[i]f circumstances do not meet with her momentary, fleeting emotional need, her responses work to produce constant distortion." (*Id*.) Dr. Urban concluded that the Defendant was incapable of providing any objective account of her behavior and lacking in any ability to participate rationally and competently in her own defense. (*Id*.)

On September 4, 1987, the trial court held a hearing to determine the Defendant's competence to stand trial on charges of murder in the death of Robert Thomas. (Ex. E.) Both Dr. Paul and Dr. Urban testified at this hearing.

During his direct examination, Dr. Paul reaffirmed Defendant's diagnosis of Bipolar Affective Disorder. (Ex. E-955.) He testified that, while the Defendant may not have been grossly psychotic in terms of being either manic or openly depressed during his evaluations, "that picture could change with startling repetivity if she were put under enough pressure." He explained that a vigorous cross-examination would probably produce that pressure. (Ex. E-957.) Dr. Paul further related that, when he observed the Defendant during her meeting with her attorneys, the stress of that meeting caused her judgment to become impaired due to her mental illness. (*Id*.) He agreed that the application of stress to the Defendant, in light of her illness, would cause an increase of impaired judgment and inability to stay on track. (Ex. E-958.) Dr. Paul testified that the Defendant has limited insight into the nature, extent, and severity of her illness and, while she may sincerely believe that she can control herself and her symptoms, she is in fact unable to do so. (Ex. E-960.)

Based upon his observations of the Defendant on more than 64 occasions, his observations of her interactions with her attorneys, his consultation with Dr. Urban and a review of Dr. Urban's findings, Dr. Paul opined that the Defendant could not rationally and meaningfully interact with counsel in the preparation of her case and in giving testimony at trial. (Ex. E-960-961.) Considering the level of hostility which the

Defendant had shown toward her lawyers, Dr. Paul doubted that she would be able to cooperate with them. (Ex. E-976.) He noted that the Defendant would likely be amenable to an attorney who would say nice things to her and avoid the hard aspects of trial preparation. (Ex. E-976-977.) As Dr. Paul explained, "[s]he wants to go to trial. If an attorney were to step forward right now and say, 'We'll do it, we'll have you in trial next Wednesday,' I'm sure you would be welcomed with open arms," even though to do so would be against her best interests. (Ex. E-977.)

Dr. Urban similarly opined at the competency hearing that, as a direct result of her mental illness, the Defendant was totally unable to rationally and meaningfully interact with her counsel and provide meaningful testimony in defense of her case. (Ex. E-985, E-992.) Dr. Urban described her psychological problems as "extremely severe" and her mental profile as "a very complicated picture" involving the confluence of three separate disorders. (Ex. E-985.) According to Dr. Urban, the Defendant suffers primarily from bipolar disorder, but she also has an underlying personality disorder as well as "very disturbing paranoid kinds of ideation" that constantly interfere with her capacity to perceive the motives of other people. (Ex. E-986.) Dr. Urban explained:

> Assuming we were able to successfully control the manic-depressive form of her illness, ... we would still have to contend with the personality disorder which in itself has an awful lot to do with the way that she forms relationships and how meaningful those relationships are and in terms of constant conflict that she experiences internally. Assuming that that was dealt with, we would still be left with the paranoia that is of great concern to her.

(Ex. E-986-987.) Dr. Urban further explained that – once emotions are triggered in the Defendant – even in a non-stressful situation, this has very disruptive effects on her capacity to remain insightful and rational and thus to provide any kind of suitable judgment. (Ex. E-991.)

Following the September 4, 1987 competency hearing, the trial judge found the Defendant not competent to stand trial, but he also found a substantial probability that she could attain competency in the foreseeable future with direct and continuing

psychiatric care.  He therefore ordered that the Defendant be placed at Mayview State Hospital in Bridgeville, Pennsylvania for continued treatment, and he directed that the court be given periodic reports on her progress.  (Ex. E-1043-1044; Ex. 16, 17.)

*Mayview State Hospital Records*

Defendant was committed to the Forensic Unit of Mayview State Hospital on September 17, 1987.  (Ex. A-540.)  Upon her arrival, psychological and psychiatric evaluations were performed by Howard P. Friday, Ph.D., and Duncan Campbell, M.D., respectively.  (Ex. A-538-541.)  Initially, the Defendant presented as pleasant, cooperative and appropriate in her responsiveness and behavior, with clear and coherent speech and no evidence of pressured speech or altered psychomotor activity. (Ex. A-541.)  Dr. Friday observed that, during this initial assessment, the Defendant was working very hard to present herself in the best possible light.  (Ex. A-539.)  Dr. Campbell's initial diagnosis was Bipolar Affective Disorder, Mixed Type in Remission and Mixed Personality Disorder.  (Ex. A-541.)

Although the Defendant appeared to be doing well during her first few weeks at Mayview, her behavior soon deteriorated.  Shortly following her admission she complained of side effects from her medication and requested that it be reduced.  (Ex. 17.)  A few days after her medication was discontinued at the end of September, she became agitated and irritable.  (*Id.*)  A visit with her parents on September 30, 1987 went badly, ending in verbal altercations.  (Ex. 16.)  Thereafter, the Defendant was frequently observed on the telephone using profane language toward her mother.  (*Id.*) She became argumentative, demanding and markedly obsessive-compulsive about her appearance.  (Ex. 16, 17.)  She required significant supervision and redirection to comply with rules and regulations and became sorely resentful of this.  (*Id.*)  At the beginning of November she became increasingly grandiose and paranoid and her reasoning and judgment became markedly impaired.  (Ex. 17.)  She began to display rambling and pressured speech as well as loosened associations.  (*Id.*)  At this point,

16

Drs. Friday and Campbell felt that Defendant did indeed manifest the symptoms of bipolar disorder, mixed type and that, while competent upon her arrival to Mayview, she was no longer so. (*Id*.)

At the beginning of November, 1987, the Defendant was placed on Tegretol and, shortly thereafter, was started on a highly structured and rigid program to address her obsessive-compulsive behavior and to help her become more compliant with ward regulations and routines. (Ex. 17.) She was also involved in regular individual and group psychotherapy and, on this routine, she did improve. (*Id*.) However, the Tegretol was discontinued in late December due to severe side-effects. Thereafter, the Defendant continued with her behavioral programs and individual therapy and it was felt that her controls and behavior remained generally appropriate. In January of 1988, the Defendant refused all medications, stating that all previous medications had resulted in unbearable side effects. (*Id*.)

On January 29, 1988 Drs. Campbell and Friday reported that:

For the several weeks that have followed discontinuance of medication, she exercised good controls and was essentially cooperative and appropriate in her interactions. She has remained involved in her individual and group therapy as well as a variety of other activities here. She has had an opportunity to discuss her conflicts with the family, her attorneys and other important individuals in her life and she appears to have developed some degree of insight into the part she has played in these difficulties.

It is felt that at this juncture, approximately six weeks after all medication has been discontinued, the patient is now competent to be tried and should be returned to Erie County Prison.

(Ex. 17.) Their final diagnosis was Bipolar Affective Disorder, mixed type, in remission and Mixed personality disorder with paranoid and narcissistic features. (*Id*.) In their Summary and Evaluation for the Court, Drs. Campbell and Friday noted the "unfortunate" fact that the Defendant could not take Tegretol or Lithium due to allergic reactions inasmuch as these medication appeared to have "some calming affect." [sic]. (*Id*.) They felt "certain that [the Defendant] will under stress have increasing problems with control and mood," and advised that, "in spite of her concerns about side effects

17

from other psychotropic agents, she may require these at times to control symptoms of her Bipolar Disorder." (*Id*.) "Undoubtedly," they wrote, "she may also require them periodically under the normal course of this illness." (*Id*.) Drs. Campbell and Friday concluded that the Defendant's prognosis "certainly must be guarded" and predicted that "[t]his illness will manifest itself again." (*Id*.)

Following her release from Mayview State Hospital on February 18, 1988, the Defendant was returned to the Erie County Jail to await trial on charges of murder. (Ex. A-545.) Before her trial commenced, she was again placed on medication. (Tr. 5/22/08 [71] at 178-79.) She was eventually tried in May or June of 1988 and acquitted. (*Id*. at p. 167.)

*Defendant's Post-Acquittal Treatment*

Following her acquittal in the Robert Thomas case, Defendant returned to treatment at St. Vincent, where she was initially seen by Dr. Kripa Singh in October of 1989 in relation to her renewal of SSI disability benefits. (Ex. A-4075-4080.) On mental status examination, it was noted that the Defendant engaged in non-stop speech. Though she was cooperative, Dr. Singh found her "not exactly accessible because of the excessive flightiness." (Ex. A-4077.) In terms of her mood and affect, Dr. Singh felt the Defendant showed some manic and hypermanic symptoms, including excessive pressure of speech, some relative overactivity, flighty ideas, an inability to reach goals and a grandiose self-concept. (*Id*.) He diagnosed "Bipolar affective disorder - Mixed - Rapid cycling" and noted that "these rapid cycling bipolar affective disorders are rather difficult to treat." (Ex. A-4079.) He considered her prognosis poor "given the chronicity and non-compliance that she shows." (*Id*.)

Dr. Singh continued to see the Defendant on a regular, out-patient basis between January of 1991 and January of 1999. (Ex. A-772-797; A-798.) His treatment notes reflect that, while the Defendant tended to display hypomanic symptoms at times (and even slight mania) – including pressured speech, flight of ideas and incessant

talking, she managed to function satisfactorily on a regimen of Prozac and BuSpar.[6] (A-774, 775, 778, 781, 783, 784, 786, 787, 789, 793.)

In October of 1999, the Defendant began treating with Asha S. Deshpande, M.D. (Ex. A-798-99.) During an October 18, 1999 examination, Dr. Deshpande observed that the Defendant was dressed very sloppily, had poor eye contact, and displayed flat affect. Her speech was fast, pressured, very tangential, and disorganized and, at times, she exhibited flight of ideas. Dr. Deshpande diagnosed "bipolar disorder mixed with intact cognition." (Ex. A-798.) She continued the Defendant on Prozac and BuSpar, but added Klonopin to address the Defendant's complaints of insomnia. (Ex. A-799.)

Defendant continued with Dr. Deshpande through May of 2003. (Ex. A-800-812.) Notes from a November 15, 1999 evaluation indicate that the Defendant's diagnosis had somehow changed and she now "carrie[d] the diagnosis of schizoaffective disorder."[7] (Ex. A-800.) During an April 17, 2000 examination, Defendant appeared to be grossly disorganized and was hard to understand because she "had flight of ideas going all over the place." (Ex. A-801.) At that point, Dr. Deshpande added Risperdal to the Defendant's regimen to treat her disorganized thinking and paranoid ideations. (*Id*.) The following month, Synthroid was added to address the Defendant's rapid mood swings. (Ex. A-802.) Defendant generally remained stable on her medication for the next year. (Ex. A-803-805.) Beginning in November of 2000, she began to express concerns with her father's behavior, complaining that he was acting irrationally and giving away his money to other people.

---

[6] Dr. Singh's notes also document his puzzlement that Prozac would produce such beneficial effects for the Defendant, given the fact that it is an anti-depressant and the Defendant tended toward a hypomanic state. (Ex. A-786, 792, 795, 796.)

[7] There is no explanation in the medical records as to why this change in the Defendant's diagnosis occurred. (Ex. A-800.) At the competency hearing, Dr. Sadoff testified that a diagnosis of schizoaffective disorder is used when a patient is exhibiting symptoms of both schizophrenia and some type of affective disorder, such as bipolar disorder. (Tr. 5/21/08 [72] at 133, 135-36.)

(Ex. A-804.)  These concerns continued into April of 2003, when Dr. Deshpande increased the Defendant's medication because of the fact that she seemed very angry, upset and delusional.  (Ex. A-811.)  Final treatment notes from May 21, 2003 indicated that the Defendant was very circumstantial and tangential in her thinking.  Dr. Deshpande found it hard to redirect her to her original thoughts and she "kept talking, not making any sense."  (Ex. A-812.)  Defendant was advised to keep taking her medications, which at that point included Wellbutrin, BuSpar, Stelazine, Klonopin, and Synthroid.  (*Id*.)

*The James Roden Homicide*

In September of 2003, the Defendant was arrested on charges of homicide in connection with the shooting death of her then-boyfriend, James Roden.  Following her arrest, it was discovered that her house was littered with perishable items and trash, including food, animal feces, and garbage bags filled with items.  Many of these items were found to be infested with fleas and other vermin.  (Ex. C.)  Indeed, a city housing inspector declared the Defendant's house to be totally uninhabitable.  (*Id*.)

In connection with the Roden proceedings, Defendant was sent to Mayview State Hospital on April 1, 2004 for purposes of undergoing a competency evaluation. (Ex. A-556, 813.)  The following day, Laszlo Petras, M.D., performed an initial psychiatric assessment.  (Ex. A-556-559.)  In interviewing the Defendant, Dr. Petras observed that most of the Defendant's information showed some delusional thoughts, projection, and distortion.  He documented, for example, her claim ("which does not appear to be correct") that she had a firm and was managing some doctors.  (Ex. A-556.)  He concluded that she showed signs and symptoms of a Psychotic Disorder and initially diagnosed Delusional Disorder, noting, however, that Bipolar Affective Disorder, Manic Episode, Schizoaffective Disorder, and Paranoid Schizophrenia could not be ruled out.  (Ex. A-558.)  He found signs of mania and poor judgment and proposed that the Defendant be administered a mood stabilizer to prevent her from going into manic

state.  (Ex. A-559.)  He also proposed psychological testing to "rule out underlying maladaptive personality traits" and to "further aid in differential diagnosis."  (*Id*.)

The Defendant was discharged from Mayview on September 2, 2004 for further proceedings in the Roden case.  (Ex. A-566.)  In his summary report, dated August 19, 2004, Dr. Petras concluded that the Defendant had achieved maximum benefit from her hospitalization and that there was no reason for further inpatient care.  (Ex. A-565.)  He noted that the Defendant had come to Mayview taking the anti-depressant Wellbutrin and, without any antipsychotic medication or mood stabilizer, her signs and symptoms of mania had appeared to increase.  (Ex. A-563.)  He reported that, upon being started on Geodon, the Defendant started showing some improvement.  (*Id*.)  She had been participating in group activities and therapeutic modalities, despite some initial resistance, including "legal issues group and social dynamics group."  (Ex. A-563-564.)  Though she had initially been "somewhat disruptive with verbal altercations," she had more recently been able to participate more attentively and respectfully.  (Ex. A-564.)  Dr. Petras further reported that the Defendant's mental status was alert, oriented and cooperative, she had no formal thought disorder and no longer exhibited pressured speech or flight of ideas.  His revised diagnosis at that time was Bipolar Disorder, Manic Phase, in Partial Remission.  (*Id*.)  He felt that the Defendant's short-term prognosis was fair "as she had good response to medication after trials with different antipsychotic medication and mood stabilizers."  (Ex. A-565.)  However, he assigned a poor long-term prognosis in light of her historic noncompliance with medications and treatment while in the community.  He noted that, while the Defendant clearly understood the nature and seriousness of the crime, her options under the legal system, and the need to cooperate and work with her lawyer to assist in her own defense, she still had not achieved a full understanding of the seriousness of her mental illness and its consequences.  (*Id*.)  In particular, Dr. Petras felt that the Defendant still had a tendency to use defense mechanisms – such as denial, projection, and rationalization – which were self-defeating and which interfered with her ability to fully understand her

21

need for treatment and the seriousness of the consequences when she does not comply with mental health treatment in the community. (*Id*.)

On September 8, 2004, the trial court held a competency hearing at which Dr. Petras testified, in accordance with his written reports, that the Defendant was presently competent to stand trial on her criminal charges and to assist counsel in her own defense. (Ex. A-1610-1612, 1624-1625.) He cautioned, however, that the Defendant's failure to comply with her medication regimen could cause her to regress back into a manic phase within a very short period of time. (Ex. A-1612-1613, 1625.)

In January of 2005, the Defendant pleaded guilty but mentally ill to the third-degree murder of Mr. Roden. She was sentenced to serve 7 to 20 years in prison.

Following her sentencing, Defendant was readmitted to Mayview State Hospital to receive treatment and obtain recommendations for her care while in state prison. (Ex. A-577, 586.) She remained at Mayview from January 27 to March 16, 2005, during which time she was followed by Dr. Petras. (Ex. A-577-580, 586-587.)

In his discharge summary, Dr. Petras wrote that the Defendant's main difficulty was her consistent lack of insight into her illness and lack of good judgment. (Ex. A-586.) Upon admission, she had exhibited signs and symptoms of hypomania. (Ex. A-577.) Though she initially refused medications, she eventually accepted Abilify because it was the only medication that she had not tried and because she did not perceive any significant side effects. (Ex. A-586.) She began going to group sessions and interacting more appropriately with others. She no longer insulted her peers or provoked them to fight. (*Id*.) At the time of her discharge, she still exhibited some hypomania but Dr. Petras felt that she had achieved the maximum benefit from her hospitalization. (*Id*.) Defendant's diagnosis upon discharge remained Bipolar Affective Disorder, Manic. (Ex. A-587.) Dr. Petras assigned her a poor prognosis due to her chronic noncompliance, lack of insight and poor judgment. He cautioned that, without supervision, she will most likely stop her medication and regress to the previous psychotic state. However, he felt that, with improvement on medication and ongoing

educational psychotherapy, the Defendant would have control of her manic phase.  (*Id.*)

*Defendant's Records from SCI Muncy*

Since March of 2005, the Defendant has been serving her state prison sentence at the State Correctional Institution in Muncy, Pennsylvania.  Records spanning a period of at least two and one-half years suggest that she has functioned reasonably well in an institutional setting.  She has consistently been housed within the general population of inmates.  Her diagnosis of bipolar disorder is documented in the prison health records (Ex. A-675-679, 4982, 4984, 4985), although there are also some records suggesting that mental health care providers at Muncy have considered the possibility that the Defendant may, in fact, have a personality disorder.  (Ex. 20, 21, 22, Ex. A-4984.)  While in prison, the Defendant has had no infractions warranting discipline.  However, the records suggest that, on at least two occasions, she became belligerent with prison personnel to the point that she had to be escorted by guards from the sick call area.  (Ex. A-4995, 4996.)

*Recent Competency Evaluations*

In connection with the instant proceedings, Defendant has been evaluated by two different experts in the mental health profession.

1.  <u>Robert L. Sadoff, M.D.</u>

Dr. Robert Sadoff examined the Defendant for three hours on June 19, 2007 and again for three hours on October 22, 2007 at the request of Defendant's present counsel, Thomas W. Patton, Esq..  In his report to Mr. Patton, Dr. Sadoff related that the Defendant appeared to be manic during his mental status examination.  (Sadoff Rep., 1/15/08, at p. 4.)  He found her speech to be pressured and voluminous and noted that it was difficult to get her to stop talking and to focus on questions posed to her.  She exhibited paranoid ideation, which was sometimes focused on her attorney.

23

(*Id*.)  With respect to her competency, Dr. Sadoff found that the Defendant "clearly knows who the principals are in the courtroom and their functions" (*Id*. at p. 2), but he opined that she is not able to focus in a rational manner when working with her attorney.  (*Id*. at p. 4.)  He noted, that, on both occasions when he examined the Defendant, she interspersed comments into her personal history to the effect that she cannot trust or work with her attorney, that she cannot confide in him, and/or that she would like to replace him.  (*Id*. at pp. 2-3.)  Further, "[b]ecause she feels she is extremely bright, she feels she can run her case and make decisions without listening to counsel.  She believes she knows what is right and what she needs for her defense." (*Id*. at p. 4.)  She has often gone against the advice of her counsel by communicating with the newspapers about her case.  (*Id*. at p. 3.)  Dr. Sadoff observed that the Defendant was not taking medication and felt that her manic symptoms were quite apparent.  (*Id*. at p. 4)  He concluded that, "[a]s long as she continues to be manic and depressed, she does not think rationally and cannot work in a rational manner with her attorney in order to prepare a rational defense."  (*Id*.)  Accordingly, he recommended that the Defendant be hospitalized for a trial of medication to address her bipolar disorder so that she can regain her competency to stand trial.  (*Id*.)

2.     William J. Ryan, Ph.D.

On March 5, 2008, the Defendant was admitted to the Metropolitan Correctional Center (MCC) in New York City pursuant to court order requiring that the Defendant undergo a psychological assessment to determine her competency to stand trial on the present charges.  During the 30-day period during which Defendant remained at MCC, she was evaluated on at least six different occasions by William J. Ryan, Ph.D.  (Ex. 2, p. 9.)

In his report to the Court, dated April 15, 2008, Dr. Ryan reviewed the Defendant's current mental status.  He noted that her demeanor was generally uncooperative throughout the evaluation process, though she showed improvement in

subsequent interviews. Her speech initially appeared at times to be illogical, irrelevant and excessive in rate and volume, and at times her thinking appeared scattered and tangential. Ultimately, it appeared to Dr. Ryan that this was her response to dealing with perceived adversaries. She was fully oriented and had little trouble with attention, though she often chose to follow her own agenda rather than answer the evaluator's questions. Her insight and judgment were considered to be poor. (Ex. 2, p. 8.)

On at least one occasion, the Defendant was cooperative and friendly with Dr. Ryan. When asked about this change in attitude, the Defendant explained her previous failure to cooperate as resulting from stress related to her airplane trip to MCC. She acknowledged her moodiness and explained that she experiences panic attacks and needed a few days to relax after arriving. During some subsequent interviews, she was again angry and belligerent toward Dr. Ryan. He described the Defendant's often angry, belligerent, and hyper-talkative demeanor as follows:

> She demonstrated immense anger towards the evaluators and the evaluation. Ms. Armstrong got increasingly angry when the evaluator tried to redirect her during interviews. When not redirected, Ms. Armstrong launched into long winded diatribes until she was interrupted. For example, when Ms. Armstrong was asked about specific plans regarding to her defense, she stated, "I'm worried. I can't fight the federal government. Who am I? It's insane to blow someone up in public. I'm a low profile person. This crime is too blatant, insane, and outrageous. I have problems with abusive boyfriends. That's different. I only assault when assaulted. I don't like violence or to see suffering. I'm not sadistic. I turned myself into the police. Now they want to crucify me. I sued Geraldo for slander and libel because he did a show about me and was trying to film me at prison with a telegraphic lens. They made a documentary about me in England and Scotland and a feature film. They did my story on Inside Edition during Sweeps Week. I want to help other people so they don't have a situation like this happen. I didn't like my father, but I never threatened him."

(Ex. 2, p. 9.) Dr. Ryan documented that the Defendant has unscrupulous methods of dealing with others and cited an example where she used underhanded means to obtain an uncompleted written psychological test and then tore it up. At times she would try to bully her evaluators and she exhibited distrust toward Dr. Ryan and toward psychiatric medication in general. (Ex. 2, p. 9.) At times her beliefs appeared grandiose

as when describing her current legal case.  (*Id*. at p. 10.)

Clinically, Dr. Ryan felt that the Defendant presented with Posttraumatic Stress Disorder relative to her long history of physical abuse and Personality Disorder Not Otherwise Specified (NOS) with borderline, paranoid and narcissistic traits.  (Ex. 2, p. 10.)  According to Dr. Ryan, the latter disorder is categorized in the DSM-IV-TR by the presence of features of more than one specific personality disorder that do not meet the full criteria for any one particular personality disorder, but that together cause clinically significant distress or impairment in one or more important areas of functioning.  (*Id*.)  In Dr. Ryan's opinion, the Defendant presented with a number of characteristics which pertain to a variety of personality disorders:

> She was routinely skeptical about the intentions of the evaluator, and reported beliefs regarding the government's want to prosecute her as a result of past altercations she had with police.  This pervasive pattern of skepticism is often associated with Paranoid Personality Disorder.  Ms. Armstrong has also historically shown a pattern of unstable and tumultuous interpersonal relationships, impulsivity, and unstable mood, and her attorney has experienced Ms. Armstrong this way.  These are characteristics often associated with Borderline Personality Disorder. Finally, Ms. Armstrong was grandiose, harbored a sense of entitlement, exploitative, and arrogant.  These are characteristics often associated with Narcissistic Personality Disorder.

(Ex. 2, pp. 10-11.)

The impact of these personality disorders, Dr. Ryan opined, probably contributed to Ms. Armstrong being seen as bipolar.  He cited numerous examples of her impulsive behavior, which he explained are self-defeating and typical of what is seen in these personality disorders.  (Ex. 2, p. 11.)  He observed that past trials of medication had not consistently restored her to competency, and he concluded that the Defendant's limitations in functioning are directly attributable to personality disorders rather than a mental illness under the law.  (*Id*.)

With respect to the Defendant's understanding of the charges and proceedings against her, Dr. Ryan outlined the Defendant's answers to various questions which seemed to establish a satisfactory degree of understanding on her part.  (Ex. 2, p. 11.)

With respect to the Defendant's ability to assist counsel in the defense of her case, Dr.

Ryan essentially concluded that any limitations which the Defendant may have in this

regard are the result of her personality disorders, not bipolar disorder:

> In Ms. Armstrong's case, the personality characteristics are counterproductive to building rapport with an attorney. This may explain why many efforts to restore her to Competency appear to fail, since personality disorders are not easily treatable, nor are they typically grounds for incompetence. Ms. Armstrong often did not respond to questions, but pressed her own issues. Ms. Armstrong often answers in an irrelevant manner due to being defensive and single-minded, rather than giving the irrelevant responses which signal thought disorder or Bipolar Disorder. The perseveration results from her effort to hammer her argument at perceived adversaries. When it is apparent to her that others are not following her line of thought, Ms. Armstrong's low frustration tolerance acts to instigate drastic mood swings, and her grandiosity acts to deafen her to the advice and opinions of those around her. It is a testament to her contact with reality and interpersonal relatedness that she often complains: "You're not listening to me." Consequently, even when Ms. Armstrong is fully medicated, she continues to be an extremely difficult client for attorney's [sic] to work with. This suggests Ms. Armstrong's personality disorder may cause her to be incorrectly seen as not competent to stand trial. Ms. Armstrong also admitted to evaluators she was trying to obtain disability benefits during the time of some of her evaluations and was thus exaggerating her illness.

(Ex. 2, p. 13.)

In sum, Dr. Ryan concluded that the Defendant does not appear to have a

serious mental illness within the meaning of the competency statute. (Ex. 2, p. 14.) He

observed that she has not been medicated in three years, and he considered it unlikely

that she could have remained stable without medication for this length of time if she

actually did have a serious mental illness. (*Id.*) While he acknowledged that the

Defendant's personality makes her difficult to work with, he noted that the competency

statute specifies that any finding of non-competence must be the result of a serious

mental disease or defect and, "because a personality disorder is not a serious mental

illness, it is rarely seen to contribute to a finding of Not Competent." (*Id.*) He

concluded:

> Ms. Armstrong is very intelligent and has a sufficient factual understanding of her case and courtroom terminology and roles. There was also a lengthy interview in which Ms. Armstrong responded to every question directly, and gave high level responses associated with Competency. Her personality disorder manifests in interpersonal

difficulties and tumultuous relationships, and in her belligerence and argumentative presentation. However, Ms. Armstrong was calculating and unscrupulous on more than one occasion, also typical of personality disorders. She was also manipulative, demanding, and intrusively advocated for her own needs and desires. She was typically unwilling to convenience anyone else, but repeatedly sought conveniences for herself. She was extremely rigid, unwilling to negotiate, forcefully insisting her demands be met without offering any cooperation in exchange. Her statement that she responds appropriately "when I feel like it" appears quite credible. Further, this conduct was reduced to very manageable proportions when she no longer viewed this evaluator as an adversary.

(Ex. 2, p. 14.)

Though Dr. Ryan viewed the Defendant as "present[ing] with a number of characterological issues which appear to occasionally limit her ability to communicate coherently about her case," he reiterated that character traits and a personality disorder are not the result of mental disease.[8] (*Id*.) With regard to the Defendant's competency to stand trial, Dr. Ryan concluded that the Defendant is indeed competent inasmuch as she "possesses a rational and factual understanding of the proceedings against her, has the capacity to assist legal counsel in her defense, and [ ] can rationally make decisions regarding legal strategy." (*Id*.)

*Testimony from the Competency Hearing*

Commencing on May 21, 2008, this Court held a two-day evidentiary hearing on the issue of the Defendant's competency. At that hearing, the Court received expert testimony from Drs. Sadoff and Ryan, who expressed their opinions as to the Defendant's mental competence. The Court also heard testimony from several individuals employed at SCI-Muncy as well as from Laszlo Petras, M.D., who treated the Defendant during her stay at Mayview State Hospital in 2004 and 2005, and Mr. Ambrose, Defendant's former counsel in the Thomas homicide case.

---

[8] Dr. Ryan did conclude that the Defendant currently presents with a "Mental Disease" under the law, i.e. Posttraumatic Stress Disorder (Ex. 2, p. 15), but he apparently concluded that there was no clinically significant causal relationship between this disease and the Defendant's functional limitations.

1.    The Prosecution's Case

One of the major themes explored at the hearing was the question whether the Defendant's mental condition truly merits the diagnosis of Bipolar Disorder or whether, on the contrary, the more appropriate diagnosis is Personality Disorder NOS.  The prosecution's general theory is that the Defendant was mistakenly diagnosed in the 1980s with bipolar disorder as a result of exaggerating her symptoms in an overt campaign to obtain disability benefits.  Once the Defendant had been diagnosed with bipolar disorder, the government posits, subsequent mental health professionals were too deferential in continuing the diagnosis without adequately and independently documenting the signs and symptoms that would justify such a diagnosis.

In advocating this theory, the government relied largely on opinion testimony from Dr. Ryan.  Dr. Ryan was recognized and accepted by this Court as an expert in the field of forensic psychology.  (Tr., 5/21/08 [72] at pp. 9-10.)

In essence, Dr. Ryan opined that the Defendant's diagnosis of bipolar disorder should be ruled out because, in his view, the Defendant did not present with such a disorder while at MCC, the diagnosis is not adequately supported in the medical history by relevant clinical findings and testing data, and there are too many situational factors that account for the few symptoms that prior mental health care professionals have actually witnessed.  (*See* Tr., 5/21/08 [72] at pp. 29-30, 35-36, 80, 97, 103-09, 111-114, 229-230, 251, 253, 255-57, 273, 281, 284.)  He suggests that the Defendant's bipolar diagnosis should be viewed with some skepticism because, in his opinion, "a lot of these evaluations were done possibly for Ms. Armstrong to get use of psycho legal defenses that she may not have been truly entitled to, or to get a disability that she may not have truly been entitled to" and "even the psychologists did not really give powerful malingering tests to detect whether or not she was faking mental illness."  (*Id*. at p. 273. *See also id.* at p. 274.)

Dr. Ryan testified that one of the essential elements of hypomania and mania is

a disturbance of mood and a change in functioning that is observable by other people –
in other words a marked or uncharacteristic change in the person's typical behavior.
(*See* Tr., 5/21/08 [72] at pp. 56-57.)  Dr. Ryan saw no signs or symptoms exhibited by
the Defendant during her 30-day hospitalization at MCC that he would interpret as
showing mania or hypomania.  (*Id*. at pp. 15-16, 37, 80, 284.)  He believes that the
apparently manic and hypomanic signs and symptoms documented by other evaluators
are better interpreted as attributes of her personality disorder which manifest as the
result of discreet, situational triggers such as encounters with perceived adversaries.
(*Id*. at pp. 30-31, 61, 65-66, 70, 75-76, 97, 251, 253, 255-57, 259-61, 267-68, 281,
284.)

Dr. Ryan explained that, because bipolar disorder involves a chemical
imbalance, treatment is through drugs to correct the imbalance, whereas drug treatment
is not typically indicated for personality disorders.  (Tr., 5/21/08 [72] at pp. 57-58, 64.)
He interprets the Defendant's medical history as showing that she did not consistently
respond well to prescribed medications, such as Lithium Carbonate, and that she
seemed to function well at times without any medication.  (*Id*. at pp. 62-64, 66-68.)  He
interprets the Defendant's prison records as showing that she has functioned in a stable
manner within the general population at Muncy these past several years while off
medication, apparently without having experienced any manic or hypomanic episodes,
and he considers this fact to be at odds with the conclusion that bipolar disorder
renders her incompetent.  (*Id*. at p. 228, 235, 278-79, 282, 284.)  Dr. Ryan further
opined that a hypomanic or manic individual would not be able to control herself during
a full-day court proceeding as the Defendant had done.  (*Id*. at pp. 279-81.)

Thus, Dr. Ryan's basic conclusion remains that the Defendant's limitations in
functioning are attributable to her personality disorder, rather than bipolar disorder, and,
inasmuch as she does not suffer from a serious mental illness, she is not incompetent
to stand trial.  (Tr., 5/21/08 [72] at pp. 70-71, 272-73, 284.)  Though Dr. Ryan does not
believe that the Defendant is bipolar, he alternatively opined that, assuming the

Defendant *is* bipolar, she is in a period of remission and presently competent to stand trial.  (*Id*. at pp. 272-73, 278, 286-87.)

To support its theory that the Defendant has been functioning well while incarcerated at SCI-Muncy, the government presented testimony from three Muncy corrections officers.  Lt. George Sisley testified that the Defendant has been a model inmate during her stay at Muncy and that he has observed no obvious changes in her behavior during her three-year period of incarceration.  (Tr., 5/22/08 [71] at pp. 8-11.)  He recounted that he had spoken with the Defendant immediately prior to her flight to MCC and agreed that her demeanor was "steady" at that time, even though she was not happy about her impending flight.  (*Id*. at pp. 19-20.)

April Ardabell works as a prison guard on the E block area where the Defendant has been housed.  (Tr., 5/22/08 [71] at p. 21.)  She also testified that the Defendant has been a model inmate and has caused no problems.  (*Id*. at pp. 24, 26, 33.)  She works regularly cleaning floors and taking out trash without incident.  (*Id*. at pp. 24-25, 26.)  Ms. Ardabell recounted one incident where the Defendant had been double-slotted to use both the phone and shower at the same time.  According to Ms. Ardabell, when she informed the Defendant about this conflict, the Defendant remarked that she had been informed this was the only time slot left for her and it "wasn't worth arguing over."  (*Id*. at pp. 25-26, 27-28.)  During Ms. Ardabell's 8-month assignment in the Mental Health Unit, the Defendant was never placed there.  (*Id*. at pp. 22-23.)  Ms. Ardabell has never observed the Defendant in what she would consider a manic or hypomanic state and never observed a marked change in her behavior.  (*Id*. at pp. 23, 26.)

Lori Bower testified that, while incarcerated at Muncy, the Defendant performed her job duties religiously and did not "slack."  (Tr., 5/22/08 [71] at pp. 39-40.)  On one occasion when the Defendant was not let out of her cell at the correct time for work detail, she responded in what Ms. Bowers felt was a reasonable fashion despite being frustrated.  (*Id*. at pp. 41-42.)  Ms. Bower has never observed a marked change in the Defendant's demeanor or behavior during her incarceration.  (*Id*. at pp. 42-43.)

31

2.    The Defendant's Case

In support of its case that the Defendant is incompetent to proceed to trial, the defense presented testimony from Dr. Sadoff, a court-recognized expert in the field of forensic psychiatry.  (Tr., 5/21/08 [72] at pp. 16-17.)  Dr. Sadoff's opinion is that the Defendant suffers from bipolar disorder and that, while the Defendant is competent in terms of rationally understanding the nature of her charges and the current proceedings (Tr., 5/21/08 [72] at p. 156, 202-03), her mental illness renders her psychotic to the point that she is incapable of rationally working with her attorney to assist in the defense of her criminal charges.  (*Id*. at p. 122, 124-25, 128, 143-45, 146, 203-05, 208, 210-11, 221.)  He defines psychosis as "the breakdown of the personality not dealing with reality" and notes that bipolar individuals can reach a psychotic state, whereas individuals with personality disorders typically do not do so.  (*Id*. at pp. 128-29.)

Dr. Sadoff bases his diagnosis on many factors, including his own extensive contacts with the Defendant over many years, his personal observations of the Defendant while she was in a manic state, her bizarre behavior in the mid-1980s when her home was found to be filled with rotting cheese and other food stuffs, and treatment reports from Mayview State Hospital which document observations of the Defendant over a long period of time and which suggest that she has benefitted from anti-psychotic medication in the past.  (Tr., 5/21/08 [72] at pp. 125-26.)  He finds the Defendant's conduct in 2003 concerning the inhabitability of her house to be consistent with what occurred in the mid-1980s and further evidence of psychotic thinking.  (*Id*. at pp. 127-28.)  Dr. Sadoff also finds support in the reports of Drs. Urban, Cooke and Petras, each of whom documented their own personal observations of the Defendant's manic and/or hypomanic episodes.  (*Id*. at pp. 131, 132-33.)  Dr. Sadoff explained that, once a manic episode is witnessed, it changes the patient's diagnosis and the affective disorder must then be included as a component in her diagnosis; the patient cannot at that point be diagnosed as having a personality disorder alone.  (*Id*. at pp. 131-33.)

Dr. Sadoff does not view the Defendant's ability to function well at times while off

medication as inconsistent with a diagnosis of bipolar disorder. For example, he does not view the fact that the Defendant was found to be competent in 1988 while off medication as evidence that she was mis-diagnosed with bipolar disorder by Mayview staff. (Tr., 5/21/08 [72] at pp. 149-50, 153.) Dr. Sadoff explained that some bipolar individuals can go for a long time without medication and are fairly effective in their work, but when their lives become disrupted, that stimulus might affect their chemical balance and then they become more symptomatic. Thus, the mere fact that a person does not appear manic or depressed all the time does not mean therefore that they are not bipolar. (*Id*. at p. 150.) Dr. Sadoff noted that, when the Defendant was found competent to stand trial in 1988, her bipolar disorder was felt to be in remission, such that she was not showing the signs of her psychotic illness at that point. (*Id*. at pp. 150, 153, 217-18.) He stated that the length of a person's remission depends on the individual, their chemical imbalance and the situation in which the person is involved. (*Id*. at p. 183.) Dr. Sadoff further explained that, because of the cyclical effect of the illness, individuals with bipolar disorder go through periods of "fair normalcy" where they don't have the acute symptoms of either mania or depression. (*Id*. at p. 153.)

Similarly, Dr. Sadoff does not believe that the Defendant's ability to function well in prison without medication undermines his diagnosis. He explains that, for "somebody who has the kind of looseness that she has in many ways, structure is very important" and she does better in a structured environment. (*Id*. at p. 141.) At the same time, however, it is important that things be structured the way that she wants them to be; she may not do as well, e.g., when a new prison guard comes on and doesn't know her routine. (*Id*.) The fact that she may function well day-to-day in prison merely demonstrates for Dr. Sadoff that, at that point, she is in some control and may be more euthymic[9] than depressed or hypomanic. As Dr. Sadoff explains, "people stabilize at

_____

[9] Dr. Sadoff explains "euthymia" as a period during the bipolar cycling when the individual appears to be fairly normal and is not displaying symptoms of depression or mania. (Tr. 5/21/08 [72] at p. 129.)

different places and under different environments" such that when a particular bipolar individual cycles up or down depends on the environment or the stimulus, whether external or internal. (*Id*. at p. 142.) Thus, "if the external environment is stable and supportive and structured, she can do quite well." (*Id*.)

Dr. Sadoff testified that, while the Defendant can function well in a structured and non-confrontational environment, she decompensates under stress. He explained that, for example, she will react differently if Mr. Patton comes in and begins talking to her about new criminal charges because this is a source of anxiety which will lead to her lessened control over her state of mind. (Tr., 5/21/08 [72] at p. 142.) Dr. Sadoff testified that he personally saw evidence of this when meeting with the Defendant and Mr. Patton. (*Id*.) He finds support for this view in the findings of Drs. Campbell and Friday who treated the Defendant while she was at Mayview State Hospital in 1987. Though they found the Defendant competent to stand trial upon her discharge from Mayview, Drs. Campbell and Friday cautioned that the Defendant may need medication in the future when she comes under the stress of having to deal with her criminal case. (*Id*. at p. 154, 217-18.)

Dr. Sadoff acknowledges that the Defendant has a personality disorder which plays into her behavior. As he explained it, her personality disorder "colors the affect of the manic symptoms that she portrays" when she has paranoid ideations about Mr. Patton. (Tr., 5/21/08 [72] at p. 146. *See id.* at p. 207) He notes that not all manic individuals manifest in the same way and much depends on the person's underlying personality characteristics or personality disorders. (*Id*.) He also testified that when a bipolar individual also has a personality disorder, that personality disorder as well as the individual's metabolism and many different medical factors may impact on that individual's success or failure with a particular medication. (*Id*. at p. 130.)

However, while Dr. Sadoff acknowledges that the Defendant has a personality disorder, he attributes symptoms such as the Defendant's pressured speech, irrelevant thinking, tangential thought, irritability, poor insight, poor judgment, hyper-talkativeness,

illogic, and flight of ideas to her bipolar disorder (or her bipolar disorder in conjunction with her personality disorder), as opposed to her personality disorder alone. (Tr., 5/21/08 [72] at p. 159-62, 195.) Furthermore, he opines that the Defendant's inability to work effectively with Mr. Patton is not merely the result of personality differences or the Defendant's personality disorder alone but is, rather, a result of her bipolar disorder and the psychosis it produces – her failure to perceive things logically based on a break from reality. (*Id*. at pp. 145, 146-47, 155-56, 157-58, 192, 203-05, 207, 210-11, 215, 221.) He explains that Mr. Patton, as the Defendant's counsel, is very important to her and any time she sits down with him to discuss her case it is stressful for her. (*Id*. at pp. 182-83.) He opines that, when the Defendant is irrational with Mr. Patton, she is in a psychotic state where she is delusional and cannot be counseled or re-directed because she persists in her delusions about the case. (*Id*. at pp. 155-56, 156-57, 203-05, 210-11, 215.) He is hopeful that the "basic underpinnings" of her irrational and psychotic behavior can be neutralized with proper medication and that, with medication and psychotherapy, "the prognosis for her becoming competent in the foreseeable future is present." (*Id*. at p. 147.) He acknowledges that, even with proper treatment, the Defendant will still be difficult to work with because of her serious personality disorders – "she would still be demanding and she would still give you a hard time." (*Id*.) However, Dr. Sadoff believes that, if her psychosis can be eliminated through treatment, an attorney could effectively work with her. (*Id*. at pp. 147-48.)

In support of Dr. Sadoff's opinion testimony, the defense presented testimony from Dr. Laszlo Petras, Forensic Director at Mayview State Hospital. (Tr., 5/22/08 [71] at p. 50.) Dr. Petras treated the Defendant during admissions to Mayview State Hospital in 2004 and 2005.

Dr. Petras testified that, upon the Defendant's admission to Mayview in April 2004, he observed in her signs of a psychotic illness but was not yet sure how to characterize her disorder. (Tr., 5/22/08 [71] at p. 55-59, 68.) During the course of her hospitalization, Dr. Petras witnessed the Defendant in a manic state which lasted more

than one week.  (*Id*. at pp. 59-60, 66-67, 78, 95-96, 109.)  He started her on a course of Geodon, an antipsychotic medication, which helped to stabilize her mood.  (*Id*. at pp. 64-65, 67, 70, 153-54.)  After treating the Defendant from April to August, 2004 and based on his observation of the Defendant's manic episode, Dr. Petras changed his diagnosis to bipolar disorder, manic phase, in partial remission.  (*Id*. at 59, 66-67, 95-96.)  After taking Geodon, the Defendant improved to the point that she was considered competent upon discharge.  (*Id.* at pp. 71-72, 153-54.)

In January of 2005, Dr. Petras again treated the Defendant at Mayview, at which time he felt that she was heading back toward a hypomanic state.  (Tr., 5/22/08 [71] at pp. 74-75, 79.)  Dr. Petras again diagnosed the Defendant with bipolar disorder.  (*Id*. at p. 80.)  He testified that he harbors no doubts about the accuracy of this diagnosis because of the fact that the Defendant had previously met all the criteria for bipolar disorder under the diagnostic manual and because her medical history shows that she has been independently diagnosed as bipolar by other clinicians.  (*Id*. at pp. 80-81.)  Dr. Petras considered his observations as to the Defendant's behavior to be consistent not only with the diagnosis of bipolar disorder but also with what other doctors had documented in her past medical records.  (*Id*. at p. 81.)  He saw consistencies in her behavior, the course of her illness, and her response to treatment.  (*Id*.)

Dr. Petras expressed disagreement with Dr. Ryan's opinion that the Defendant suffers only from a personality disorder.  (Tr., 5/22/08 [71] at pp. 85-86, 91-92.)  He "flatly reject[s]" Dr. Ryan's dismissal of the Defendant's prior diagnoses of manic depression.  (*Id*. at p. 92.)  Dr. Petras explained that one manic episode at any point in a person's life is sufficient to establish the diagnosis of bipolar disorder.  (*Id.* at p. 82, 159-60.)  Thereafter, any signs or symptoms consistent with a manic episode must be attributed to the bipolar disorder, as opposed to a personality disorder.  (*Id*. at pp. 85-86, 92.)  Even if the patient thereafter never exhibits another manic episode, the affective disorder must still be included in the person's diagnosis, but it would be considered to be in remission, meaning that the patient is not currently manifesting any

signs or symptoms of the illness.  (*Id*. at pp. 82-83, 92.)  In other words, once a person is diagnosed with bipolar disorder, that diagnosis cannot be negated or ignored and will remain for life.  (*Id*. at p. 82.)  There is no cure for the disease and treatment is therefore geared toward controlling the individual's signs and symptoms.  (*Id*. at pp. 84-85.)

Dr. Petras testified that, in his view, the majority of signs and symptoms documented by Dr. Ryan during Dr. Ryan's clinical evaluation are consistent with a profile of an individual suffering from bipolar disorder.  (*Id*. at p. 93.)  He noted that anti-psychotic or mood stabilizer drugs such as Geodon are generally not indicated for personality disorders except, e.g., for conditions like borderline personality disorder where there is a short-lived acute agitation or psychosis.  (*Id*. at p. 65-66.)

Dr. Petras maintained, however, that, even if he did not believe that the Defendant is manic, he would still be hesitant to diagnose a personality disorder.  (*Id*. at p. 139.)  Under the DSM-IV-TR, a diagnosis of a personality disorder generally requires that the individual exhibit an enduring pattern of inner experience and behavior that deviates markedly from the expectations of his or her culture and the onset of this pattern typically occurs before age 18.  (*Id*. at p. 132-34.)  In addition, however, the DSM requires that this enduring pattern is not better accounted for as a manifestation or consequence of another mental disorder.  (*Id*. at p. 136.)  Dr. Petras believes that, in the Defendant's case, her "enduring pattern" is better explained as a consequence of another mental disorder, i.e., bipolar disorder, and, thus, the Defendant cannot satisfy this essential criterion of the DSM relative to personality disorders.  (*Id*. at pp. 136-38.)

Beyond that, Dr. Petras does not believe that another essential criterion for personality disorders – that the enduring pattern is inflexible and pervasive across a broad range of personal and social situations – is satisfied here.  (Tr., 5/22/08 [71] at p. 138.)  According to Dr. Petras, the essence of a personality disorder is that they are inflexible and the relevant signs and symptoms should consistently manifest regardless of the circumstances.  (*Id*. at pp. 138-39.)  In Dr. Petras' view, the Defendant's mood

has changed dramatically over time; at times she is labile in her affect, other times she was not and the signs and symptoms that might support a diagnosis of personality disorder are not present all the time. (*Id*. at p. 139, 154.) According to Dr. Petras, one with a personality disorder might be labile for days, weeks, months or years, as opposed to being labile for a "couple of months here and there." (*Id*. at p. 140.)

Finally, Dr. Petras finds support for his position in the DMS, which cautions that clinicians "must be cautious in diagnosing Personality Disorders during an episode of a Mood Disorder or an Anxiety Disorder because these conditions may have cross-sectional symptom features that mimic personality traits and may make it more difficult to evaluate retrospectively the individual's long-term patterns of functioning." DSM-IV-TR at p. 688. He agreed that, in accordance with the DSM, when the Defendant displays signs of irritability, talkativeness and illogical thinking during a mood disorder, those signs and symptoms must be attributed to the mood disorder (i.e., bipolar disorder) because there is no basis for assuming that they are being caused by something else. (*Id*. at p. 158.)

Finally, the defense offered testimony from Leonard G. Ambrose, III, Esq., who represented the Defendant in the 1980s in connection with the Robert Thomas homicide. (Tr., 5/22/08 [71] at p. 167.) During the course of his representation, Mr. Ambrose experienced numerous interruptions and delays getting to trial due to the Defendant's mental state. As he explained,

> the reason why it took over three years to get to trial is because she would go away, she would get treated or she would get medicated, she'd come back, and we started to begin preparation for a trial. She would decompensate. It would get to the point that you couldn't have any rational discussion with her. She didn't want to take medication. It was fine if you talked about things unrelated to the case, but you couldn't discuss the case in any meaningful way.

(*Id*. at pp. 168-69.) During the course of the proceedings, the trial court made multiple findings that the Defendant was not capable at various times of rationally interacting with Mr. Ambrose in the preparation and presentation of her defense. (*Id*. at p. 170.)

At times during these proceedings, the Defendant was on psychiatric medication. According to Mr. Ambrose, the medication would curb her "highs" and "unthought her" such that "she could understand the seriousness and the importance of sitting down and trying to have a discussion about the preparation of her case." (*Id*. at p. 173.) Without medication, the Defendant would engage in "non-stop verbiage" for half an hour or more which would have nothing at all to do with her case. Medication would "kind of cut off those talks," such that Mr. Ambrose could have a window within which to communicate with her. (*Id*.) Without medication, Mr. Ambrose found it impossible to discuss witnesses, strategy, "all of the things that a trial lawyer has to consider in putting together a case." (*Id*. at p. 176.) According to Mr. Ambrose,

> As you basically start to hunker down and get into the guts of the case, she would start to disintegrate and come apart. The highs would get higher, the crazy thinking would get crazier, the flight of ideas, the non-stop verbiage would increase, and it would get to the point that it was overly unproductive. Nothing could be accomplished in any meaningful sense.

(*Id*. at p. 180.) With medication, she could "at least have some semblance of a focus" and she was able to get her case tried. (*Id*. at p. 179.)

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

"Fundamental to our adversary system of justice, and perhaps especially of criminal justice, is the prohibition against subjecting to trial a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *United States v. Renfroe*, 825 F.2d 763, 765 (3d Cir. 1987) (citing *Drope v. Mississippi*, 420 U.S. 162 (1975)). Clearly, the conviction of a legally incompetent defendant and the failure to provide adequate procedures to determine competence violate a defendant's constitutional right to a fair trial. *Id*. at 765-66.

The mere fact that a defendant suffers from a mental illness does not mean that the defendant is thereby incompetent to stand trial. *See United States v. Leggett*, 162

39

F.3d 237, 244 (3d Cir. 1998) (citing cases). Rather, "[i]n *Dusky v. United States*, 362 U.S. 402 (1960), the Supreme Court defined the test for competence to stand trial as whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceeding against him." *Renfroe*, 825 F.2d at 766. Congress has since codified this standard in the comprehensive Crime Control Act of 1984, P.L. 98-473, 18 U.S.C. § 4241, which provides, in part, as follows:

> **(d) Determination and disposition.–** If, after [a competency] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General [for hospitalization at a suitable facility]. ...

18 U.S.C. § 4241.

When evaluating a defendant's competency, a district court must consider a number of factors, including "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Leggett*, 162 F.3d at 242 (quoting *Drope*, 420 U.S. at 180). Other factors that may be relevant to the determination "include an attorney's representation about his client's competency ... and a showing of narcotics abuse." *Renfroe*, 825 F.2d at 767 (internal citation omitted). "All of these factors must inform the statutory requirement that a defendant be able to understand the nature and consequences of the proceedings against him and be able to assist properly in his defense." *Id.* Determining a defendant's competency is "often a difficult [question] in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180.

In evaluating the Defendant's competency, I note that both the prosecution and the defense agree that the Defendant adequately comprehends the nature and possible consequences of the proceedings at hand. Therefore, I will not presently concern

40

myself with that inquiry.

Instead, I will focus on the two major issues that have been disputed in these proceedings:  first, whether the Defendant suffers from a "mental disease or defect" within the meaning of the competency statute and, second, whether the Defendant has the mental capacity to assist properly in her own defense.

A.

As I've outlined in some detail, the parties dispute whether the Defendant suffers from bipolar disorder or, alternatively, a personality disorder alone.  This is a significant issue because there is uncontradicted evidence in this record that, while bipolar disorder is considered a serious "mental disease or defect" for purposes of establishing an individual's mental incompetence, a personality disorder is not.  (Tr., 5/21/08 [72] at pp. 30-31, 71, 272, 285-86, Tr. 5/22/08 [71] at pp. 88-89.)  *See also U.S. v. Riggin*, 732 F. Supp. 958, 964 (S.D. Ind. 1990) ("As a general matter, a personality disorder is separate and distinct from a mental disease or defect, and thus, does not ordinarily constitute the basis of incompetency for purposes of a federal criminal trial.") (quoting *United States v. Rosenheimer*, 807 F.2d 107 (7th Cir.1986); *United States v. Fazzini*, 871 F.2d 635 (7th Cir.), cert. denied, 493 U.S. 982 (1989)).

Dr. Petras testified that, under the DSM-IV's multiaxial assessment scheme, conditions diagnosed under Axis I, such as  Bipolar Disorder, Schizophrenia, Schizoaffective Disorder or Major Depression, represent serious mental illnesses that significantly interfere with the individual's functioning in one or more major areas of life, such as work, interpersonal relationships, or self-care.  Axis II diagnoses, on the other hand, are reserved for conditions such as personality disorders, learning disabilities, intellectual dysfunction, and the like.  (Tr. 5/22/08 [71] at p. 88-89.)  Dr. Ryan explained that personality disorders are not technically considered a mental illness and are not typically responsive to medication.  (Tr. 5/21/08 [72] at pp. 30-31.)  While personality disorders can impair a person's ability to function well (by, e.g., making it hard to get

41

along with others or making it hard to hold down a job), they do not in themselves cause clinically significant distress to the person who has them. (Id.) Dr. Sadoff explained that, whereas people with bipolar disorder are psychotic while in the manic or depressive phase, people with personality disorders usually are not. (*Id*. at pp. 128-29, 130.) I accept this testimony as a valid basis for differentiating between major mental illness such as bipolar disorder on the one hand and personality disorders on the other.

1.   The Court credits Dr. Sadoff's opinion that the Defendant suffers from Bipolar Disorder.

        Based on my review of the substantial body of evidence presented during the competency hearing, I credit the opinion of Dr. Sadoff that the Defendant suffers from bipolar disorder – a serious mental illness diagnosed under Axis I of the DSM-IV-TR, which produces episodes of psychotic thinking.

        In crediting Dr. Sadoff's opinion as to the Defendant's proper diagnosis, I note that he is an extremely well credentialed and experienced forensic psychiatrist. He is board certified in psychiatry, legal medicine, forensic psychiatry and added qualifications in forensic psychiatry. (Tr. 5/21/08 [72] at p. 119.) He has published eight books and roughly one hundred journal articles, has testified in numerous cases at various times as an expert for the prosecution, the defense, and the court, and has examined thousands of patients over the course of 45 years. (*Id*. at pp. 117-19.)

        Dr. Sadoff has had access to the Defendant's lengthy medical history and has personally examined her, both in the 1980s and, more recently, on two occasions in 2007 when he observed the Defendant for three hours each time in the presence of her attorney, Mr. Patton. I credit Dr. Sadoff's testimony that, during these recent interviews, he personally witnessed evidence of the Defendant's psychotic thinking resulting from a manic or hypomanic episode.

        I credit Dr. Sadoff's testimony that a correct diagnosis of bipolar disorder must be made based on a "long-term view" of the individual "at different times and under

different circumstances." (Tr., 5/21/08 [72] at pp. 122-23.) I find that the Defendant's lengthy medical history is supportive of Dr. Sadoff's diagnosis.

For example, Dr. Petras testified that, during the Defendant's 2004 hospitalization at Mayview, he personally observed her having a manic episode lasting more than seven days. (Tr., 5/22/08 [71] at pp. 59-60.) Dr. Petras further testified that, after administering antipsychotic medication – namely, Geodon – the Defendant's mood became better stabilized and her competency improved. (*Id.* at pp. 64-65; see *also* Ex. A-563-65.) Eventually, based on the Defendant's manic episode, her response to Geodon, and a review of the medical history, Dr. Petras diagnosed the Defendant with bipolar disorder, manic phase, partial remission. (*Id.* at pp. 66-67.) I credit Dr. Petras' testimony in this regard and find that his diagnosis is not only internally consistent but also supportive of Dr. Sadoff's diagnosis.

I also note that numerous other psychiatrists or psychologists aside from Dr. Petras have diagnosed the Defendant with bipolar disorder during the last thirty years – including Dr. Callahan, Dr. Pandya, Dr. Paul, Dr. Urban, Dr. Cooke, Dr. Campbell, Dr. Friday, and Dr. Singh. I note that Drs. Urban and Cooke also reported having witnessed the Defendant in a hypomanic state. Thus, the Defendant's longitudinal medical history supports a finding that she is bipolar and has had psychotic episodes in the past.

I find that Dr. Sadoff's diagnosis is supported by the fact that other trial judges have, in the course of two separate criminal cases, found the Defendant incompetent to stand trial by reason of a serious mental illness and ordered that the Defendant undergo a period of in-patient treatment to restore competency.

Dr. Sadoff's diagnosis is supported by evidence in the record that the Defendant has obtained at least partial relief from her bipolar symptoms through the administration of antipsychotic medications. As noted, there is evidence from Dr. Petras that her manic symptoms improved while she was on Geodon.

In arguing that the Defendant is not bipolar, the government suggests that the

Defendant has done better while *off* medication and cites as evidence the Summary and Evaluation for Court authored by Drs. Campbell and Friday on January 29, 1988. Drs. Campbell and Friday treated the Defendant at Mayview State Hospital from approximately mid-September of 1987 through January of 1988.  In particular, the government cites a portion of their report which notes that, approximately six weeks after the Defendant's medications had been discontinued, she was felt to have been restored to competency.  (Ex. 17.)

When the entirety of the report is considered in context, however, it does not necessarily support the government's inference that the Defendant does better off medication than on.  Broadly speaking, the report indicates that the Defendant was taking medication upon her arrived at Mayview and initially appeared competent. Shortly after her admission, however, she complained of side effects from her medication and her medication was therefore reduced and discontinued by the end of September.  Soon thereafter, her behavior decompensated to the point that she became bizarre and was felt to be no longer competent.  At this point, Drs. Friday and Campbell felt it was "clear" that the Defendant did indeed suffer from Bipolar Affective Disorder, mixed type.  At the beginning of November, she was placed on Tegretol and started on a highly structured and rigid behavior program, which brought about improvements.  However, she was unable to continue on Tegretol due to severe side effects and that medication was discontinued by the end of December.  For the weeks that followed, she continued with her behavior programs and individual therapy and showed better control.  By the end of January, 1988, it was felt that the Defendant's bipolar disorder was in remission and she was competent to stand trial, though she had been off medication for some six weeks.  Significantly, Drs. Campbell and Friday noted that it was unfortunate the Defendant could not take Tegretol or Lithium inasmuch as they did appear to have a "calming effect" on the Defendant.  (Ex. 17, p. 3.)  They cautioned that it is "certain" that the Defendant will have increased problems with control and mood when under stress and that, despite her concern about taking other

44

psychotropic drugs, she may require them at times to control her bipolar symptoms. (*Id*.) "Undoubtedly," they predicted, "she may also require them periodically under the normal course of this illness." (*Id*.)

Viewing the Mayview report in its entirety, I find that, on balance, this report, rather than supporting Dr. Ryan's diagnosis, supports Dr. Sadoff's conclusions about the Defendant's psychiatric condition because it is confirmatory both of Dr. Sadoff's diagnosis and the conclusion that the Defendant has benefitted from psychotropic medication. Further, I credit Dr. Sadoff's testimony that the validity of his diagnosis is not undermined by the fact that not all medications have worked effectively for the Defendant, because different kinds of medication will work differently in different people. (Tr., 5/21/08 [72] at p. 149.)

Dr. Sadoff's opinion that the Defendant's bipolar illness can produce psychotic thinking is also supported by evidence as to the condition of her residences, both in the mid 1980s and in 2003, when she was arrested on charges of homicide. There was uncontradicted evidence that, upon her arrest in the Thomas case in 1984, Defendant was found to have over 700 pounds of cheese and over 300 pounds of butter, among other items, stored unrefrigerated and rotting in her home. (*See* Ex. B.) There was further uncontradicted evidence that, upon her arrest in 2003 in the James Roden case, the Defendant's home was found to be inhabitable by virtue of the trash, animal feces, insects and rodents that were found within. (Ex. C.) I credit Dr. Sadoff's testimony that these events are reflective of the Defendant's psychotic thinking. (Tr., 5/21/08 [72] at pp. 128.) I note that, in fact, Dr. Ryan agreed such behavior is not the type of behavior that one would expect from a person suffering only from a personality disorder and is more consistent with major mental illness. (*Id*. at pp. 266-67.)

Finally, Dr. Sadoff's diagnosis is inferentially supported by the observations of her prior attorney, Leonard G. Ambrose, III, Esq.. Mr. Ambrose spent in excess of 200 hours with the Defendant between 1985 and 1988 in connection with the Robert Thomas homicide case. I credit Mr. Ambrose's testimony that, when the Defendant

45

was medicated for her bipolar illness, he was able to discuss her case with her and prepare for trial.  However, when the Defendant was in an unmedicated state, it was essentially impossible for him to effectively communicate with her concerning matters of defense strategy.  I credit Mr. Ambrose's recollection that, during the course of his representation, there were occasions when the Defendant talked incessantly about irrelevant matters and would call him repeatedly, up to 15 times in a single evening. This evidence also lends support to the conclusion that the Defendant suffers from a major mental illness which can produce psychotic episodes.

2.     The Court declines to credit Dr. Ryan's opinion that the Defendant's functional limitations are attributable solely to a personality disorder.

Dr. Ryan obtained his bachelor's degree in nursing from the State University of New York at Buffalo in 1979.  Thereafter, he obtained his master's degree in 1982 and his doctorate degree in 1986 in clinical and school psychology from Hofstra University. (Tr., 5/21/08 [72] at p. 4.)  He has held teaching positions at New York Medical College, John Jay College of Criminal Justice, and the Long Island University.  (*Id*. at p. 7.)   Dr. Ryan started with the Federal Bureau of Prisons as a staff psychologist in 1993 and has been a forensic psychologist with the Bureau since 1995.  (*id*. at p. 5.)  His sole responsibility in his capacity as a forensic psychologist for the Bureau of Prisons is to conduct forensic evaluations for the courts.  (*Id*. at p. 5.)  Over the last ten years, Dr. Ryan has conducted approximately 750 forensic evaluations.  (*Id*. at p. 6.)  He was randomly selected by the Bureau of Prisons to exam the Defendant pursuant to this Court's order of February 11, 2008.

Notwithstanding Dr. Ryan's solid credentials and expertise in the field of forensic psychology, and also notwithstanding his position of neutrality as a court-appointed examiner in this case, I nevertheless decline to credit his opinion that the Defendant does not suffer from bipolar disorder and that her functional limitations are attributable solely to a personality disorder.

It is the government's theory that the Defendant was errantly diagnosed with bipolar disorder in the 1980s in connection with her attempts to secure social security disability benefits. After that, the theory goes, the Defendant's bipolar diagnosis was essentially "rubber-stamped" by various mental health care professionals who did not meaningfully examine the propriety of the diagnosis or adequately document the signs and symptoms that would justify continuing a diagnosis of bipolar disorder. However, the Court is not persuaded by this theory.

I acknowledge that Dr. Ryan expressed dissatisfaction with the quality of some of the medical records. He opined, for example, that, where psychological testing was performed, the raw testing data should have been set forth in the report such that reviewing psychologists could independently interpret the data. At times, he felt that the medical records documented too few signs or symptoms to justify a diagnosis of bipolar disorder or, alternatively, he felt that those signs and symptoms that were documented were too subjective or might be better accounted for by situational factors. Dr. Ryan may well be correct that the examiners who prepared certain of the psychiatric or psychological reports could have been more thorough in terms of documenting the Defendant's presenting signs and symptoms and in terms of explaining their diagnoses. However, the fact that the medical records might have been better constructed does not, in my view, undermine the validity of the Defendant's diagnosis of bipolar disorder. On the contrary, an overall review of the Defendant's lengthy medical history leaves one with the firm impression that the Defendant has long suffered from a serious mental illness, consistent with Dr. Sadoff's opinion.

As for the Defendant's attempts to manipulate her treating physicians, the evidence does indeed suggest that the Defendant engaged in an overt attempt in the early 1980s' to highlight her mental illness as a means of obtaining disability benefits. However, it does not follow, and this Court does not believe, that the Defendant's treating physicians thereby ceded to her demands and diagnosed bipolar disorder without any legitimate basis. Similarly, while it may have been to the Defendant's legal

advantage to highlight her mental illness as part of her defense in the Robert Thomas case, that fact does not necessarily undermine the validity of her bipolar diagnosis.

Rather, the records reveal that the Defendant's mental health care providers were well aware of her desire to qualify for disability benefits and that they were quite properly unwilling to be manipulated by her agenda.  For example, when the Defendant was applying for disability benefits in 1982 and sought a more detailed report from Dr. Francis in support of her claim, he refused this request, indicating that the Defendant would have to be re-evaluated to assess her current condition since her last contact had been in November of 1981.  Further, Dr. Francis was unwilling to see the Defendant because she had missed prior appointments and did not comply with his treatment plan.  (Ex. A-905).  When the Defendant complained again in May of 1983 about the manner in which Dr. Choksi had filled out an evaluation form, Dr. Choksi declined to give a more extreme assessment of her condition, despite his belief that the Defendant had severe psychiatric problems, because Dr. Choksi felt he had not had sufficient time treating the Defendant.  (Ex. 11.)  Moreover, Dr. Choksi expressly recognized that it was difficult to assess the actual extent of the Defendant's disability because of the fact that all of her verbalizations were geared toward establishing her disability.  (*Id*.)  In response to the Defendant's complaints, the St. Vincent client advocate advised the Defendant to continue treatment with Dr. Pandya but emphasized that this recommendation in no way implied that the Defendant's health care providers would make a "more extreme report" to the Social Security Administration.  (Ex. 11.)  It is also worth noting that Dr. Pandya's initial diagnosis of manic-depressive disorder was made *prior to* the Defendant's complaints in May of 1983 about the manner in which her disability evaluation forms were being filled out.

Other psychiatrists or psychologists have similarly documented their awareness of the Defendant's manipulative tendencies.  In January of 1985, Dr. Paul observed that the Defendant had begun relating to him in a manipulative manner and appeared to view him as someone who could influence changes in prison policy on her behalf or

secure mental hospitalization for her. (Ex. A-872.) On one occasion, the Defendant wrote him a letter in an apparent attempt to get Dr. Paul to intervene on her behalf in a matter of prison discipline but, rather than comply, Dr. Paul simply noted that the Defendant was clearly being manipulative and did not seem to need him for his "customary function." (Ex. A-873.) Dr. Cooke found, upon psychological testing, that the Defendant "can be very manipulative" and that "[s]he responds to her own needs with little thoughts for the feelings and needs of others." (Ex. 19.)

In fact, the record suggests that the Defendant was so overt and transparent in her attempts to manipulate health care providers that it would be only logical to assume they could see through her efforts. Dr. Urban observed in 1987 that "Ms. Diehl is highly prone to fake poorly in regular efforts to manipulate and influence others to her selfish needs." (Ex. A-884.) He noted that these efforts "are so poorly disguised as to be recognized very quickly and leave other persons confused." (*Id*.) Indeed, Dr. Ryan described the Defendant's demands upon her doctors at St. Vincent as "naive because it's so overtly manipulative," and he observed that "any mental health professional would recognize that... we don't take orders from patients." (Tr., 5/21/08 [72] at p. 48.) Dr. Ryan further acknowledged that he would not expect other psychologists or psychiatrists to allow a patient to dictate their diagnosis. (*Id*. at pp. 90-91.)

In sum, although there is certainly evidence in the record establishing the Defendant's manipulative tendencies, I am not persuaded that this factor renders the Defendant's many diagnoses of bipolar disorder invalid.

I am also not persuaded by the suggestion that all of the Defendant's treating or examining physicians and psychologists merely continued the bipolar diagnosis without independent review. On the contrary, it appears that certain mental health professionals, especially Drs. Campbell, Friday, Paul, and Petras, have all had the opportunity to observe and examine the Defendant over a substantial period of time. Drs. Campbell, Friday and Petras had the opportunity to observe the Defendant over the course of several weeks and even months while she was hospitalized at Mayview.

49

Dr. Paul saw the Defendant some 64 times while she was incarcerated at the Erie County Prison.  Their opportunity to observe and evaluate the Defendant was no less substantial than that of Dr. Ryan, who admits that, during the Defendant's 30-day stay at MCC, he probably spent no more than 8 to 10 hours actually sitting down with her. (Tr. 5/21/08 [72] at p. 243.)

Similarly, it cannot be said that Drs. Cooke and Urban merely acquiesced in the Defendant's previous diagnosis of bipolar disorder.  Rather, both Dr. Cooke and Dr. Urban reported seeing the Defendant in a hypomanic state, and both had the benefit of the Defendant's responses to a panoply of psychological tests, which further informed their diagnoses of bipolar disorder.  While Dr. Ryan took issue with some of this testing, at the end of the day, there is no sufficient evidentiary basis in the present record from which I can conclude that the testing performed by Drs. Cooke and/or Urban is unreliable and that the conclusions they drew from that testing should therefore be rejected.  Moreover, it is noteworthy that Dr. Ryan's opinion was rendered with "less than the usual degree of psychological certainty" (although he claims within a reasonable degree of psychological certainty) due to the fact that the Defendant would not comply with his own attempts at psychological testing.  (Ex. 2, p. 14.)

Both Drs. Sadoff and Petras testified that, once an individual has experienced a manic episode, any future diagnosis must include the affective disorder as a component of the diagnosis; thus, it would be error to diagnose such an individual solely with a personality disorder and to disregard the manic component.  (Tr., 5/21/08 [72] at pp. 131-32; Tr., 5/22/08 [71] at p. 92.)  Dr. Petras therefore flatly disagrees with Dr. Ryan's refusal to include bipolar disorder in his diagnosis because of the fact that the illness is present by history.  According to Dr. Petras, even if the Defendant was not manifesting any signs or symptoms of the disease, she should, at the very least, be diagnosed with Bipolar Affective Disorder in remission.  (Tr., 5/22/08 [71] at pp. 92-93.)  I accept this testimony as credible.

Dr. Petras further testified that, once the diagnosis of bipolar disorder is made,

50

the only rational basis upon which a future mental health evaluator can exclude the illness from his or her diagnosis is to conclude that the prior diagnosis of bipolar disorder was made in error.  (Tr., 5/22/08 [71] at pp. 92-93.)  I accept this testimony as credible.  In short, Dr. Ryan's diagnosis can only be accepted as accurate by concluding that every other clinician who has diagnosed the Defendant with bipolar disorder did so in error.  I do not find that the record supports that conclusion, and I therefore reject Dr. Ryan's opinion that the Defendant does not suffer from bipolar disorder.

3.      <u>The Defendant's functional limitations must be attributed primarily to her Bipolar Disorder.</u>

At the evidentiary hearing, all three medical witnesses agreed that there is no known cure for bipolar disorder and that the only recourse is treatment to control the symptoms.  Thus, once the disease is properly diagnosed, the diagnosis remains for life. (Tr., 5/21/08 [72] at pp. 86-87;129-30; Tr., 5/22/08 [71] at pp. 84-85.)  I credit this testimony and find that the Defendant does indeed continue to suffer from bipolar disorder.

Dr. Ryan's report indicates that the Defendant showed signs of, among other things, expressive and receptive speech difficulties, illogical and irrelevant thoughts, excessive rate and volume of speech, scattered and tangential thinking, and looseness of association.   (Ex. 2, pp. 8-9.)  Dr. Ryan agreed that these symptoms can all be consistent with a person suffering from hypomania or mania, but he did not interpret them in that fashion; instead he interpreted them as symptoms of her personality disorder only.  (Tr. 5/21/08 [72] at pp. 250-51, 260-61.)  I am not persuaded by Dr. Ryan's opinion in this regard.

Dr. Sadoff would agree that, in addition to her bipolar disorder, the Defendant suffers from a personality disorder which "motivates" and/or "colors" her manic behavior.  (Tr. 5/21/08 [72] at pp. 145-46, 207.)  While he feels that the Defendant's

problems with her lawyers and with other interpersonal relationships are based upon a combination of her bipolar disorder and her underlying personality disorder (*id*. at pp. 161, 207), he considers symptoms such as the Defendant's pressured speech, irrelevant thinking, tangential thinking, irritability, poor insight and judgment, hyper-talkativeness, illogic, and flight of ideas to be symptoms of her bipolar disorder.  (*Id*. at pp. 161-62, 207.)

Dr. Petras testified that, pursuant to the DSM-IV, all of the signs and symptoms that the Defendant exhibited during her hospitalizations at Mayview in 2004 and 2005 must be attributed to her bipolar disorder in light of the fact that she was diagnosed as having experienced a manic episode.  (Tr., 5/22/08 [71] at pp. 85-86.)  Dr. Petras explained that, under the DSM-IV, when signs or symptoms such as irritability, circumstantial thinking, talkativeness and illogical thought are observed during an episode of a mood disorder such as hypomania, one should assume that these signs and symptoms are attributable to the actual mood disorder rather than attributing them solely to a personality disorder.  (*Id*. at pp. 155-58.)  Dr. Petras further testified that at least the majority of the signs and symptoms documented by Dr. Ryan are consistent with a diagnosis of bipolar disorder.

Thus it appears, at least inferentially, that both Drs. Sadoff and Petras would attribute the signs and symptoms documented by Dr. Ryan in his report, or at least the majority of them, to the Defendant's bipolar disorder.  (Tr., 5/21/08 [72] at pp. 135-37; Tr., 5/22/08 [71] at pp. 92-93.)  I am persuaded by the conclusions of Dr. Sadoff and Dr. Petras and, consequently, I find that the Defendant's functional limitations must be attributed largely, if not exclusively, to her bipolar disorder, notwithstanding the fact that she may also suffer from a personality disorder.

B.

Having determined that the Defendant suffers from a major mental illness, I must next determine whether, as a result of her illness, the Defendant is presently incapable of properly assisting her counsel in constructing a defense to the present charges. As Dr. Ryan testified, to find mental incompetence, there must be a link between an individual's mental illness and her inability to assist in her own defense. (Tr. 5/21/08 [72] at pp. 280–81.) Under *Dusky v. United States*, the precise query is whether the Defendant "has sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding." 362 U.S at 402 (quoted in *Indiana v. Edwards*, — U.S. —, 128 S. Ct. 2379, 2383 (2008).

Based upon a careful and considered review of all the evidence, I find by a preponderance of the evidence that the Defendant is not competent to proceed under this standard.

In arriving at this finding I credit the representations of defense counsel, Mr. Patton, to the effect that, when he tries to sit down and communicate with the Defendant about her case, she becomes belligerent and abusive, irrational in her demands and incapable of understanding either the illogic of her own positions or the importance of heeding her counsel's advice. Rather than meaningfully interact with her attorney to confront the evidence against her, she will simply demand that Mr. Patton obtain a dismissal of all her charges or a grant of prosecutorial immunity with no apparent understanding as to why this is not rationally possible under the circumstances. The Supreme Court has observed that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense," *Medina v. California*, 505 U.S. 437, 450 (1992), and thus, Mr. Patton's representations are entitled to a certain amount of deference as a matter of course. This is especially true given the fact that Mr. Patton is a seasoned public defender who has represented hundreds of defendants. I have found him to be a highly competent and skillful advocate on behalf of his clients. Given his considerable experience, Mr. Patton can

accurately differentiate, in my view, between the "difficult client" and a defendant who can no longer properly assist in her defense.

Secondly, the Court credits Dr. Sadoff's testimony, based on his own observations of the Defendant interacting with Mr. Patton, that her functional problems and irrationality are rooted not in a mere personality conflict with counsel or in particular character traits, but in her psychosis. It is Dr. Sadoff's opinion that the breakdown in communication between the Defendant and Mr. Patton stems from the Defendant's delusional state of mind which prevents her from rationally assisting him in preparing a defense.

It has been the government's theory that, if indeed the Defendant is bipolar, then she has been in a period of remission for several years as evidenced by her apparent ability to function well in prison without medication. The government characterizes the Defendant's problems with her attorney as discreet, situational events which do not meet the criteria for a true manic or hypomanic episode. In other words, it is the government's theory that the Defendant is basically "fine" until she walks into a room with Mr. Patton and returns to "normalcy" again when she leaves his presence. However, I am not persuaded that the government's theory accurately describes the Defendant's mental condition.

While it appears that the Defendant has functioned adequately at Muncy without major incident, this fact is not necessarily incompatible with Dr. Sadoff's finding that she is psychotic in the presence of her attorney. There is credible evidence to suggest that the Defendant functions well in a highly structured, even rigid, environment. Dr. Sadoff directly stated as much (Tr., 5/21/08 [72] at p. 141), and I find his testimony credible in this regard. It is consistent, for example, with the January 1988 report of Drs. Campbell and Friday, which documented the Defendant's mental progress when placed in a highly structured and rigid behavioral program while at Mayview. (Ex. 17, p. 2.) Prison, of course, is the ultimate structured environment where most everything is governed by a predictable routine. Therefore, the Defendant's ability to function fairly

54

well within this venue is perhaps not surprising, nor is it necessarily inconsistent with Dr. Sadoff's opinion that the Defendant is still symptomatic in the presence of her attorney.

Dr. Sadoff persuasively testified that, when the Defendant is placed under significant stress, her control is "loosened" and she therefore becomes more prone to psychotic episodes. (Tr., 5/21/08 [72] at p. 154.) He explains that, for example, though she may function well day-to-day in prison, the Defendant will react differently to Mr. Patton coming in and discussing an issue like new criminal charges because this can create anxiety in her which will lead to her having less control over her state of mind. (*Id*. at p. 142.) Indeed, Dr. Sadoff testified that he personally saw evidence of this when he was able to watch the Defendant meet with Mr. Patton. (*Id*. at pp. 142-43.)

Dr. Sadoff's theory is supported by the observations of numerous other clinicians who have documented the Defendant's tendency to mentally decompensate under stress. For example, Dr. Paul reported in September of 1987 that, though the Defendant was not then grossly psychotic, this was the case only so long as pressure is minimal. (Ex. A-877.) He testified at a court hearing that this "picture could change with startling repetivity if she were put under enough pressure," and he felt that a vigorous cross-examination would probably produce that type of pressure. (Ex. E-957.) Accordingly, Dr. Paul considered the Defendant to be "quite incompetent" to stand trial on her then-current criminal charges. (Ex. A-878.) Dr. Urban similarly reported that, although the Defendant was not psychotic at the time of his evaluation, "a psychotic loss of control in her perceptions can be easily" triggered due to the extreme degree of her internal conflicts. Further, Dr. Urban found "constant signs of potential for decompensation into psychosis with minimal pressures or when her hypomanic thoughts and feelings accelerate and reality boundaries are blurred." (Ex. A-884.) Dr. Cooke likewise reported in 1985 that, though the Defendant was not overtly psychotic during his examination, testing showed her potential for decompensation into psychotic behavior. (Ex. 19, p. 8.) He noted that the Defendant was "extremely emotionally labile" and tended to overreact to the "slightest emotional stimulation." (*Id.* at p. 6.)

55

Drs. Campbell and Friday predicted in January of 1988 that "[i]t is certain that this individual will under stress have increasing problems with control and mood." (Ex. 17, p. 3.)

When asked why this mental decompensation occurs in particular when the Defendant is in the presence of her attorney, Dr. Sadoff explained that, as her defense counsel, Mr. Patton is an especially important figure. (Tr., 5/21/08 [72] at pp. 182-83.) This is consistent with Dr. Urban's observation that "closer, more meaningful or intense emotional contacts" would result in greater distortion to her reactions (Ex. A-885), and Dr. Cooke's observations that the Defendant is extremely emotionally labile and "situations where she is emotionally involved can produce confusion, poor judgment and inadequate memory." (Ex. 19, p. 6.) The historic evidence suggests that the Defendant had similar problems with her counsel in the 1980s and that the stress of addressing her then-pending criminal charges with her attorneys caused her to psychotically decompensate when non-medicated. As has been true in the present case, the Defendant exhibited extreme hostility toward her counsel during the pendency of the Robert Thomas case. (Ex. E-957.)

The Court is fully cognizant that the relevant inquiry at hand is the Defendant's *present* state of mind, *Leggett*, 162 F.3d at 244, and, consequently, the opinions of the Defendant's prior mental health evaluators are not a direct reflection upon her current state of competence or incompetence. Nevertheless, consideration of the Defendant's mental health history is helpful in that, from a longitudinal perspective, it lends credence to Dr. Sadoff's opinion that the Defendant can decompensate rapidly to the point of psychosis when placed under the stress of trial preparation with her attorney.

I acknowledge the testimony from three different Muncy officials that the Defendant's demeanor and behavior while incarcerated has been generally steady and that none of the three witnesses has experienced any serious problems with the Defendant or noticed a marked change in her behavior. While these witnesses may have had frequent contact with the Defendant, none of them purported to have

extensive, one-on-one contact with her, nor had any of them observed her under highly stressful circumstances comparable to those experienced by Mr. Patton. Moreover, certain of these witnesses agreed that – if they had witnessed the Defendant engaging in the kinds of outbursts documented on March 21 and July 19, 2007 in the sick call area, or the kind of behavior which Mr. Patton has observed – they would consider such behavior to be a marked change in the Defendant's demeanor.

Ultimately, there is no evidence of record to unequivocally document that, in the days or hours immediately prior to or after her meetings with Mr. Patton, the Defendant has been "fine" or "normal." Though the Defendant by all appearances has functioned adequately at Muncy, the Court is not persuaded that she has been in a period of unabated remission these past several years.

The Court also credits testimony from Drs. Sadoff and Petras which suggests that not all bipolar individuals display their symptoms in exactly the same way. Dr. Sadoff explained that the manner in which a manic person manifests his or her symptoms depends a lot on the underlying characteristics of his or her personalities. (Tr., 5/21/08 [72] at p. 146.) Furthermore, different bipolar individuals stabilize at different places and under different environments. (*Id.* at p. 142.) Dr. Petras explained that the cycling which a bipolar individual experiences can occur in a random manner, rather than in an orderly or predictable pattern. (Tr., 5/22/08 [71] at pp. 154-55.)

In attempting to discredit Dr. Sadoff's opinion, the government points out that Dr. Sadoff's evaluations of the Defendant occurred only when Mr. Patton was also present. The government suggests that, because the Defendant clearly is not happy with her present counsel, it is not surprising that Dr. Sadoff would witness dramatic outbursts from the Defendant when she is in the same room as Mr. Patton. The government views the Defendant's belligerent conduct toward Mr. Patton as a mere by-product of an adversarial relationship and as evidence of the Defendant's personality deficits, rather than as a true manic or hypomanic event. Implicit in the government position is the suggestion that Dr. Sadoff was witnessing a distorted picture of the Defendant's

behavior.  The Court finds, however, that it is precisely the Defendant's interactions with her counsel that are most relevant for purposes of our present inquiry and, because Dr. Sadoff is the only expert to have witnessed that relationship, his opinion is of particular value in that regard.

An additional factor for the court's consideration in making a competency determination is the defendant's demeanor in court.  *Leggett*, 162 F.3d at 242.  For most of the hearing, the Defendant appeared to be quite subdued.  She had minimal interaction with Mr. Patton but, from time to time, conferred with the investigator working for the Federal Public Defender's office.  However, despite the fact that she believes she is competent and capable of proceeding to trial, on several occasions toward the end of the proceedings, she spoke out at inappropriate times while witnesses were testifying.  It is perhaps worth noting that she spoke out most vocally during the testimony of Mr. Ambrose, her former trial attorney, when he discussed his difficulty trying to get the Defendant to rationally address a key piece of evidence against her in the Robert Thomas case.  During this outburst, the Court was able to witness some of the hostility which the Defendant still apparently harbors against her former counsel, notwithstanding her acquittal in that case.

Based on my consideration of all the foregoing factors, I find that the preponderance of credible evidence supports a finding that the Defendant does not possess sufficient present ability to consult with her lawyer with a reasonable degree of rational understanding because of the psychotic symptoms produced by her bipolar disorder.  I thus find, by a preponderance of the evidence, that the Defendant is presently suffering from a mental disease rendering her mentally incompetent to the extent that she is unable to assist properly in her defense.[10]

---

[10] It appears that 18 U.S.C.A. § 4241(d) expressly places the burden of proof upon the party seeking to establish the defendant's incompetency – in this case, the defense.  Moreover, in *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996), the Supreme Court stated in *dicta* that "Congress has directed that the accused in a federal

I accept Dr. Sadoff's testimony that, if the Defendant were to get treatment for her bipolar disorder, the basic underpinning of her illogic, her psychotic thinking, could be neutralized.  As Dr. Sadoff explained:  "I would think with proper treatment over a period of time and psychotherapy, somebody working with her, dealing with the reality of the issues, that the outlook, the prognosis for her becoming competent in the foreseeable future is present, it's there."  (Tr., 5/21/08 [72] at p. 147.)  He believes that, with the elimination of the Defendant's psychosis, an attorney would be able to work with her.  (*Id*. at pp. 147-48.)  I credit Dr. Sadoff's opinion that, with treatment of the Defendant's bipolar disorder through medication or otherwise, her psychotic thinking can be neutralized to the point that she may be capable of interacting logically and rationally, if not perfectly, with defense counsel.  This opinion is consistent with the past findings of Drs. Paul, Campbell and Petras that the Defendant required medication to treat her bipolar disorder in order to be competent to stand trial.

### III.  CONCLUSION

Based upon the foregoing, I find that the Defendant is not competent to stand trial and should be committed to the custody of the Attorney General for a period of hospitalization and appropriate treatment in accordance with 18 U.S.C. § 4241.

An appropriate order is being entered contemporaneously herewith.

---

prosecution must prove incompetence by a preponderance of the evidence.") (citing 18 U.S.C. § 4241).  Notwithstanding this, both the government and the defense believe that, within this circuit, it is the government's burden to establish *competency* by a preponderance of the evidence.  *See United States v. Askari*, 222 Fed. Appx. 115, 119 2007 WL 1073698 at **4 (3d Cir. April 11, 2007).  The Third Circuit Court of Appeals has not squarely addressed this issue in a published, precedential opinion since *Cooper* was decided.  Furthermore, the language in *Askari* suggesting that the burden of proof remains on the government is also *dicta*.  For present purposes I will apply the language of the statute and assume the defense has the burden of proof; however, I also note that, even if the burden were placed upon the government, the result of these proceedings would be the same.