**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA  )
           )
    v.       )   Case No. 1:07-cr-26-SJM
           )
MARJORIE DIEHL ARMSTRONG )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McLAUGHLIN, SEAN J., District J.,

   The Defendant, Marjorie Diehl-Armstrong, is charged with one count each of conspiracy to commit armed bank robbery, bank robbery, and carrying and using a firearm during and in relation to a crime of violence. This matter is once again before the Court for a determination of the Defendant's competency to proceed to trial.

   Counsel for the Defendant originally filed a motion for a hearing to determine competency on January 24, 2008 based on an examination performed by Dr. Robert L. Sadoff. Pursuant to 18 U.S.C. § 4241(b) and § 4247(b) and (c), the Defendant was committed to the custody of the Attorney General and was subsequently evaluated at the Metropolitan Correctional Center of New York by William J. Ryan, Ph.D., a forensic psychologist. Following a two-day hearing, the Court concluded by a preponderance of the evidence that the Defendant was not competent to proceed to trial.

   Accordingly, the Defendant was committed to the custody of the Attorney General for appropriate treatment in accordance with 18 U.S.C. § 4241. She was transferred to the Federal Medical Center in Carswell, Texas, where she underwent a four-month period of treatment. On January 30, 2009, this Court received a Certificate of Recovery from W. Elaine Chapman, Warden of FMC Carswell, accompanied by a Forensic Evaluation prepared by Leslie Powers, Ph.D., stating that the Defendant was believed to be competent to stand trial.

   The Defendant was subsequently returned to the Erie County Prison where her counsel arranged for additional forensic evaluations by Dr. Sadoff and Frank Dattilio,

Ph.D.  Both Drs. Sadoff and Dattilio opined that the Defendant is not competent to stand trial due to the fact that her bipolar disorder is interfering with her ability to properly assist her lawyer in preparing a defense.

This Court held an evidentiary hearing on April 27, 2009, at which time I heard testimony from Dr. Powers, Dr. Sadoff, and Dr. Dattilio and received voluminous records documenting the Defendant's treatment at FMC Carswell.  Both sides have submitted their proposed findings of fact and conclusions of law.  Accordingly, this matter is now ripe for adjudication.

## I.  BACKGROUND

FMC Carswell, located in Fort Worth, Texas, is part of the federal Bureau of Prisons.  (Tr. 5.)[1]  In addition to housing a large general population of prisoners, FMC Carswell contains three mental health units, designated as "M1," "M2," and "M3."  The M1 unit resembles a hospital setting in which inmates can come and go from their rooms at will.  (Tr. 13.)  Although the unit is locked, inmates are normally permitted to leave the unit if they have a pass.  (*Id*.)  The M2 unit is designated as an outpatient unit. (*Id*.)  The M3 unit is designated as a psychiatric observation unit and is reserved for inmates who are a disciplinary problem or who may be upsetting the milieu of the M1 unit.  (*Id*.)  The M3 unit is more like a traditional prison setting where inmates are housed in rooms with a locked door and handcuffed as they are transported in and out of their rooms.  (*Id*. at 13-14.)  The goal of the Institution is to have all inmates undergoing forensic studies housed on the M1 unit, away from the general population. (*Id*. at 13.)

When inmates initially arrive at the facility, they receive an initial evaluation in the

---

[1] Citations to the April 27, 2009 hearing transcript will be abbreviated "Tr. ___." Further, to maintain uniformity with the pagination used by the parties, this Court's citations are to the version of the hearing transcript filed on September 8, 2009 [Doc. 125].

Receiving and Discharge (R&D) area for the purpose of assessing whether they are well enough to be housed on the M1 unit.  (Tr. at 14.)  Individuals who are psychotic or very sick or who present a danger to themselves or others are placed on M3 for psychiatric observation.  (*Id.*)  Once it is determined that the inmate is well enough to be housed with the other inmates on the M1 unit, the individual signs a consent to be housed with other inpatients and is transferred to M1.  (*Id.*)

The Defendant was admitted to FMC Carswell on or around September 10, 2008.  Because she was already serving a state sentence for murder, she was automatically transferred to the M3 unit for observation at the request of the executive staff.  (Tr. 17.)  An initial R&D screening form notes that the Defendant was not cooperative with questioning, engaged in perpetual talking, complained, and was grandiose and paranoid.  (Ex. 3, p. 47; Ex. A-8272.)

On September 12, 2008, the Defendant was psychiatrically evaluated by Camille Kempke, M.D.  (Ex. 3, pp. 48-51; A-8273-8276.)  At that time, the Defendant exhibited run-on, tangential speech that was difficult to interpret.  Her mood was irritated and she complained about being on the unit and having received the wrong size clothing.  She denied being psychologically ill and stated she would not take any medication.  Dr. Kempke thought the Defendant appeared hypomanic and delusional and her initial proposed treatment plan included prescribed medication.  (*Id.*)

By September 15, 2008, the Defendant was thought to be capable of transferring to the M1 unit.  In conjunction with this transfer, she executed a "Consent to Admission for Mental Health Treatment."  (Ex. 3, pp. 5, 27.)

Once on the M1 unit, the Defendant was free to move about the unit and engage in activities such as reading, watching television, doing laundry, working on crafts, and participating in psycho-educational groups.  In light of her pending charges and her status as a convicted state inmate, however, the Defendant was not permitted to leave the M1 unit.  (Ex. 2, p. 7.)  She was very upset by this decision and reportedly complained about the issue at length during her first few visits with Dr. Powers.  (*Id.*)

3

During her stay on the M1 unit, the Defendant was routinely observed and monitored by staff.  No disturbances in sleep were noted.  (Ex. 2, p. 8.)  Though she adamantly refused to consider psychotropic medication, she was compliant with her other prescribed medications.  (*Id.*)  Nursing and correctional staff observed that the Defendant tended to be demanding and had few friends on the unit.  Most of the Defendant's time on the M1 unit was spent sitting in the same chair in the television room watching hours of television or talking on the phone.  (*Id.*)

Medical records suggest that the Defendant commonly had problems with other inmates.  A staff note from October 20, 2008 reports that "Inmate Marjorie Diehl-Armstrong ... from M-1 almost caused a big fight among other inmates on the unit" by allegedly using demeaning words in reference to other inmates.  (Ex. 4, p. 18.)  The Defendant denied the accusations and was escorted to the nurses station where she talked to the nurses about the incident.  (*Id*.)  She was subsequently confined to her room for the rest of the evening "to prevent any further incidents from happening."  (*Id*.)  The note states that seven other inmates had informed staff that "the inmate Armstrong is a bully, hostile, and mean person."  (*Id*.)

According to progress notes from the Defendant's October 23, 2008 treatment team meeting, she was viewed by social work staff as manipulative and lacking insight, while nursing staff reported that she was "very disruptive" on the unit.  (Ex. 3, p. 60.)  On November 3, 2008 the Defendant reported to nursing staff, "These girls are calling me names again when there is [sic] no witnesses."  (Ex. 3, p. 62.)  A psychiatric progress note from the following day reflects the Defendant's concern that other inmates were trying to set her up to look manipulative and problematic.  (Ex. 3, p. 63.)  She reportedly made comments to the effect that "racist blacks" were "all harassing [her]," that they would go to "no length to frame" her, and that she was "the only one not afraid of them."  (*Id*.)  It appears that the Defendant's trouble with other inmates involved issues of alleged name-calling as well as use of the television and dryers.  (*Id*.)

4

At one point on or around December 11, 2008, while talking on the phone within earshot of other inmates, the Defendant was heard discussing the crimes committed by some of the other inmates.  (Ex. 2, p. 8.)   When confronted by her treatment team with this misconduct, the Defendant became defensive and refused to admit fault.  (*Id*.; Ex. 3, p. 70.)  She began yelling at the treatment team and was transferred to the M3 unit for upsetting the milieu of the mental health unit.  (*Id*.)  Upon being searched during the (AD) admission process, she was found to be in possession of a piece of paper containing the names and registration numbers of many fellow inmates, and an incident report was written.  (Ex. 2, p. 8.)  Progress notes reflect that the Defendant remained argumentative and loud and could not be redirected following this incident.  She was placed into a cell where she continued to be verbally combative.  (Ex. 3, p. 70.)  Later that day, a nursing assessment treatment team note was authored, describing the Defendant as hyperverbal, disheveled, pressured in her speech, and insisting that she hadn't done anything wrong.  (Ex. 3, p. 71.)

Several days later, on December 16, 2008, the Defendant was seen by mental health staff, pleading to be returned to M1 and insisting that she was not at fault.  (Ex. 3, p. 27; Ex. 4, p. 1; Ex. A-8297.)  She was advised that the unit team would require her to accept responsibility for her actions and work towards improving her behavior.  (*Id*.)

The Defendant subsequently sent Dr. Powers a letter urging Dr. Powers to meet with her concerning her desire to return to the M1 unit and citing the fact that she is claustrophobic, that her nerves were "frayed" by proceedings in her criminal case, and that she needed to call her father on Christmas.  (Ex. 4, pp. 16-17.)  The Defendant also remarked in her letter, "I have been thinking about this since December 11th and I am truly sorry for any negativity or confusion caused.  I told Dr. Kempke I will be sure not to offend staff or inmates and to conduct myself absolutely properly at all times if given [the] chance to return to M1."  (*Id*.)

The Defendant was seen by Dr. Kempke on December 22, 2008, at which time she was alert but frustrated about remaining on AD status.  (Ex. 3, p. 75.)  Dr. Kempke

discussed with Defendant "the need for polite, sweet [and] short sentences" when conversing with Dr. Powers about her desire to be transferred back to M1. (*Id*.) Despite her frustrated mood, the Defendant was able to speak in "a little shorter, nicer tone" (*id*.), and she showed no signs of psychosis. (*Id*.) According to Dr. Power's report, the Defendant did subsequently make an effort toward accepting responsibility for her behavior, stating to Dr. Powers, "I apologize if it appeared as though I was talking about other inmate's [sic] crimes. I know that I talk too loud and I am working on that too." (Ex. 2, p. 8.)

Despite these overtures, the Defendant remained on AD until the end of December, due to the pendency of the incident report and the need to coordinate her transfer with corrections staff. (Ex. 3, p. 77.) Once transferred, the Defendant expressed her happiness to be back in the M1 unit. (Ex. 3, pp. 77, 82.) She was observed over the next two and ½ weeks to be generally appropriate when interacting with peers and staff, making better choices and keeping a low profile. (Ex. 3, pp. 82-84.)

Throughout the course of her evaluation at FMC Carswell, the Defendant attended weekly competency restoration classes. Notes from the November 3, 2008 class indicate that the Defendant interacted appropriately with other group members and was able to stay focused on the activity throughout most of the session. (Ex. 4, p.5.) Though she violated class rules by asking a question related to her own case toward the end of the session, she was easily re-directed and did not respond inappropriately. It was felt that she showed a good understanding of courtroom proceedings and was gaining more control over her behavior in the group. (*Id*.)

Notes from the November 10 class indicate that the Defendant participated fully but veered off topic at one point to discuss her own personal frustration with the length of time that she is being held without proceeding to trial in her own case. She was easily redirected and able to control her behavior for the rest of the session. (Ex. 4, p. 4.)

6

On November 17, the Defendant again participated fully in her competency restoration class but became visibly irritated when the class reviewed material which she already knew.  (Ex. 4, p. 3.)  Once again she required redirection at one point when she started to discuss details about her own case which was not relevant to the group, but she reportedly responded appropriately and created no problems for the remainder of the session.  (*Id.*)

On December 8, 2008 it was noted that the Defendant was late for class, as had been her habit, and that she would be confronted if this continued in the future, as her tardiness was disruptive to the other group members.  (Ex. 4, p. 2.)  During this session, the Defendant participated fully and offered helpful information to new group members concerning court proceedings.  She demonstrated a logical thought process, spoke coherently, and maintained normal attention and concentration.  Although she was able to control her behavior for most of the group session, she sparked a controversy at one point by muttering something under her breath which resulted in a confrontation with another inmate.  (*Id.*)  Staff notes reflect that she was unable to be redirected and spoke over both group facilitators.  All group members were dismissed and the Defendant "was informed that this behavior was a violation of group rules, and was a good example of the type of behavior that would not be allowed in court."  (*Id.*)  She reportedly indicated her understanding "but maintained a frustrated expression on her face as she walked back to her room."  (*Id.*)

The Defendant's last attendance at competency restoration was on January 12, 2009.  (Ex. 4, p. 6.)  Records reflect that her participation in that session was good.  (*Id.*)

On or around January 31, 2009, however, as she was awaiting her release from FMC Carswell, the Defendant was involved in a physical altercation and transferred back to the M3 unit.  (Ex. 3, p. 81.)  In a letter dated February 1, 2009 and addressed to nursing staff, the Defendant maintained that she was attacked by another inmate after other inmates "egged [the inmate] on."  (Ex. 3, p. 97; Ex. A-8322.)  A psychiatric

7

examination performed the following day showed the Defendant to be alert and cooperative, using speech that was loud and pressured but capable of being interrupted.  (Ex. 3, p. 85.)   No psychotic symptoms were noted, but the Defendant's mood was described as "angry to tearful" over the injustice of being transferred to M3.  (*Id*.)

Defendant was eventually transferred from M3 for discharge on February 4, 2009.  (Ex. 3, p. 86.)  Her Discharge Summary, authored by Dr. Kempke, indicates a diagnosis of:  (Axis I) Bipolar I Disorder, Most Recent Episode Hypomanic (by history); (Axis 2) Personality Disorder, Not Otherwise Specified with Borderline, Paranoid, and Narcissistic Traits; (Axis 3) Hypothyroid, Glaucoma, Osteoporosis, allergies to Penicillin, Bactrim, Lithium, Tegretol, and Demorol; (Axis 4) Legal problems and lack of social support; and (Axis 5) GAF of 60.  (Ex. 3, p. 24.)  Dr. Kempke noted that the Defendant was medically and psychiatrically stable upon discharge, but she assigned the Defendant a poor prognosis due to the severity of her personality disorder.  (*Id*.)

## EXPERT REPORTS

*Dr. Leslie Powers*

Accompanying Warden Chapman's Certificate of Recovery is Dr. Powers forensic evaluation, dated January 12, 2009.  (Ex. 2.)  In discussing the Defendant's mental status, Dr. Powers observed that the Defendant "often spoke in a pressured manner with an elevated tone when complaining or defending herself but when sternly directed, she was able to speak appropriately."  (*Id*. at p. 7.)  When asked questions, the Defendant would "frequently offer more information than needed and would venture from the topic if allowed to continue," but Dr. Powers also noted that "she was generally redirected easily."  (*Id*.)

During the course of her evaluation, Dr. Powers' first several meetings with the Defendant were spent listening to the Defendant complain about her restriction to the M1 unit.  (Ex. 2, p. 7.)  During these conversations, the Defendant's speech was rapid,

loud, and run-on to the point that Dr. Powers could not get a word in.  Consequently, Dr. Powers advised the Defendant that, "as long as she refused to let me participate in the conversation, I was going to walk away." (*Id.*)  In fact, Dr. Powers reports that she did exactly that on several occasions; however "[a]fter three attempts to talk about her complaints to no avail, [the Defendant] began to speak in a manner that allowed me to converse with her in an appropriate manner." (*Id.*)  According to Dr. Powers, "[f]rom this point on, when Ms. Armstrong would speak in a loud and rapid manner, I would remind her I was going to walk away and she would slow down and lower her voice." (*Id.*)

Dr. Powers found the Defendant to be an active participant in her Competency Restoration Classes who would frequently raise her hand to volunteer answers. (Ex. 2, p. 8.)  Although she would occasionally speak in her usual loud and rapid manner, particularly when complaining about something, instructors were able to easily redirect her.  (*Id.*)

In assessing the Defendant's competence to stand trial, Dr. Powers had "little doubt" that she "possesses a rational and factual understanding of the Court process," as the Defendant showed a "clear understanding" of the pending charges, could "logically discuss the option of accepting a plea agreement versus taking her case to trial," and understood the roles of the various parties to the court proceedings.  (Ex. 2, p. 9.)  Dr. Powers also noted that the Defendant was "able to ask appropriate questions, comprehend instructions and advice, and engage in decision-making based on advice presented to her." (*Id.*)  Nevertheless, Dr. Powers acknowledged the "constant concern" over the Defendant's "expressed dissatisfaction" with her present counsel and "the affect [sic] this may have on her ability to assist in her defense." (*Id.*)  Dr. Powers reported that, when questioned about this, the Defendant responded, "I am a perfectionist when it come to my freedom.  My attorney has never handled a case this serious and it scares me." (*Id.*)

Based on her evaluation of the Defendant, Dr. Powers rendered the following diagnosis:

| Axis I: | Bipolar I Disorder, Most Recent Episode Hypomanic (by history) |
|---|---|
| Axis II: | Personality Disorder, Not Otherwise Specified with Borderline, Paranoid, and Narcissistic Traits |
| Axis III: | Hypothyroidism, Glaucoma (by self report) |
| Axis IV: | Legal Problems, Lack of Social Support |
| Axis V: | Current Global Assessment Functioning = 60 |

(Ex. 2, p. 9.)

While acknowledging that the Defendant met the diagnostic criteria for Bipolar I Disorder by virtue of her medical history, Dr. Powers found that the Defendant did not satisfy the criteria for a hypomanic or depressive episode during the period of this evaluation.  (Ex. 2, p. 9.)  In particular, she did not demonstrate any disturbances of sleep or increase in goal-directed behavior, nor was she observed engaging in pleasurable activities having a high potential for painful consequences.  (*Id*.)  Indeed, Dr. Powers reported that the Defendant did not engage in any activities at all, except for talking on the telephone and watching television.  (*Id*. at pp. 9-10.)

Dr. Powers further opined that the Defendant's rapid and pressured speech and irritable mood –  which, in the past, had been reported as manifestations of the Defendant's mania – were better explained as symptoms of the Defendant's personality disorder.  (Ex. 2 at pp. 9-10.)  In expounding on this conclusion, Dr. Powers wrote the following:

> A review of Ms. Armstrong's records indicate pervasive and long standing characterological deficits in her ability to relate and function in social and personal contexts.  Previous psychological reports and Court testimony from the last 25 years have described Ms. Armstrong as impaired socially and occupationally, difficult, defensive, demanding, rigid, deceitful, manipulative and hostile.  These descriptives are hallmark characteristics of an individual with pervasive characterological deficits.
>
> Ms. Armstrong exhibits traits of Borderline Personality Disorder.  She has demonstrated frantic efforts to avoid real or imagined abandonment and she alternates between extremes of idealization and devaluation in unstable and intense interpersonal relationships.  This is best demonstrated by her discussions concerning her relationship with her mother where she indicates intense admiration and the need for acceptance and yet, expresses immense anger and negativity toward her mother as the cause of her social and academic problems.  As previously noted, the only time she showed any dysthymic emotion was when discussing her attempts to make her mother proud of her.

During the course of this evaluation, Ms. Armstrong was observed to demonstrate paranoid beliefs.  She frequently reported beliefs that others were interested in exploiting or harming her.  She often stated, "You all are just out to get me because this is a high profile case."  She also reported to nursing staff that other inmates on the unit were "trying to frame her so she would get in trouble."  She harbored paranoid beliefs regarding the use of psychological testing she was asked to complete stating, "I know how people can use these tests and twist them."  As a result of her beliefs, she refused to participate in any formal testing procedures.  Finally, nurses reported she frequently accused them of giving her medication she was not prescribed.  She has, on several occasions, looked over each pill carefully and then proceeded to smell it before finally taking it as directed.

Ms. Armstrong also exhibits Narcissistic traits.  She displays arrogant behaviors and has a sense of entitlement.  She demands specific and special treatment from the nurses and is insulting when she does not get this treatment.  For instance, during the first few weeks of her evaluation, she demanded that she receive a special mattress and special shoes because of her unique physical needs.  During her phone conversations, she has repeatedly voiced her belief that she is different from the other inmates on the unit and does not deserve to be incarcerated at FMC Carswell like the other inmates.  She is interpersonally exploitative.  She manipulated a staff member into allowing her to make a phone call to an individual who was not on her approved phone list by stating this individual was the attorney on her case.  She has also befriended some of the lower functioning inmates in order to obtain personal items from the commissary.  She has exhibited a grandiose sense of self and is preoccupied with fantasies of power and success.  During a clinical interview she stated she was "one of the best teachers [the school district] had ever seen" even though she admits she could not secure a permanent position with the school district.  Regarding her appearance, she stated, "I used be [sic] the prettiest girl in town.  Everyone said so."  When an attempt was made to persuade her to participate in psychological testing, she reported, "My intelligence score has already been determined to be the one [sic] of the highest you can get.  I don't need another test to tell me that."  This sense of grandiosity was also noted in her belief that she is the most knowledgeable concerning the best way to defend her case.  This was noted during her conversations with her attorney where she often began sentences with, "You had better..." and she would make frequent demands of him to engage in legal actions under her direction.  She also stated, "I don't feel prepared for trial with this attorney.  I would like to go into Court and act like a lady but I feel like someone has to be aggressive and my attorney is not, so I am."

(Ex. 2, pp. 10-11.)

As to the ultimate question of competency, Dr. Powers opined that the Defendant is competent to proceed to trial.  The Defendant, Dr. Powers wrote, "clearly possesses a factual and rational understanding of information required of a competent defendant" and has "demonstrated her ability to comport her behavior in formal settings and to follow directions given by those in authority."  (Ex. 2, p. 11.)  As to the Defendant's ability to assist properly in her own defense – the issue which was the focus of this Court's prior competency determination – Dr. Powers opined that the Defendant has "demonstrated the ability to participate in defense planning with her attorney although her actual strategy is clouded by her personality deficits."  (*Id.*)  Dr.

11

Powers elaborated:

> One of the most significant barriers to assisting in her defense has been her argumentative
> style of speech.  She has a tendency to talk rapidly in a loud manner and will not pause long
> enough for the listener to respond, particularly when discussing issues that are stressful to
> her.  If allowed to continue, she also has a propensity to derail from the topic at hand.  During
> the course of this evaluation, she has consistently responded more appropriately when she is
> given firm boundaries regarding this behavior.  When she is aware that her presentation is
> not in her best interest, she is able to modulate her tone and stay on topic.

(*Id*.)  In conclusion, Dr. Powers opined that, while the Defendant meets the criteria for a

mental disease or defect, the latter does not affect her ability to understand the nature

and consequences of the proceedings or to assist properly in her own defense.  (*Id*.)


*Dr. Frank Dattilio*

In March of 2009, the Defendant underwent a psychological evaluation and

competency assessment performed by Frank M. Dattilio, Ph.D., a clinical and forensic

psychologist.  This evaluation was performed at the request of defense counsel and Dr.

Sadoff, with particular focus on determining whether or not the Defendant can rationally

assist her attorney in preparing a defense.  (*See* Ex. A-8162.)

Dr. Dattilio initially met with the Defendant on March 26, 2009 at the Erie County

Prison for the purpose of conducting a clinical interview.  Having been led into the

examining room in shackles, the Defendant "immediately became irate" with the idea

that she would have to remain restrained in that fashion throughout the interview.  She

refused to participate in any psychological testing until, through a request to the prison

officials, she was eventually unshackled.  (Ex. A-8170.)

Thereafter, Dr. Dattilio found the Defendant to be less agitated but still displaying

variable emotions with sporadic crying.  (Ex. A-8171.)  He found it difficult to understand

what she was saying, as her speech was "incessant[ ]" and "pressured," "skirt[ing]" along

from topic to topic in an illogical sequence of thought, often rambling incessantly."  (*Id*.)

When asked to repeat was she was saying, the Defendant was unable to comply.  (*Id*.)

Any attempt by Dr. Dattilio to talk over or limit the Defendant's speech was "met with a

reaction of intense anger and hostility." (*Id*.)

Despite much difficulty, Dr. Dattilio was able to administer the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). Because the Defendant was unable to concentrate long enough to read and respond to the score sheet independently, Dr. Dattilio administered the test by reading the questions to her and capturing her responses, then having her review the responses for accuracy. (Ex. A-8171.) This process occurred over the course of many hours preceding and following the dinner hour. (*Id*.) Despite this method of administration, Dr. Dattilio viewed the validity scores as reflecting the Defendant's openness and candidness in her responses, with no indication of deceptiveness on her part or attempting to portray herself in a relatively better or worse light. (Ex. A-8173.)

Dr. Dattilio also convinced the Defendant, again with great difficulty, to participate in the Folstein Mini Mental Status Examination (MMSE) and the Competency Screening Test (CST). (Ex. A-8171.) Her score on the MMSE was 30/30, indicating that the Defendant was alert, responsive and oriented to time, place and person. (A-8172.) In commenting on the Defendant's mental status, Dr. Dattilio observed that, "[w]hile she was devoid of any overt psychotic ideation interfering with her primary thought processes, psychotic content did surface as the interview progressed, particularly as her mania became more pronounced and she rambled about the details of her case." (*Id*.) Dr. Dattilio found her mood and affect to be "quite volatile and manic," and this lasted "for hours on end." (*Id*.) He described her speech as uncontrolled and rambling on like a "runaway train" (*id*.) and her thought content as "often irrational and disconnected." (*Id*.) Though the Defendant denied hallucinations or delusions, she reportedly made statements to the effect that she could put spells on people she didn't like and that they have "dropped over dead." (*Id*.)

Having reviewed the Defendant's detailed mental health history, Dr. Dattilio found "strong evidence" that the Defendant "has suffered from a major affective illness ranging from Bipolar Disorder, Manic/Depressive Type to Cyclothymia." (Ex. A-8173.)

While reports indicate that "she has displayed some psychotic features in the past," Dr. Dattilio wrote, "the more predominant aspect of her illness has always been her variable mood that has ranged from depression to manic symptoms." (*Id.*) From a longitudinal standpoint, Dr. Dattilio found "strong, convergent validity" of the existence of bipolar illness which, at the very least, has been "a major part of Ms. Diehl-Armstrong's diagnosis against the backdrop of a [sic] paranoid, borderline, and narcissistic personality traits." (*Id.*) Based on his own observations and clinical interview, Dr. Dattilio felt convinced that the Defendant does, indeed, suffer from a bipolar illness, manic type. (*Id.*)

Dr. Dattilio found that the Defendant's results on the MMPI-2 suggested the profile of "a severely paranoid personality makeup with a psychotic-like state or borderline condition." (Ex. A-8174.) "What was most pronounced," he observed, "is that Ms. Diehl-Armstrong tends to be hostile and agitated when she feels trapped or threatened, causing her to react in manipulative and self-centered ways." (*Id.*) Dr. Dattilio also noted some indication of impairment with judgment and deterioration with respect to her impulse control. (*Id.*) He interpreted the MMPI-2 results as also indicating that the Defendant suffers from moderately severe depression and anxiety which, he felt, is "likely to be displayed in dramatic ways." (*Id.*) He found the Defendant "quite unwilling to admit to any emotional conflicts" and apparently lacking a good repertoire of coping skills. (*Id.*) "What is often considered a chip on the shoulder or wounded pride syndrome with her profile," he wrote, "indicates that tempter tantrums are likely to have been a major way of getting what she has wanted during her upbringing." (*Id.*)

"Overall," Dr. Dattilio concluded,

> it is my impression that Ms. Diehl-Armstrong's profile is typical of a personality disorder, NOS, with strong borderline, paranoid, and narcissistic traits. She also has bipolar illness as well. Ms. Diehl-Armstrong's diagnoses makes it extremely difficult for her to function interpersonally, and in this particular case, has interfered with her ability to work effectively with her legal counsel in developing a viable defense.

14

(Ex. A-8174.)

With respect, more specifically, to court proceedings, Dr. Dattilio reported that the Defendant's participation in the CST showed that she understood the serious nature of her alleged crime and had a basic understanding of both the trial process and the roles of the various trial participants. (Ex. A-8174.) Moreover, while she displayed an appreciation and reasoning concerning the grounds for developing a defense, Dr. Dattilio found her reasoning to be "quite distorted." (*Id*.) He noted, for example, that

> she believes that she is being conspired against and that she has been wrongfully accused because "a crackhead who tried to rob her is trying to save his ass from going to prison." She further states that she can easily prove this, but her attorney does not want to listen to her. She is completely obsessed with the belief that she is not being represented appropriately by her current legal counsel and is under the delusion that high profile attorneys, such as "Johnny Cochran-type attorneys" are interested in taking her case because there is money in it. Therefore, it is her desire to fire her attorney and hire high profile counsel. Although, when asked who this counsel is, she was unable to say, other than simply to state that she needs money from her estate in order to hire effective counsel.

(*Id*.) Thus, even though the Defendant manifested an understanding of the trial process and its participants, Dr. Dattilio felt she "perceives that it is a forum for vindicating herself by proving the validity of her notion that she is being conspired against." (Ex. A-8174-8175.)

Since the focus of his consultation related to the Defendant's ability to assist her present counsel, Dr. Dattilio considered that relationship. He observed that

> [d]uring the examination, Ms. Diehl-Armstrong was very resistant to my attempts to explain the difference between her views and the nature of available defenses, particularly those that her attorney is proposing. During my attempts to explain this to her, she manifested increasing agitation and difficulty in attending to relevant information. While Ms. Diehl-Armstrong was able to demonstrate a recognition and appreciation of the importance of legal counsel in presenting a defense, she does not believe that her current legal counsel is capable, nor competent, to represent her and she demands new counsel.

(Ex. A-8175.)

Part of Dr. Dattilio's consultation involved a meeting with both the Defendant and Mr. Patton, her current attorney, which occurred on March 27, 2009. Dr. Dattilio described the Defendant's conduct as extremely agitated and degrading toward counsel in his absence. (Ex. A-8175.) In his presence, she greeted him cordially but then

15

"started on a tirade about how he is not doing what he is supposed to do by following up on certain leads that she has given to him." (*Id.*)  Having witnessed this exchange, Dr. Dattilio described the interaction as follows:

> Attorney Patton was extremely professional and patient with Ms. Diehl-Armstrong, who hardly allowed him to get a word in edgewise.  Attorney Patton attempted numerous times to reason with Ms. Diehl-Armstrong, but it was clear to me that her mania, along with her anger and belligerence left little room for him to get through to her.  During the process, Ms. Diehl-Armstrong appeared to escalate, becoming quickly derailed and going off on various tangents.  She was extremely difficult to center and even after given ample time to ventilate, she simply went on excessively without rest.  Ms. Diehl-Armstrong became so obsessed with how her civil attorney, Lawrence A. D'Ambrosio, Esq., is stealing from her and ruining her life that it dominated the entire interview period, despite my efforts to redirect her focus.

> On numerous occasions in which Attorney Patton attempted to structure his questions in order to work with Ms. Diehl-Armstrong in building a defense, this was met with opposition, belligerence, and such a diatribe of grandiose statements that it became clear that a productive conversation was futile.  This session was concluded with Attorney Patton and myself ending the interview.  As we left the interview room, Ms. Diehl-Armstrong continued on her rampage as though we were still present and listening to her attentively.

(Ex. A-8175.)

As to the ultimate issue of the Defendant's competency, Dr. Dattilio opined that, while the Defendant is competent in the basic knowledge of a court proceeding, she is not competent to rationally assist her attorney in building a viable defense due to her serious mental illness – i.e., her bipolar illness which, at present, remains unmedicated. (Ex. A-8175.)  Additionally, Dr. Dattilio opined, the Defendant "maintains a diagnosis of a Personality Disorder, NOS, with strong borderline, paranoid and narcissistic traits." (*Id.*)  He found that the Defendant lacks insight into her mental illness and maintains a delusional belief that she can turn her illness "on and off at will" (*Id.*), and he concluded that her illness would continue to interfere with her ability to work effectively with her counsel unless she receives treatment.  (Ex. A-8176.)  Complicating matters, Dr. Dattilio opined, is the fact that the Defendant has a long history of difficult relationships with men and her current counsel is male.  (*Id.*)  Dr. Dattilio observed that, during previous episodic occurrences, the Defendant has apparently responded well to psychotropic medication and treatment; however, once returned from the hospital, if she is not presented quickly for trial, the Defendant decompensates in the interim and

chooses not to take medication.  (*Id*.)  Dr. Dattilio opined that the Defendant "will clearly need to be monitored effectively and have her case heard in an expedient fashion in order to avoid any future deterioration."  (*Id*.)  He cautioned, however, that, even with this strategy, there is no guarantee that she will be able to assist her legal counsel in developing a reasonable defense.  (*Id*.)

*Dr. Robert Sadoff*

The Defendant was also examined by Dr. Sadoff on March 13, 2009 over the course of approximately three hours.  (Ex. A-8156.)  Dr. Sadoff reported on his examination in a letter to defense counsel dated April 15, 2009.  (Ex. A-8156-8159.)

Based on his most recent observations of the Defendant, Dr. Sadoff opined that she has a grasp of her case and her defense from an intellectual standpoint and, when she is not manic, is able to work with her attorney in preparing her defense even though she continues to talk to reporters against counsel's advice.  (Ex. A-8157.)  Dr. Sadoff described the Defendant's speech during his examination as pressured, with flight of ideas and "non-stop."  (*Id*.)  He noted there are times when she shows genuine affect, as when she cries or becomes angry and upset or frightened.  (*Id*.)

Dr. Sadoff found it "clear" from his examination that the Defendant does have bipolar disorder and that she was manic "much of the time" that he was with her.  (Ex. A-8158.)  "When she is manic," Dr. Sadoff noted, "she does not want to have [present defense counsel] as her attorney," and, he opined, cannot work with defense counsel "because of her psychotic condition."  (*Id*.)   Dr. Sadoff concluded:

> Thus, it is my opinion at the present time, within reasonable medical certainty, that Marjorie Diehl-Armstrong has bipolar disorder and personality disorder, not otherwise specified, with paranoid, borderline and narcissistic features, and that when she is psychotic she becomes manic and cannot work with you in preparing her defense.  When she is not manic and not psychotic, she can understand the nature and consequences of her current legal situation and could work with you if she chooses to do so.
>
> Thus, it is a day to day situation about her competency, and she should be assessed for competency on the day of her hearing or her trial.  It is best if she were to be given medication to stabilize her bipolar condition and then have her legal hearing or trial shortly after her discharge from the hospital when she is stabilized.

17

(Ex. A-8159.)

**THE COURT HEARING**

The Court held an evidentiary hearing on April 27, 2009, at which time it took testimony from Dr. Powers, Dr. Dattilio, and Dr. Sadoff.  Each of these mental health professionals testified consistently with their written reports, as I will discuss in more detail.

*Dr. Powers*

In general, it is Dr. Powers' opinion that the Defendant's current symptomatology is best explained by her diagnosis of a personality disorder, not otherwise specified, with borderline, narcissistic and borderline traits.  It is further Dr. Powers' opinion that the Defendant has a degree of control over her behavior sufficient to render her competent to stand trial.

Central to this opinion is Dr. Powers' view that the Defendant's bipolar disorder was in a state of relative quiescence during her incarceration at FMC Carswell and that the symptoms observed during that time did not suggest the presence of any mania. While Dr. Powers credits the Defendant's diagnosis of bipolar disorder by history, she did not feel comfortable diagnosing the illness herself because, in her view, the Defendant did not manifest enough of the required criteria to warrant such a diagnosis during evaluation at FMC Carswell.  (Tr. 63-64.)

Dr. Powers referred to the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEST REVISED ("DSM-IV-TR") (4th ed. 2000), which discusses "Criteria for Hypomanic Episode," (*see id.* at 368), and lists as one criterion "[a] distinct period of persistently elevated, expansive, or irritable mood, lasting through at least 4 days, that is clearly different from the ususal nondepressed mood."  (*Id.*)  Dr. Powers testified that, of these three types of mania (elevated, expansive, or irritable), the only variety that arguably could have applied was "irritable" mania.  (Tr. at 66.)

According to the DSM, when the subject's persistent mood is irritability, the

18

episode can be considered hypomanic if at least four of the following symptoms are present to a significant degree:

(1)     inflated self-esteem or grandiosity

(2)     decreased need for sleep (e.g., feels rested after only 3 hours of sleep)

(3)     more talkative than usual or pressure to keep talking

(4)     flight of ideas or subjective experience that thoughts are racing

(5)     distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli)

(6)     increase in goal-directed activity (either socially, at work or school, or sexually) or psychomotor agitation

(7)     excessive involvement in pleasurable activities that have a high potential for painful consequences (e.g., the person engages in unrestrained buying sprees, sexual indiscretions, or foolish business investments)[.]

(*See* DSM-IV-TR at 368; *see also* Tr. at 66-67.)  Dr. Powers testified that the Defendant did exhibit inflated self-esteem or grandiosity (criterion 1), was hyper-talkative (criterion 3), and demonstrated occasional flight of ideas (criterion 4); however she felt that none of the remaining symptoms had been present.  (Tr. 66-72.)  Thus, Dr. Powers felt that she could not diagnose an episode of irritable mania because only three of the four required symptoms outlined in the DSM-IV-TR had been observed and, as to the remaining symptoms, it was not even a close call.  (*Id.* at 72-73;104-07;147-48.)

Dr. Powers also discussed the factors which led her to diagnose the Defendant with Personality Disorder Not Otherwise Specified (NOS) with Borderline, Paranoid, and Narcissistic Traits.  (Tr. 74.)  She explained that the Defendant satisfied some of the criteria relative to three specific personality disorders but did not meet the full criteria for any single one.  (*Id.*)  In such cases, the DSM-IV-TR allows a diagnosis of personality disorder NOS, "and then you can talk about which personality disorders they exhibit the traits of."  (Tr. at 74-75.)  For example, Dr. Powers felt that the Defendant met two of the prongs relative to Borderline Personality Disorder, *to wit*:  (1) frantic efforts to avoid

real or imagined abandonment and (2) a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation.  (Tr. 75-76; *see also* DSM-IV-TR at 710.)  Dr. Powers felt the latter symptom was best characterized by the "love-hate" attitude the Defendant displayed toward her deceased mother.  (Tr. 76.)

Dr. Powers also felt the Defendant exhibited certain traits associated with Paranoid Personality Disorder, which is defined in part as a "pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent."  (DSM-IV-TR at 694; *see also* Tr. 76.)  Dr. Powers felt that the Defendant exhibited two traits in particular, *i.e.*, she "suspects, without sufficient basis, that others are exploiting, harming, or deceiving" her, and she "is reluctant to confide in others because of [an] unwarranted fear that the information will be used maliciously against" her.  (DSM-IV-TR at 694; *see also* Tr. 76.)  Dr. Powers felt this was exhibited by the Defendant's stated belief that she has been framed and that others "have it in for her," and her unwillingness to participate in any psychological testing, which is based on her fear that it could be used against her. (Tr. 76.)

It was also Dr. Power's opinion that the Defendant showed certain personality traits associated with Narcissistic Personality Disorder and, indeed, she felt this was "really key to the issue of competency."  (Tr. 77.)  For one, Dr. Powers felt that the Defendant displayed a "grandiose sense of self-importance" (DSM-IV-TR at 717; Tr. 77), in that she frequently made claims concerning important things that she has done, as with her claim that she didn't need to take an IQ test because she had previously taken one and scored the highest possible score.  (Tr. 77.)  For another, Dr. Powers felt the Defendant also displayed "a sense of entitlement" (DSM-IV-TR at 717), as when she demanded special shoes or a special mattress at Carswell.  (Tr. 77.)  The Defendant was also considered by Dr. Powers to be "interpersonally exploitative," defined by the DSM as "tak[ing] advantage of others to achieve ... her own ends" (DSM-IV-TR at 717), in that she was "frequently caught splitting staff" by trying to play one

20

staff member against another.  (Tr. 77-78.)  She was also observed using certain lower

functioning inmates in an effort to obtain commissary items.  (Tr. 78.)  Dr. Powers

described how, consistent with this personality trait, the Defendant was most agitated

and most difficult to redirect when confronted with facts that she believed to be untrue.

(*Id*.)  Dr. Powers further explained how the Defendant's narcissism came out in

recorded conversations with her attorney, where her tone tended to be very "bossy" and

exhibited a belief that her defense strategy was superior to his.  (Tr. 80.)

Dr. Powers testified concerning the difference between mental illnesses such as

bipolar disease and personality disorders.  She described personality disorders as

"really different" from other disorders coded on Axis 1 in that they are "pervasive"

across different situations and "characterological" – i.e., "part of their personality" and

the way in which "they relate to the world."  (Tr. 74-75.)   According to Dr. Powers, these

types of disorders do not meet the requirements of a serious mental disease or defect

for purposes of determining competency.  (*Id*. at 75.)  Moreover, Dr. Powers testified

that individuals with personality disorders have much more control over their behaviors

than an individual with an Axis 1 diagnosis would have.  (Tr. 130-31.)

Dr. Powers opined that some of the Defendant's apparently manic symptoms –

such as pressured speech, flight of ideas, and tangential thinking – were not reflective

of a true manic state, but could instead be better explained as part of the Defendant's

personality make-up.  (Tr. 88-89, 101-04, 130-32.)  According to Dr. Powers, it is part of

the Defendant's personality that, when angry or frustrated, she will "spit out" whatever is

on her mind and is determined to "have her say."  (Tr. 26-27.)  Dr. Powers explained:

> [I]n my opinion Ms. Armstrong, when she is trying to get a point across,
> when she is upset about something, when she's angry or agitated, what
> really takes precedent [sic] for her is this feeling of grandiosity, what she
> has to say is more important than what you have to say, so she's going to
> say it almost to the point of being disrespectful until corrected, because
> her time and her words are more valuable than what you have to say.  I
> think that is a symptom of this grandiosity, sort of narcissism, that is a trait
> in personality disorder [sic].

(Tr. 146.)  Moreover, Dr. Powers felt that the consistency of the Defendant's pressured

speech, which improved to some extent over time but which was virtually always present, was indicative of a personality disorder, since the presence of "pervasive" and "inflexible" traits are the "hallmark" of a personality disorder.  (Tr. 20, 47, 53-54, 131-32.)  Dr. Powers likewise felt that the Defendant's tendency to exhibit a flight of ideas, and the tangential thinking which was reported by Dr. Kempke, were a function of her personality and simply the "way she communicated."  (Tr. 89; *see also id.* at 130-32.)

Dr. Powers further opined that the Defendant's various outbursts and run-ins with other inmates at FMC Carswell – as on December 11, 2008 when she was sent to the M3 unit after being confronted about discussing other inmates' cases over the telephone – were not reflective of psychotic episodes but were, rather, the result of maladaptive confrontation skills:

> I think, many, many times when we have an inmate who is being accused of something and they feel like they're being accused unjustly, and they're confronted in front of people, a lot of times they don't have good confrontation, avoidance skills and they immediately go to the one skill that they're good at and that is anger.  For many defendants it's been adaptive in the past.  And that clearly is what I saw with Ms. Armstrong. When she got in trouble at this particular time, she became irate.  She was furious that we were calling her on her behavior.  And got very confrontive, and was not directable as a result, she was so angry.

(Tr. 148-49.)  According to Dr. Powers, this incident – and the incident on December 8, 2008 when the Defendant caused a disruption in her competency restoration class and could not be immediately redirected –  were the exception rather than the norm.  Dr. Powers maintained that the Defendant was generally manageable during her four months at Carswell and did not cause "this level of problem except for two occasions that were notable."  (Tr. 149.)

Dr. Powers considered the Defendant's general ability to regain control of herself to be inconsistent with manic behavior.  Dr. Powers noted that, within five minutes or so following the Defendant's outburst on December 8, 2008, she was able to calm down, regain control of her behavior, and return to her unit.  (Tr. 152.)  This type of reaction, Dr. Powers opined, is inconsistent with the presence of mania, which cannot be "turned

off that quickly." (*Id.*)  Dr. Powers explained that, when somebody is in a psycho-agitated state or a goal-directed state, it is "very difficult for them to stop that behavior." (Tr. 152.)  Another factor which Dr. Powers found to be inconsistent with a manic episode was the lack of any sleep disturbance on the Defendant's part following the December 8 outburst, which she would consider to be one of the "hallmarks" of mania. (*Id.*)

As further evidence that the Defendant was not manic, Dr. Powers offered testimony that, during the Defendant's 4-month stay at FMC Carswell, she was never diagnosed or reported by any staff members to be experiencing an actual psychotic or manic episode, nor were delusional thoughts ever documented or anti-psychotic medications ever prescribed.  (Tr. 36-38, 74, 139-41, 143-44.)  Dr. Powers opined that some of the Defendant's statements, which might seem grandiose or even delusional at first, actually had some basis in fact or are, at least, not completely irrational, such as the Defendant's claim that this pending criminal matter is a "high-profile" case or her belief that she does not need psychiatric medication.  (Tr. 31, 141-43.)  It was also Dr. Powers' view that many of the Defendant's disputes with others stemmed from disagreement over factual issues, rather than from a lack of insight.  (Tr. 143.)

Dr. Powers opined that the Defendant's performance on the MMPI test administered by Dr. Dattilio did not compel the conclusion that the Defendant was in an active manic state.  She felt that a manic individual would not have been able to focus for hours on end and complete the test, which consists of some 567 questions.  (Tr. 72, 154-56.)  She also felt that the test results, which ostensibly reflected the presence of mania, could be explained by a significantly elevated score relative to ego inflation which, in turn, she thought could be explained by the Defendant's narcissistic personality traits.  (Tr. 159-61.)  In fact, Dr. Powers considered the MMPI scores to be

> a statistical picture of what I saw for four months.  In that when you first look at her and she's got run-on speech and she has pressured speech, you think oh, this appears, as Dr. Kempke said, this appears like hypomania.  And then the more you get to know her, the more you kind of rule out these other things and kind of tie it all into more ego inflation.  Tie

it into more grandiosity and narcissism, that is really the hallmark of a personality disorder.

(Tr. 160-61.)

Dr. Powers concluded that the Defendant's difficulty in dealing effectively with her attorney is the result of her personality – her "characterological deficits" – rather than her bipolar disorder or some other serious mental disease or defect. (Tr. 75.) She opined that the Defendant's stated concerns about her attorney – even if they were not substantively accurate – were rational and not indicative of a psychotic thought process. (Tr. 40-41, 54-55.)

Dr. Powers further opined that the Defendant's behaviors were volitional and something over which she exercises a degree of control. She acknowledged that the Defendant's speech did not change a great deal during her stay at FMC Carswell and remained pressured "[a]lmost without exception" (Tr. 20), yet Dr. Powers felt this was a volitional habit:

> [F]rom the very beginning, I made it very clear to Ms. Armstrong that I was not going to have a conversation with her if I was not going to be able to participate, that would not be a conversation. So I would say I'm going to walk off if you do not let me talk. And she would say okay, okay, okay, and would let me talk.
>
>                                     ***
>
>      When I told her ... I was not going to have a conversation with her if she continued to talk like that, she was able to slow down a little bit and allow me to get in a word edgewise. Other staff adopted that same stance and was [sic] successful in speaking with her. ... I noted to her during one conversation I had with her, that it's difficult to talk with her because she talks and talks and talks without pause. And she said I know I do that, but I feel like if I don't do that, people won't listen to me. So it became clear to me over time that Ms. Armstrong uses this as a method to get her point across. It's a mal-adaptive method, but a method she uses nonetheless.

(Tr. 20-22.)

According to Dr. Powers, the Defendant showed an awareness of the difficulty created by her speech habits and expressed an intention to improve:

> [A]t times she even said I'm going to work on that. I realize I to [sic] do that, I know I have a problem with that. She would explain that she does it

24

because she thinks it makes her – it makes her voice heard better.  She believes that's what gets people's attention.  But she did realize that could be problematic and would try to work on it.  And I did notice some improvement, like I said, there was never a time that I noticed that she was able to really calm down and talk in a voice that I'm talking in now.  It was always slightly pressured.  But she was able to be redirected and interrupted.

(Tr. 23.)

Dr. Powers testified that there were many times during her incarceration at FMC Carswell when the Defendant showed an ability to modify her behavior.  As one example, Dr. Powers discussed the fact that, following her transfer to the M3 unit on December 11, 2008, the Defendant expressed remorse for her behavior and resolved to improve.  (Tr. 28-29.)  Dr. Powers testified that, on a subsequent occasion when her telephone conversations were being monitored, the Defendant began discussing another inmate's crime but stopped herself, stating, "I can't say anything about that, I've told them I won't."  (Tr. 30.)  Dr. Powers also cited a progress note in which the Defendant was quoted as saying "I'm doing much better than yesterday.  I have not been disrespectful."  (Tr. 42.)  Dr. Powers felt this showed that the Defendant was aware that she had a behavioral problem with being disrespectful and that she was working on her problem.  (*Id.*)

Dr. Powers also testified concerning her ability to listen in on recorded conversations between the Defendant and her attorney, which she considered "crucial" to her evaluation.  (Tr. 59-60; Ex. 5.)  According to Dr. Powers, these conversations reflect an ability on the Defendant's part to formulate a strategy, which is a sign of competency.  (Tr. 59-63.)  The fact that her strategy may be flawed, Dr. Powers felt, was not a sign of bipolar illness, but rather, "the result of someone who is very strong willed, somebody that is inflexible and believes that she knows more about her case than anybody else and can defend it as good or better than anybody else."  (Tr. 61.)  Dr. Powers concluded that while the Defendant has a difficult personality, and while her personality makes her attorney's job more difficult, she is not incompetent by reason of

25

a mental disease or defect.  (Tr. 61-62.)

*Dr. Dattilio*

Dr. Dattilio, a clinical and forensic psychologist, testified concerning his evaluation of the Defendant at the Erie County Prison on March 26-27, 2009.  Dr. Dattilio's initial intention was to administer a battery of psychological tests in order to render a differential diagnosis and clarify whether or not she met the criteria for any personality disorders and/or bipolar illness.  (Tr. 171-72.)

Dr. Dattilio testified that the Defendant presented as very agitated "right off the bat" due to the fact that she was shackled.  (Tr. 172.)  In addition to being very perturbed about that, she presented as "very expansive, escalated in mood," and "very manicky."  (*Id*.)  Her speech was pressure and run-on for long periods of time and she quickly veered off topic.  She was easily distracted, difficult to evaluate, and "quite exhaustive."  (*Id*.)  Although Dr. Dattilio hypothesized that the Defendant was manic, he "wanted to give it some time and see what unfolded."  (Tr. 173.)  He described his impressions as the evaluation continued:

> [I]t became very, very clear to me that this woman really struggled with keeping herself on track.  And she would often go off on tangents very quickly.  So as I worked with her, the more and more I engaged with her, the more it became clear that this woman didn't come up for air.  I mean she just spewed this stuff out, almost in a marathon type fashion.  And that's typically one of the hallmarks ... and oftentimes undiscernible [sic] with manic disorders.  I also noticed that she became agitated very easily.  And is very vigilant of any moves or changes in behavior, I think at one point I yawned during the process because I was a little tired, and she became very agitated at that.

(Tr. 173.)

As noted in his report, Dr. Dattilio was ultimately able to conduct only one true psychological test, the MMPI, which was administered orally.  (Tr. 172, 174.)  Dr. Dattilio testified that the test, which normally takes less than 1 and ½ hours to complete, took hours for the Defendant to complete because she was so easily distracted.  (Tr. 175, 176.)  As he described it, "I would only go every 10 questions, and then she would

veer off and she would go on a tangent.  I had to try to coerce her to come back and ... stay focused.  It was really a struggle for hours to get her to do that."  (*Id*. at 175.)

According to Dr. Dattilio, the MMPI's built-in validity scales showed results that indicated a valid test and an accurate psychological profile of the Defendant.  (Tr. 177-78.)  Substantively, Dr. Dattilio testified that the MMPI showed a "very, very disturbed person, who has had significant elevations in a number of personality disordered areas, what we call Axis II" (Tr. 178) – specifically, narcissistic, borderline and paranoid personality traits  (*id*.) –  and also a clinically significant elevation on the hypomanic scale.  (Tr. 179.)   According to Dr. Dattilio, the results revealed a mixed clinical picture. (*Id*.)

With respect to the Defendant's elevated ego inflation score, Dr. Dattilio did not view this factor as invalidating a finding of mania, since "ego inflation is also one of the hallmarks of bipolar disorder."  (Tr. 180.)  Nor did Dr. Dattilio believe that this single score could be meaningfully disentangled or extrapolated from the rest of the Defendant's composite test results (Tr. 180-81), which he felt revealed "one of the most complex, difficult types of personalities that I've seen in my 30 years of experience." (*Id*. at 181.)

Dr. Dattilio opined that the record in this case reveals the "convergent validity" of the Defendant's bipolar diagnosis.  He viewed the diagnosis as not only supported throughout the Defendant's medical history, but also consistent with his own observations of the Defendant's behaviors, which he felt to be "very characteristic" of bipolar disorder and, as well, the MMPI results, which indicated elevations of both mania and depression.  (Tr. 181-82.)

However, it was also Dr. Dattilio's opinion that the Defendant suffers not only from bipolar disorder, but also from a mixed personality disorder, with paranoid, narcissistic, and borderline traits.  (*Id*. at 182-83.)  Thus, he agrees with Dr. Powers' Axis II diagnosis and believes this complicates her problems.  (*Id*. at 183, 185.)

Dr. Dattilio further opined that the Defendant is not presently competent to

27

rationally assist her counsel in preparing a defense due to her bipolar disorder. (Tr. 184, 185.) He felt that "her illness is getting in the way of her ability to listen, to contemplate, and to digest suggestions with regard to a viable defense plan." (*Id.* at 184.) He believes she is "deluded and very angry and agitated." (*Id.*) He testified that defense counsel's efforts in trying to deal with her patiently were "just to no avail" and that the Defendant "couldn't even keep herself focused" on what her attorney was trying to say. (*Id.*) Dr. Dattilio elaborated further on the reasons why he believes that the Defendant's problems in this regard are attributable to her bipolar disorder:

> I think because this distractibility, this pressure that's in her, that is displayed at the minimal level through her speech, but more so in her cognitions and her ability to intake and process information is derailing her, making it difficult. She's so focused and so obsessed in an area of – not even being able to relate, not even being able to work with you, that it's completely disarming her. I don't think she even hears what you say.

(Tr. 184-85.)

When asked if there is at least the possibility of the Defendant being restored to competency, Dr. Dattilio responded, "I hope so, I don't know for sure. I don't know how she would respond to medication. But I hope so." (Tr. 185.)

On cross-examination, Dr. Dattilio was questioned about one aspect of his report which seemed to indicate that the Defendant was psychotic and another page suggesting that she was not currently suffering from psychotic features. Dr. Dattilio explained this apparent inconsistency by referring to the Defendant's state as "semi-psychotic, psychotic like, she pulls herself back." (Tr. 211.) He elaborated that

> [t]his is complex, there is [sic] incongruities ... this just concretizes how mixed this picture is. You see it and you don't. It changes, and she's over here and she's over there. Very, very complex picture. And this is why I have no doubt that her attorney has difficulty working with her. Because she's really a mixed bag.

(Tr. 211.)

Dr. Dattilio acknowledged that the Defendant's personality disorder is clearly a prominent issue, notwithstanding her bipolar disease. (Tr. 215.) However, he stated that he has equal confidence in both diagnoses. (Tr. 227.)

28

Dr. Dattilio opined that the Defendant's ability to be redirected when in an agitated state could be consistent with her being in a manic state, but it would depend on the level of mania that is present.  (Tr. 227.)  He explained that "many people who are manic can be redirected, but they're not usually directed for long, it's kind of short lived, and then it comes back.  Or they may internalize it ... I mean some can't, some can."  (*Id.*)  In response to the Court's query whether it is typically more difficult to talk someone down off their high when they are genuinely manic, Dr. Dattilio responded:

> Well, that's an excellent question.  Because if someone is really at the height of their mania, they're out of their minds.  [sic]  They may really ... go ballistic and won't even hear you.  But then there may be degradations of that level of mania and they may be able to be talked down, depending on how high they are at the time.  This is what makes this so difficult because it's not an either/or, there's a lot of shades of gray.

(Tr. 228.)  Dr. Dattilio was asked whether someone who is truly experiencing a period of mania can just turn it off "like a switch" when the triggering stressor is gone.  He testified that, if someone is at their "extreme height" of mania, then it's very difficult for them to do that, but it may be possible if they are escalating or "at some variation below."  (Tr. 229.)

Dr. Dattilio was also asked about "the likelihood that every time she meets with the same stimulus, a manic event is turned on."  (Tr. 230.)  Dr. Dattilio opined that "one of the cues for this woman is emotionally charged situations.  Or what she perceives as emotionally charged situations."  (*Id.*)  He opined that, for the Defendant, "seeing, actually seeing and interacting with her attorney" is a "psycho-social stressor."   (*Id.*)

*Dr. Sadoff*

Dr. Sadoff met with the Defendant for three hours on March 13, 2009 at the Erie County Prison, following her return from FMC Carswell.  (Tr. 232.)  Over the course of several meetings with the Defendant occurring from 1987 to present, he has spent approximately 14 and ½ hours face-to-face with her.  (*Id.*)

Dr. Sadoff testified that he first met with the Defendant outside of the presence

of her attorney and found her to exhibit rapid, pressured speech and flight of ideas, "typical for Marjorie Diehl-Armstrong." (Tr. 233.) He considered her behavior at that time to be hypomanic. (*Id*.)

Dr. Sadoff explained that he purposefully met with the Defendant alone, initially, in order to "see if there was any change in her demeanor, her attitude, her affect, her state of mind," when defense counsel is present. (Tr. 233.) Dr. Sadoff observed that, when defense counsel was present, the Defendant would not listen to his advice and directions. As Dr. Sadoff described it, "she wants things from you that are unrealistic. You can't or won't give them to her because they're not in her best legal interests. And she's angry at you because you won't do it her way, rather than listening to you to do it the legal way, your way, which I would expect is the rational way." (Tr. 236.)

Dr. Sadoff harbors no doubt that the Defendant is bipolar (Tr. 233), but he also agrees with Dr. Powers' and Dr. Dattilio's diagnoses of Personality Disorder, NOS with Paranoid, Narcissistic, and Borderline traits. (Tr. 234.) He feels that this combination of bipolar disorder and personality disorder confuses the competency issue because "one infiltrates the other" and "what you're seeing is a mixed bag." (Tr. 235.) Dr. Sadoff feels that it is naive to parse out these conditions and see only one or the other. (Tr. 234-35.) He testified in response to defense counsel's questioning, that:

> The bottom line for me is that she cannot work with you in preparing a rational defense. She will not listen to you. You tell her do not talk to the reporters, she knows better. She talks to them, she tells them things. She's hurting her case. She doesn't believe she is because she is smarter than you are or at least she believes she is. It's part of her narcissism, it's also part of her hypomania.

(Tr. 235.)

Dr. Sadoff agrees there are times when the Defendant is competent, but he also opined that she often comes off looking "better than what I think she really is" due to the fact that she is very intelligent. (Tr. 235-36.) The real test, he felt,

> comes down to can she sit with you and listen to you. You are her attorney, you are there to help her with this case. She can't listen to you and won't listen to you and won't work with you to prepare a rational defense, then she's not competent, in my opinion. Even though she knows what's going on, perhaps better than 90 percent of the people in

30

this room.

(Tr. 236.)

Dr. Sadoff opined that the Defendant's personality disorder affects her ability to function. (Tr. 237.) He testified that a borderline personality disorder, when severe, can result in psychosis. (*Id*.) A severe borderline psychosis, he opined, would render the Defendant incompetent to stand trial. (*Id*.) Dr. Sadoff testified that the psychosis caused by a severe borderline personality is different in substance than the psychosis caused by a manic state, but it could still render the Defendant incompetent by making her unable to deal with reality or help in preparing a rational defense. (Tr. 238.)

Dr. Sadoff was questioned as to whether the Defendant's bipolar disorder is currently rendering her incompetent to proceed to trial. Dr. Sadoff essentially answered that, "when she is manic and when she is psychotic and when she is not dealing with reality ... she is not competent." (Tr. 238-39.) Dr. Sadoff opined that, at the time he examined the Defendant on March 13, 2009, the Defendant was psychotic because of her mania and not competent to help counsel prepare a rational defense. (Tr. 239.)

Dr. Sadoff further opined that, based on his observations of the Defendant during the course of the evidentiary hearing, "she is so unstable that at periods of time today within the courtroom she would be incompetent." (Tr. 239-40.) He was asked by the Court whether it was his opinion that the Defendant's competency was "episodic" and "ebbed and flowed." (Tr. 240.) Dr. Sadoff replied,

> That's exactly what I'm talking about, your Honor. Because it is fluid and it's not a static kind of thing. And when she's stabilized, when she calms down, and she is willing and able to talk with her attorney, she may be able to do it in a rational way. If she can, I'd be the last one to say that she's incompetent. But what I have seen when she is with him, is that she can't, won't or doesn't ...

(Tr. 240.) He opined that when the Defendant is manic, "really up there" (Tr. 252), then she is in a psychotic state. (*Id*.) When she is with her attorney and "not relevant, not rational with him, that is also psychosis." (*Id*.) Dr. Sadoff further elaborated that the

31

Defendant is not in touch with reality "[w]hen she's working with her attorney trying to listen to him, trying to mind his instructions about working together and she's not able to do it because she is so bent on her own way of doing things because that's her rationality, that's her way, that's her reality, which is not based on our reality, let's say." (*Id.*)

Dr. Sadoff agreed with the Court that her attorney "appears to be one of the primary stressors that set[s] her off." (Tr. 240-41.) Accordingly, the Court inquired whether it was Dr. Sadoff's opinion that the Defendant might function competently with a different attorney. He replied:

> Perhaps with someone who would do what she says she wants to do, is willing to give up his legal skills and acknowledge [sic] to conform to her belief system, which may or may not be valid. Now, again, she's very bright and she may have some very good strategies for her defense. But she would have to have someone who would agree with her, in my opinion, while she's in this state of mind.

(Tr. 241.)

Dr. Sadoff recommends that the Defendant undergo a trial of medication in order to stabilize her psychotic illness. (Tr. 237, 240.) Though he acknowledged that the Defendant could not take certain bipolar medications, like Lithium, due to her allergic reaction, Dr. Sadoff nevertheless recommended that the Defendant be given a trial of other medications. (Tr. 240.)

On cross-examination, Dr. Sadoff agreed with the prosecution that the Defendant's relationship with her attorney appears to be irreparably harmed and "could actually be the source of the signs and symptoms that are being exhibited to others when they observe the two of them together." (Tr. 243.) Dr. Sadoff further agreed that, normally, it might make sense to simply "[r]emove the toxic stimulus that is stimulating this kind of psychosis." (Tr. 243.) Although Dr. Sadoff was reticent about personally recommending that defense counsel be removed from the case, he acknowledged the possibility that, if defense counsel were removed from the case, the Defendant might show some improvement. (Tr. 243-44.) To that end, he recommended a three-way

32

meeting between the Court, the prosecutor, and defense counsel "to determine whether that's something that ought to happen."  (Tr. 244.)   However, he subsequently cautioned that "[p]eople are creatures of habit and she is who she is.  And if another attorney were appointed or hired or whatever for her, it's my opinion she would treat him the way she treats you."  (Tr. 254.)

*Exhibits*

In addition to reviewing the experts' reports and receiving their testimony, this Court has reviewed voluminous records from FMC Carswell.  The Court has also listened to a sampling of recorded conversations between the Defendant and other parties, which were recorded during her stay at FMC Carswell and which are contained on Government's Exhibits 5 and 7.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.    <u>Standard of Review</u>

Given my previous finding that the Defendant was incompetent to proceed to trial, and in light of the certification submitted by the Warden at FMC Carswell representing that the Defendant has been restored to competency, these proceedings are governed by 18 U.S.C.A. § 4241(e), which provides that, at this procedural juncture:

> The court shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine the competency of the defendant.  *If, after the hearing, the court finds by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense*, the court shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings.

18 U.S.C.A. § 4241(e) (emphasis added).  In accordance with this language, the Government bears the burden of proving the Defendant's competency by a preponderance of the evidence.

In the context of competency determinations, the Supreme Court has framed the

relevant inquiry as "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'"  *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). *Accord United States v. Murphy*, 572 F.3d 563, 569 (8th Cir. 2009); *United States v. McKnight*, 570 F.3d 641, 648 (5th Cir. 2009); *United States v. Ahrendt*, 560 F.3d 69, 74 (1st Cir. 2009); *Taylor v. Horn*, 504 F.3d 416, 430 (3d Cir. 2007); *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir.2005).

In evaluating a defendant's competency, courts consider a number of factors, including "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial."  *Leggett*, 162 F.3d at 242 (quoting *Drope*, 420 U.S. at 180).  Other factors that may be relevant to the determination "include an attorney's representation about his client's competency ... and a showing of narcotics abuse."  *Renfroe*, 825 F.2d at 767 (internal citation omitted). "All of these factors must inform the statutory requirement that a defendant be able to understand the nature and consequences of the proceedings against him and be able to assist properly in his defense."  *Id.*  Determining a defendant's competency is "often a difficult [question] in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180.

Here, as in the previous competency proceeding, there is no dispute concerning the Defendant's ability to sufficiently comprehend the nature and consequences of the proceedings against her; rather, the dispute once again focuses solely on the Defendant's ability *vel non* to assist properly in her own defense.  Thus, the relevant inquiry at hand is whether the Defendant has sufficient ability at present to consult with her attorney with a reasonable degree of rational understanding.  For the reasons that follow, I find that the Defendant does possess such ability and is therefore competent to proceed to trial.

34

B.     The Court Credits Dr. Powers' Opinion

All three of the mental health professions who testified at the April 27 hearing agree that the Defendant's mental health profile includes a diagnosis of Bipolar Disorder as well as Personality Disorder, Not Otherwise Specified, with Borderline, Paranoid and Narcissistic Traits.  The primary dispute, as between the Government and Defense experts, concerns the degree to which the Defendant's bipolar disorder is presently interfering with the Defendant's ability to assist her attorney.

While the Government's expert, Dr. Powers, credited the Defendant's diagnosis of Bipolar Disorder by history, she did not feel that the Defendant's symptomology during her stay at FMC Carswell warranted such a diagnosis.  Dr. Powers felt that the Defendant's primary difficulties – frequently described in terms of pressured speech, tangential thought, and flight of ideas – are better understood as manifestations of certain characterological deficits related to her personality disorder.  She believes that the Defendant retains sufficient control over these behaviors such that she can properly assist her counsel if she so chooses.  Thus, it is Dr. Power's view that the Defendant is competent to proceed to trial.

The Defendant's experts, Dr. Sadoff and Dr. Dattilio, agree with the Axis II diagnosis of Personality Disorder, NOS with Borderline, Paranoid and Narcissistic Traits, and they further agree that this disorder colors and complicates the Defendant's mental health picture.  However, both Dr. Sadoff and Dr. Dattilio believe that the Defendant's bipolar illness continues to cause manic behavior which prevents her from assisting her counsel properly; thus, they believe the Defendant is not competent by reason of her bipolar illness.

Despite some degree of consensus in these opinions, they are, at their core, fundamentally irreconcilable.  Accordingly, I have carefully considered the totality of evidence presented in this record, giving due consideration to each party's arguments. Having done so, I find by a preponderance of evidence that the Government's theory

provides the more cohesive and internally consistent view concerning the Defendant's present mental abilities.  A number of factors lead me to this conclusion.

1.    <u>The Government's Expert Had a More Meaningful Opportunity to Observe the Defendant</u>.

One factor which leads me to credit Dr. Power's opinion is the fact that, in my opinion, she had a more meaningful opportunity to observe and assess the Defendant's present capabilities.  The testimony at the hearing showed that the observation regimen at FMC Carswell is both extensive and multi-layered.

Once an inmate is admitted, observation begins right away and continues throughout the 4-month period.  (Tr. 14, 16.)  The M1 unit is fully staffed 24 hours a day, 7 days a week with doctors, nurses, correctional officers, and other personnel.  (*Id*. at 14.)  Every weekday morning, a team meeting is held; all members of an inmate's treatment team – i.e, social worker, forensic psychologist, psychiatrist, nurses, unit staff, and correctional officers – are present.  (*Id*. at 15.)  During these meetings members discuss in detail any changes that have occurred in the inmate's behavior since the prior day's meeting.  Often, if behavioral issues arise, the issue will be addressed with the inmate directly.  (*Id*.)  Monthly team meetings are held as well where, again, all members of the inmate's treatment team are present to comprehensively discuss the inmate's progress and to interact with and take questions from the inmate.  (*Id*.)  While at Carswell, the Defendant was subjected to these regimens and also participated in individual and group therapy as well as competency restoration classes.

Dr. Powers testified, persuasively, that the period of observation is as important, if not more so, than any psychological testing that may be conducted.  (Tr. 14.)  During the four-month period which the Defendant spent at Carswell, she was monitored continuously with the specific goal of assessing her progress toward competency restoration.  (Tr. 16.)  Staff members are trained to recognize signs and symptoms of mental disorders that may impact the forensic study so that such information may be

brought to the attention of the treating forensic psychologist. (*Id*.)  Records from Carswell indicate that, during her 4-month stay, the Defendant was monitored day and night relative to her diet, daily activities, sleep pattern, affect, behavior, and whether or not she exhibited any hallucinations or suicidal thoughts.  (Ex. 3, pp. 88-92.)

As a member of the Defendant's treatment team, Dr. Powers not only had the benefit of this intensive observational feedback from other staff members, she also was in a position to observe the Defendant personally on a regular basis.  (Tr. 16.)  In fact, Dr. Powers testified that she spoke with the Defendant almost every day on the unit and had many conversations with her over the course of the four months.  (Tr. 18-19.)

I find that this level of constant observation is particularly probative at this juncture of the competency proceedings, given the complexity of the Defendant's psychological profile and the divergent opinions of the Government/Defense experts. Indeed, the Defendant's experts agreed that, from a clinical standpoint, it preferable for the clinician to be able to observe the patient over a longer period of time.  (Tr. 198, 244.)  Dr. Dattilio agreed that it is helpful to consider input from other professions who are able to engage in 24-hour observation.  (Tr. 199.)

Unlike Dr. Powers, the Defendant's experts were not privy to a lengthy period of observation.  Dr. Dattilio met with the Defendant over two days, on March 26-27, 2009. During the first day, he spent several hours with her administering a version of the Minnesota Multi-phasic Personality Inventory (MMPI).  On the second day, he met with the Defendant alone for about 45 minutes, then met with both her and her counsel for an additional 30 minutes.  (Tr. 193-94.)  Dr. Sadoff has a longer history of involvement with the Defendant spanning approximately 30 years, but his most recent evaluation of her in connection with these proceedings occurred over the course of only three hours on March 13, 2009.  (Tr. 232.)  Collectively, he has spent about 14 and ½ hours with the Defendant over the last 30 years.  (232.)   On cross-examination he candidly admitted that Dr. Powers' ability to observe the Defendant for many hours over the course of four months is a valuable tool in evaluating her mental status.  (Tr. 244.)  I

thus find that, notwithstanding Dr. Sadoff's and Dr. Dattilio's impressive professional credentials, Dr. Powers' ability to observe the Defendant over a lengthy period of time and in a variety of contexts provided her better insight into the Defendant's present state of mind than that which could be obtained from the defense experts' relatively brief examinations.

As I have suggested, Dr. Powers' opportunity for extended observation is particularly important here, because the evidence suggests that the Defendant's mental health profile is extremely complex. Dr. Sadoff has stated that the Defendant's combination of bipolar illness and a personality disorder confuses the competency issue because "one infiltrates the other" and "what you're seeing is a mixed bag." (Tr. 235.) Dr. Dattilio has described the Defendant's mental state as "one of the most complex difficult types of personalities that I've seen in my 30 years of experience" (Tr. 181).

Indeed, the record here demonstrates that the Defendant's complex mental state sometimes results in misleading initial impressions. Dr. Sadoff has stated that he believes the Defendant often comes off looking "better than what I think she really is" due to the fact that she is very intelligent. (Tr. 235-36.) There is also evidence, however, that she sometimes comes off initially looking worse. For example, when the Defendant was first admitted to FMC Carswell, Dr. Kempke's examination of her caused her to feel that the Defendant "appeared hypomanic and delusional" (although no specific delusional content was documented), (Ex. 3, pp. 48-51; A-8273-76; Tr. 94, 140), yet just a few days later Dr. Kempke felt the Defendant was competent to sign a consent form for mental health treatment. (Tr. 140-41.) Moreover, Dr. Kempke's initial impression was not borne out by subsequent observations of the Defendant, because at no point during the remainder of the Defendant's 4-month treatment did Dr. Kempke or any other staff member at Carswell document that she was exhibiting hypomania or mania. Had the Defendant only been observed during this initial assessment, Dr. Kempke may well have concluded that the Defendant was in a hypomanic state and

38

diagnosed her with active bipolar disorder.  Therefore, considering the complexity of the Defendant's mental health picture, especially as the record now stands, I find that Dr. Powers' opinion warrants particular consideration because she had a better opportunity to observe and evaluate the Defendant's psychological state.

In citing Dr. Powers' opportunity for extended observation as a factor supporting her credibility, I note that this factor is not necessarily sufficient, by itself, to carry the Government's burden of proof; rather, it is merely one consideration, albeit one which I presently give substantial weight.  That is to say, the mere fact that the forensic psychologist assigned by the Bureau of Prisons may have had a more extensive period in which to observe the Defendant would not cause me to automatically credit that expert's opinion irrespective of its logic or substance.

In my previous findings, issued on July 29, 2008, I credited Dr. Sadoff's opinion that the Defendant's bipolar disorder was, at that time, rendering her incompetent to the extent that she could not assist properly in her defense.  I credited Dr. Sadoff's opinion in this regard notwithstanding the fact that it was contradicted by the Government's expert.  Like Dr. Powers, the Government's expert in the prior proceedings, Dr. Ryan, had the opportunity to observe the Defendant for extended periods of time over a four-month period.  Also like Dr. Powers, Dr. Ryan opined that the symptoms which the Defendant was then manifesting were attributable to a personality disorder rather than bipolar disorder.  Nevertheless I declined to credit Dr. Ryan's opinion based on the record that was then before me.  In part, I found Dr. Ryan less credible due to the fact that his opinion – particularly his suggestion that the Defendant does not suffer from bipolar disorder – was inconsistent with the medical record as a whole.  I specifically rejected Dr. Ryan's intimation that the Defendant had acquired her prior diagnosis of bipolar disorder through manipulation of her mental health care providers and that the diagnosis had merely been passively carried on throughout her treatment records.  In the prior proceedings, I considered the record as a whole more supportive of the Defendant's position than of the Government's position, and that consideration

outweighed the fact that Dr. Ryan may have had a more extensive opportunity to observe and evaluate the Defendant.  That is not presently the situation here, however, in light of how the record now stands.  Accordingly, I find that the extensive opportunity which Dr. Powers and her fellow staff members had to observe the Defendant – and, by contrast, the relatively inferior opportunity which Drs. Sadoff and Dattilio had to recently observe the Defendant – is a factor supporting Dr. Powers' credibility and one reason why I credit her testimony on the issue of the Defendant's restoration to competency.

2.    <u>Dr. Powers' Theory Is Consistent With The Defendant's Observed Behaviors</u>.

There is no dispute between the parties that the Defendant is difficult to deal with and is properly diagnosed with Personality Disorder, NOS, with Borderline, Paranoid, and Narcissistic Traits.  Moreover, the evidence shows that this disorder is pervasive and characterological and is part of the Defendant's personality make-up.  (Tr. 74, 130-31; DSM at 686.)  It is Dr. Power's opinion that the primary cause of the Defendant's current problems dealing with her attorney and other people is her personality disorder, as opposed to her bipolar disorder.  (Tr. 75.)  Dr. Powers provided the following explanation as to why she believes the Defendant's symptoms are best accounted for as manifestations of her personality disorder:

> The reason that I wrote in my report that the pressured speech and flight of ideas could be better explained by a personality disorder is because in my opinion Ms. Armstrong, when she is trying to get a point across, when she is upset about something, when she's angry or agitated, what really takes precedent [sic] for her is this feeling of grandiosity, what she has to say is more important than what you have to say, so she's going to say it almost to the point of being disrespectful until corrected, because her time and her words are more valuable than what you have to say.  I think that is a symptom of this grandiosity, sort of narcissism, that is a trait in personality disorder [sic].

(Tr. 146.)  I credit Dr. Powers' opinion in this regard because I believe that, when the present record is viewed in its entirety, her opinion provides the more internally consistent and persuasive theory.

3.     The Defendant's Demonstrated Insight and Ability to Modulate Some of Her
       Non-Constructive Behaviors is Consistent With Dr. Powers' Opinion That She is
       Competent.

I find that Dr. Powers' theory is supported by the many instances during the

Defendant's period of restoration where she showed insight into her non-constructive

behaviors and also a willingness and ability to modulate those behaviors.  I credit Dr.

Powers' testimony that, from the very beginning of the Defendant's stay at Carswell, Dr.

Powers made it clear that she would not participate in any conversation in which the

Defendant incessantly talked over her and that, when Dr. Powers threatened to walk

away from a one-sided conversation, the Defendant would alter her behavior and allow

Dr. Powers an opportunity to speak.  (Tr. 20-21.)  As Dr. Powers explained it, the

Defendant "wanted a forum" in which she could be heard to air her grievances (Tr. 24),

but she was clearly able to alter her behavior when necessary so as not to lose that

forum.

I also credit Dr. Powers' testimony that, during one conversation, the Defendant

was confronted about her tendency to talk without pause and she responded, "I know I

do that, but I feel like if I don't do that, people won't listen to me."  (Tr. 22.)  I find that

this statement not only demonstrates a degree of insight on the Defendant's part but

also suggests that the Defendant's problematic speech habits have a volitional

component.  Dr. Powers persuasively described this as a "maladaptive method" which

the Defendant uses to get her point across.  (Tr. 22.)

There are, in fact, many examples in the records from Carswell of the Defendant

showing insight into her conduct and/or successfully modulating her behavior.  For

instance, a progress note dated October 17, 2008 indicates that the Defendant was

angry over the fact that, unlike most other inmates, she was not allowed off the M1unit.

(Ex. 3, p. 58.)  Despite her irritable mood and her loud speech, which staff found difficult

to interpret, the Defendant was not viewed as psychotic; quite to the contrary, the

progress note reports that the Defendant "plan[ned] to turn over a new leaf so that she

is not seen as angry and obnoxious."  (*Id.*)

41

Several days later, on October 20, 2008, the treatment team recorded the Defendant's statement, "I am doing much better than yesterday; I have not been disrespectful." (Ex. 3, p. 59.) I credit Dr. Powers' view that this incident demonstrates the Defendant's awareness that she has a problem with disrespectful behavior and that she was trying to improve. (Tr. 42.) It is also noteworthy that the treatment team described the Defendant's behavior that day as "pleasant," albeit "loud." (Ex. 3, p. 59.) I credit Dr. Powers' testimony that the Defendant's loud state was not reflective of a manic state but simply the way she talks. (Tr. 42.)

A progress note from October 26, 2008 indicates that the Defendant reported "things are better than last week." (Ex. 3, p. 61.) She was noted at that point to be compliant and less vocal on her unit. (*Id*.)

On November 3, 2008 she attended a competency restoration class and was able to stay focused throughout most of the session. (Ex. 4, p. 5.) At one point she asked a question related to her own case but was easily redirected and did not respond inappropriately. Staff noted that she appeared to be gaining more control over her behavior in the group. (*Id*.)

By November 10, she was reportedly adjusting to the unit milieu and requiring less attention. (Ex. 3, p. 64.) A competency restoration class note indicates that the Defendant digressed from the group discussion to discuss her personal frustration with the length of time she is being held without proceeding to trial; however, she was easily redirected and controlled her behavior throughout the rest of the session. (Ex. 4, p. 4.)

One week later, she became visibly irritated in her class when the group reviewed  information with which she was already familiar. She required redirection at one point after beginning once again to discuss certain details about her case, but she reportedly responded appropriately and had no further problems for the remainder of the class. (Ex. 4, p. 3.)

On November 25, 2008 she was observed to be keeping a low profile and reportedly told staff she was "minding my own business." (Ex. 3, p. 67.) On December

4 she was observed to be in interacting appropriately with staff and peers and using better judgment. (Ex. 3, p. 69.)

As I have previously discussed, the Defendant was involved in an incident during her competency restoration class on December 8 in which she sparked confrontation with a fellow inmate and could not be immediately redirected. She spoke over both group facilitators and disrupted the class to the point that class members were dismissed. (Ex. 4, p. 2.) She was told that this was an example of behavior which would not be tolerated in court and, although she maintained a frustrated expression, she indicated her understanding of the problem and was able to return to her room. (*Id.*) I credit Dr. Powers' testimony that, although the Defendant was not immediately redirectable on this occasion, she was nevertheless able to calm herself down and recognize her own mistake within a relatively short period of time. (Tr. 122.)

The Defendant had another disruptive episode on December 11, 2008 when she was confronted about discussing other inmates' information. On that occasion, the Defendant did not tolerate the confrontation, could not be redirected, and continued yelling at the treatment team to the point that she was transferred to the M3 unit. (Ex. 3, p. 70.) Her behavior was considered to be hyperverbal and she exhibited pressured speech. (*Id.*) She was subsequently advised that the unit team would require her to accept responsibility for her actions and show a concerted effort to improve her behavior. (Ex. 3, p. 72; Ex. 4, p. 1; Ex. A-8297.) Thereafter, the Defendant had a conversation with Dr. Kempke about how to converse with Dr. Powers in a more constructive way concerning her transfer back to M1 and the Defendant wrote Dr. Powers letters expressing remorse. In one letter, she promised "not to offend staff or inmates and to conduct myself absolutely properly at all times" if given the chance to return to M1. (Ex. 4, pp. 16-17.) I credit Dr. Powers' view that, while the Defendant was not initially redirectable on this occasion, it is a sign of her competency that she was subsequently receptive to suggestions about how to modulate her behavior and was also able to implement those suggestions successfully. (Tr. 28-29.) Equally significant,

in my view, is Dr. Powers' testimony that, following her returned to the M1 unit, the Defendant was observed refraining from discussing other inmates' information over the telephone, indicating, "I can't say anything about that, I've told them I won't." (Tr. 30.)

Treatment notes suggest some general improvement in the Defendant's demeanor following her return to the M1 unit.  On January 3, 2009, she expressed happiness to be back in M1 and exhibited appropriate group participation.  (Ex. 3, p. 82.)  On January 10, she was observed to be compliant within the unit and keeping a low profile.  (Ex. 3, p. 83.)  On January 17, the Defendant was felt to be interacting appropriately with peers and staff and making better choices.  (Ex. 3, p. 84.)  On January 26, staff reported that she was being "less intrusive" on the unit.  (Ex. 3, p. 80.)

I find that these instances support Dr. Powers' theory that the Defendant retains a degree of control over her behavior.  Furthermore, this volitional aspect of the Defendant's behavior supports Dr. Powers' theory that the Defendant's communicative problems, at least at this point in time, are a reflection of her personality disorder rather than an active bipolar state.  I credit Dr. Powers' testimony that, while personality disorders involve characterological traits that are pervasive and relatively inflexible, nevertheless individuals with personality disorders generally have more control over certain behaviors than they would with an active Axis I mental illness.  (Tr. 130-31.)  I am persuaded by Dr. Powers' testimony that, while the Defendant always tended to use pressured speech during her stay at Carswell, she expressed an awareness of this problem, professed a willingness to work on it and, in general, showed some degree of improvement to the extent that she could be frequently redirected and interrupted.  (Tr. 23.)

4.      The Pervasiveness of the Defendant's Interpersonal Problems Suggest That They Are Attributable to Her Personality Disorder.

To be sure, the record shows that the Defendant continued to exhibit interpersonal problems throughout her stay at Carswell.  Dr. Powers noted that the

Defendant always tended to want a forum in which she could discuss the perceived injustice of her own legal case and this was a "constant struggle." (Tr. 49.) Dr. Powers further acknowledged that, throughout the Defendant's stay at Carswell, she continued to show signs of pressured speech, loudness, rudeness, disrespect, and obnoxiousness. (Tr. 42-43, 47.) Peppered throughout the favorable progress notes from Carswell are remarks that the Defendant was manipulative toward staff, intrusive, disruptive on her unit, constantly seeking staff attention, and the source of "constant peer problems." (Ex. 3, p. 60, 62, 63, 66, 78.) At one point, after the Defendant was accused of "almost caus[ing] a big fight among other inmates on the unit" (Ex. 4, p. 18), several inmates complained to staff that the Defendant "is a bully, hostile, and mean person." (*Id.*) It is also noteworthy that, on two occasions during her stay at Carswell, the Defendant was disruptive to the point of being transferred to the M3 unit. Nevertheless, I credit Dr. Powers' view that these problems are most accurately interpreted as sequelae of the Defendant's personality disorder rather than a sign of mania, psychosis or mental incompetence. (Tr. 42-43.)

Of particular concern in this case is the Defendant's inability to communicate effectively due to her tendency to engage in pressured, run-on speech. I credit Dr. Powers' testimony that the Defendant uses this particular behavior as a maladaptive method to get her point across, particularly when she is anxious and under stress. (Tr. 22, 53.) I also credit Dr. Powers' view that the pervasiveness of this trait supports the idea that it is a part of her personality disorder; as Dr. Powers states, "She's been doing it for so long that it's difficult to stop." (Tr. 53-54.)

Yet the pervasiveness of this problem does not necessarily require a finding that the Defendant is incompetent. As Dr. Powers persuasively explained:

> I believe that she can assist in her defense. I believe that her ability to communicate is frustrating to those who try to communicate with her. But with stern, structured boundaries, she is able to modulate her behavior enough to allow others to talk. I don't think it's a matter of understanding, I think clearly from the beginning what keeps coming up is her ability to communicate. She has this pressured speech and she tends to talk over people. And that seems to be kind of the crux of the issue all along. But

45

she demonstrated time and time again at Carswell that with stern
boundaries, as she's demonstrated today, she is able to modulate her
behavior.

(Tr. 58.)

Thus, based on the evidence presently before me, I am not persuaded that the

pressured speech which the Defendant has displayed over the past year is an

uncontrollable symptom of her bipolar disorder.  Rather, I am persuaded that the

Defendant's reflection and insight into this form of speech shows that it is a maladaptive

communication technique over which she maintains a sufficient degree of control.


5.      The Defendant's Behavior and Statements During the Relevant Time Period
        Reflect Rational Thought.

Dr. Powers' opinion on competency is further supported by evidence in the

record which demonstrates that the Defendant's thought process is rational, albeit

frequently misguided.  I note, for example, a progress note from December 2, 2008

indicating the Defendant's concern over the fact that her co-Defendant was going to be

sentenced the following day.  (Ex. 3, p. 68.)  I credit Dr. Powers' testimony that the

Defendant's reaction to her co-Defendant's imminent sentencing was entirely rational,

given the possibility that her co-Defendant may be in a position to improve his own

situation by possibly providing testimony against her.  (Tr. 43.)  I also note that,

although the Defendant's mood on this occasion was described as irritable and her

speech was strident, run-on and difficult to interrupt, Dr. Kempke saw no signs or

symptoms of psychosis.  (Ex. 3, p. 68.)

Notes from Carswell also indicate that the Defendant was transferred to the M3

unit toward the end of her study period due to a physical altercation in which the

Defendant claimed to have been attacked by another inmate who was "egged on" by

third parties.  (Ex. 3, pp. 81, 85, 97.)  These records reflect that the Defendant was

concerned over the fact that she was due to leave Carswell and did not want "to leave

from [the] Hole, be in [the] Hole at [the] new prison, [or] have this ruin my record."  (Ex.

3, unnumbered p. 97.)  The Defendant was psychiatrically evaluated on February 2, 2009, while still in the M3 unit, and was observed to be cooperative but with loud, pressured speech; her mood was "angry to tearful over [the] injustice of being on M3." (Ex. 3, p. 85.)   Here again, I find that the Defendant's reaction to the situation at hand is entirely rational, given her perception that she had been punished for being the victim of an assault and her justifiable concern about how this incident would impact her prison record.  It is also noteworthy that, despite being upset over the event, the Defendant was again found to display no psychotic symptoms.  (*Id*.)

Another theme in the treatment notes is the Defendant's frustration over the fact that, unlike other inmates, she was not allowed off the M1 unit – a concern which she raised with her treatment team during an October 4, 2008 meeting.  (Ex. 3, p. 56.) Staff notes from October 12, 2008 reflect that, while the Defendant was pleasant, she continued to question why she could not go outside.  (Ex. 3, p. 57.)  Again on October 17, she expressed anger that she was not allowed off the unit and stated her belief that she was "entitled to be angry." (Ex. 3, p. 48.)  Although the Institution may have had sound reasons to restrict the Defendant's movement to the M1 unit, I find that her objection to that restriction is perfectly understandable.  I also credit Dr. Power's view that, on this occasion, the Defendant demonstrated insight into her current presentation by discussing why she felt entitled to be angry.  (Tr. 38-39.)

A still more prominent theme has been the Defendant's repeated complaints regarding her current attorney.  As to this important issue, I find that the Defendant's stated reasons for her dissatisfaction, although likely misguided, are not irrational.  As Dr. Powers noted, the Defendant has expressed concern that her attorney is too passive and she has made repeated comments that she needs a "bulldog" to represent her. (Tr. 54.)  I credit Dr. Powers' testimony that the Defendant expressed a desire to go into court and "act like a lady," but felt that she could not because "somebody has to be aggressive." (*Id*.)  At other times, the Defendant has stated concern over the fact that, in a completely separate legal matter, her present counsel was deemed ineffective

on a sentencing issue.  According to Dr. Powers, the Defendant made a remark while talking to her counsel over the telephone to the effect, "[H]ow can you expect me to believe that you're going to represent me in an appropriate way if you didn't represent her, by your own admission."  (Tr. 55.)   While such statements likely reflect a gross underestimation of present counsel's abilities, I agree with Dr. Powers that they are also indicative of a rational thought process.  I further agree with her that the rationality of the Defendant's thought process is important to consider for purposes of my competency determination because it shows the Defendant is not delusional or psychotic but is actually thinking about things that are relevant to her case.  (*Id*.)

While the Defendant has frequently clashed with her attorney over matters involving defense strategy, the important fact to be gleaned from the evidence is that she is presently capable of formulating a strategy.  The Government's Exhibit 5 is a CD containing numerous recordings of the Defendant's various telephone conversations, including – importantly – conversations with her attorney.  During these recordings, as Dr. Powers noted, the Defendant can be heard discussing a strategic plan for her defense.  I credit Dr. Powers' testimony that this ability to formulate a defense strategy is a "crucial" part of being able to communicate with counsel and assist in one's own defense.  (Tr. 60.)  Moreover, the fact that the Defendant's strategy differs from that of her counsel – indeed, the fact that her strategy may be less effective or even completely misguided – is not necessarily unusual, nor does it mean the Defendant is incompetent.  As Dr. Powers explained, the Defendant "does have this sort of arrogant belief that she's all knowing" (Tr. 61), which is consistent with her narcissistic personality.  I credit Dr. Powers' testimony that:

> it's not the result of a mental disease or defect.  It's the result of someone who is very strong willed, somebody that is inflexible and believes that she knows more about her case than anybody else and can defend it as good or better than anybody else.  So if it does play a role in her mental health, it's a personality disorder, not a mental health issue that allows her to act that way.

(Tr. 61.)

48

6.     The Defendant Did Not Show Signs of Psychosis or Delusions During the Period
of her Restoration to Competency.

Despite the Defendant's frequent interpersonal conflicts throughout her period of evaluation at Carswell, at no time was she diagnosed as being actively manic or hypomanic, nor was she found to exhibit signs of psychosis or delusions.  Had such psychosis or mania been observed, one may presume that the Defendant would have been kept on the M3 unit for psychiatric evaluation.  Equally significant, the Defendant was never prescribed any course of medication deemed necessary to restore her to competency, despite Dr. Sadoff's previous testimony that the Defendant should be tried on a course of anti-psychotic drugs for her bipolar disorder.  Moreover, the treatment notes suggest that the Defendant never exhibited a disturbance in her sleep patterns – a factor which Dr. Powers described as "crucial," because, as she testified, a decreased need for sleep is almost invariably observed with individuals in an actively manic state. (Tr. 73; 152.)  Dr. Dattilio agreed that difficulty with sleep patterns is typically seen in such cases; in fact, when asked by the Court to identify "the one thing that you didn't see that would have given you even greater comfort in your bipolar disorder diagnosis" (Tr. 228), he forthrightly acknowledged that it would probably be "the sleep issue, that it is often disturbed sleep that individuals experience."  (*Id*.)  These collective facts strongly suggest to me that the Defendant's bipolar disease is in a state of relative quiescence.

During the hearing, defense counsel highlighted Dr. Kempke's observations on September 12, 2008, shortly after the Defendant's arrival at Carswell, that she appeared hypomanic and delusional and that prescription medication should be part of the treatment plan.  (Ex. 3, pp. 48-51.)  However, I am persuaded by Dr. Powers' testimony that this represented Dr. Kempke's initial impression only and that this impression was abandoned upon further observation, since Dr. Kempke never again in the records mentioned hypomania or delusions, nor did she ever prescribe anti-psychotic medication for the Defendant.  (Tr. 30-31, 93-94, 140-45.)  In fact, in her

discharge summary, Dr. Kempke diagnosed the Defendant with bipolar disorder by history only.  (Ex. 3, p.24.)

Defense counsel also highlighted a reference within the medical record suggesting that one of the Defendant's treatment plan goals would be for her to gain control of her psychotic symptoms and accept medication.  (See Ex. 3, p. 38.)  However, I accept Dr. Powers' explanation that this note was merely a standard treatment objective later determined to be inapplicable to the Defendant's case.  (Tr. 98, 143-44.)  I therefore accord it no particular weight.

In addition, defense counsel has suggested that the Defendant may have been exhibiting manic behavior on December 8, 2008, when she sparked a confrontation during her competency restoration class which disrupted the entire session, or again on December 11, when her inappropriate behavior in talking about other inmates' cases and inability to handle staff confrontation over the issue caused her to be transferred to the M3 unit.  However, I am persuaded by Dr. Powers' explanation that the Defendant's ability to regain control of herself in a relatively short time is inconsistent with mania.

Particularly with respect to the December 8 incident, Dr. Powers testified that the Defendant was able to calm down and regain control of her behavior within about five minutes, and she persuasively explained that "mania doesn't work that way.  You can't be manic for a minute then all of a sudden be calm and not have any problem discussing your issue and completely calm down."  (Tr. 122; 151-52.)  Thus, while Dr. Powers acknowledged that mania can be set off by agitation, she also testified that it cannot be turned off quickly.  (Tr. 151-52.)  Instead, as she explained, it becomes difficult for the manic person to control their behavior.  (Id.)  Dr. Dattilio similarly agreed that, when a person is truly manic, it may be possible to redirect them but they are not redirected for long, and if they are "really at the height" of mania, "it's almost impossible."  (Tr. 230-31.)

Nor was there any report from nursing staff that, following the December 8 episode, the Defendant had a sleep disturbance or was up all night – symptoms which

Dr. Powers considers a "hallmark" of mania. (Tr. 151-52.) Rather, the Defendant essentially "went back to normal." (Tr. 151-52.) This is another factor leading Dr. Powers to view the Defendant's outburst on December 8 as resulting from "[pure] anger, not mania" (Tr. 122), and I credit her opinion in this regard. I am persuaded that the Defendant's conduct on December 8, 2008 is not indicative of a psychotic or manic event.

As for the Defendant's conduct on December 11, 2008 – the only other time when Dr. Powers found the Defendant to be unmanageable and incapable of being redirected (Tr. 149) – I am, again, disinclined to view this episode as a manic or psychotic event. Rather, I accept as persuasive Dr. Powers' opinion that the Defendant's conduct was a reflection of her lack of appropriate confrontation and avoidance skills; on that occasion, the Defendant resorted to the one adaptive behavior on which she frequently relies when faced with a conflict – namely, anger. (Tr. 148-49.)

Although defense counsel has attacked Dr. Powers' credibility on the basis that she is inexperienced and lacking in professional credentials, this argument holds limited sway in the face of compelling evidence that the Defendant was not observed to be psychotic, delusional, or hypomanic during her period of evaluation at Carswell. After all, Dr. Powers was not the only mental health professional to participate in the Defendant's treatment at Carswell. I can fairly presume that, since their specific mission includes the restoration of individuals to mental competency, Dr. Powers and the rest of the Carswell staff are experienced in observing the signs of mania and bipolar disorder and would have recognized these signs had they been manifested by the Defendant. The fact that no observations were noted by the Defendant's treatment team as to delusional thought, hypomanic behavior or other psychosis is significant and supports Dr. Powers' opinion that the Defendant is presently competent to assist in her defense.

7.      <u>The Defendant's Conduct in the Courtroom Did Not Appear Psychotic and
Demonstrated Her Ability to be Redirected</u>.

Another factor which I must consider is the Defendant's demeanor during the

April 27, 2009 hearing.  Early on during the hearing, Dr. Powers testified that one of the

Defendant's complaints upon arriving at FMC Carswell was her inability to leave the M1

unit.  The following exchange then occurred:

BY MR. PICCININI:

Q.      Okay.  During the course of the evaluation, can you indicate to Judge McLaughlin
what was she like during the four months, what type of stuff did she do on a regular basis?

A.      I noted her to do three things.  She watched television a lot, she slept, and she went
down to the cafeteria to eat.

THE DEFENDANT:   How could I when I was on unit restriction all the time, I couldn't go
down to the cafeteria to eat.  That's a lie right there.

THE COURT:  Ms. Armstrong, hang on a second.

THE DEFENDANT:  I couldn't go down, your Honor, she says I go down to the cafeteria to
eat, I was forbidden because they unconstitutionally put me on — because Health and Human
Services investigates them every week down there for their misdeeds.  I was on restriction, how could
I go down when I ate on a tray everyday, I didn't go down at all.  You got me mixed up with somebody
else.

THE COURT:  Ms. Armstrong, I would like you to remain in the courtroom –

THE DEFENDANT:  They threw the misconducts out, the lieutenants did, they expunged
them from the computer.  I had one in six years.

THE COURT:  Ms. Armstrong –

THE DEFENDANT:  I'm done with her, I don't care what she says.

THE COURT:  Hang on a second, I'm not done with you.

THE DEFENDANT:  I don't care, I don't care anymore.  You know they framed me for
something I didn't do.  The family said it when I walked in, at least they know it.  I don't care anymore,
you can say what you want.

THE COURT:  Ms. Armstrong, I want you to remain in the courtroom if you can, I'm going
to give you one warning.

THE DEFENDANT:  I won't say another word.

THE COURT:  Hang on a second.  If you be quiet, you can stay there.  One more outburst,
take her out in the holding cell.  Let's go.

(Tr. 25-26.)

I find that this episode is instructional on certain points that are relevant to these proceedings.  For one, it demonstrates to me the fact that, while the Defendant is very impulsive and prone to rude and confrontational outbursts, she is capable of being redirected in her behavior.  After being instructed by the Court that such outbursts would not be tolerated, the Defendant indicated that she wouldn't say another word and, indeed, she remained quiet and compliant throughout the remainder of the day.  The fact that the Defendant was able to modulate her behavior so quickly, in my opinion, supports the idea that she is not presently psychotic but is, rather, competent to properly assist in her own defense.  I credit Dr. Powers' testimony that

> [The Defendant] has demonstrated over and over again, even in the courtroom today, that she can, if held very structured [sic] and very sternly, to a certain set of standards, that she has some control over her behavior.  She can modulate when necessary as directed, if it's a very structured and sternly [sic] direction for her.

(Tr. 40.)

Second, even though the Defendant's behavior during this outburst was impulsive, rude, and seemingly random, it reflects a degree of rational thought.  In actuality, the Defendant's position was factually correct and Dr. Powers' original testimony, as she herself acknowledged, was factually mistaken:  *i.e.*, the Defendant could *not* have gone down to the cafeteria to eat because, unlike most other inmates, she was restricted to the M1 unit.  Thus, this incident is supportive of my earlier observation that the Defendant – though often impulsive and lacking good judgment – is not irrational.

Third, I find that the Defendant's outburst reflects an attempt by her to correct misinformation through a maladaptive communication technique.  This is consistent with Dr. Powers' testimony that, when the Defendant is upset or angry she tends to engage in pressured, run-on speech in order to make sure she gets her point across. (Tr. 146.)  Furthermore, as a result of her narcissistic personality, she will speak non-

53

stop to the point of being disrespectful because, to her, the need to make her point is more important than what others have to say.  (Tr. 146.)

In fairness, I must note that there were two additional incidents during the April 27, 2009 hearing – once at the very beginning and once during a recess – in which the prosecution advised the Court, in chambers, that the Defendant was engaging in heated dialogue with members of the Wells family.[2]  However, I am not persuaded that these episodes are reflective of psychotic behavior on the part of the Defendant.  As far as this Court could tell, the dialogue involved both parties' mutual criticisms of the prosecution, and I credit the Assistant U.S. Attorney's representation that the Wells family was "purposefully engaging in conversation with Ms. Diehl-Armstrong, egging her on."  (Tr. 186.)  At one point, the prosecutor referred to the dialogue as a "shouting match with both [sides], but about the same issue."  (*Id*.)

Notwithstanding these minor disturbances, it should be noted that the Court was able to reconvene proceedings each time within just a few minutes.  Furthermore, once court was in session, there were no disruptions to the proceedings and the Defendant comported herself appropriately at all times, except for the one outburst relative to Dr. Powers' testimony which I have already discussed.  During the remainder of the proceedings, the Defendant could be observed occasionally interacting with members of the defense team or simply sitting quietly, but nothing particularly notable occurred. In sum, then, nothing about the Defendant's behavior during the April 27 hearing leads me to believe that she was in an actively manic state or otherwise psychotic.

8.      The Testimony Offered By the Defense Experts is Less Persuasive Than That of Dr. Powers.

Aside from the fact that Drs. Sadoff and Dattilio had an inferior opportunity to observe and evaluate the Defendant, I find that their opinions are less substantively

_____

    [2]  The Wellses are family members of the decedent, Brian Wells, who was killed by a bomb in connection with the armed robbery that forms the basis of these charges.

persuasive in light of the present record.

        a)     *Dr. Dattilio*

It appeared to me that Dr. Dattilio, although certainly an impressive and well credentialed forensic psychologist, was less informed than Dr. Powers about the factual background of this case.  This led him to draw certain assumptions about the Defendant's mental state, based on some of the things she said, which appear to have been unwarranted.

For example, Dr. Dattilio perceived the Defendant as paranoid and delusional apparently based, in part, on the fact that "she believes that she is being conspired against and that she has been wrongfully accused because a crackhead who tried to rob her is trying to save his ass from going to prison."  (Tr. 215.)  When confronted with the fact that the Defendant's now-convicted co-conspirator was previously involved in the distribution of crack cocaine, had allegedly been involved in a plan to rob the Defendant, and is believed to be in a position to testify against the Defendant in hopes of obtaining a more lenient sentence, Dr. Dattilio conceded that this information – if true – would have an impact on his forensic assessment of the Defendant.  (Tr. 215-17.)

Dr. Dattilio also considered the Defendant delusional in her belief that high profile attorneys – "Johnny Cochran-type attorneys" – are interested in taking her case because there is money in it.  When questioned on this point, Dr. Dattilio opined that the Defendant's belief was delusional "[b]ecause there are no high-profile attorneys that want to take her case."  (Tr. 217-18.)  Yet, when asked to assume that, in fact, the Defendant is being informed by people she respects that there are efforts afoot to obtain money for her, through book deals or movie deals, in order to pay for a "hotshot" lawyer, Dr. Dattilio intimated that, "if that were true and you could prove that," he might view these so-called delusional statements differently.  (*Id.*)  I note that, during certain of the recorded telephone conversations contained on Government's Exhibit 5, the Defendant can be heard discussing her displeasure with defense counsel's handling of the case and her understanding that her friend and lawyer, Larry D'Ambrosio, is

attempting to secure the services of a renowned criminal defense attorney.  She can also be heard discussing the fact that she is attempting to secure a Hollywood contract for her story in the hopes of using the money to pay for new counsel.  (Ex. 5, 1/8/09, 1/21/09.)

These instances provide good examples of the kind of statements the Defendant frequently makes which, at first blush, seems indicative of a distorted thought process but which, on closer examination, actually have some basis in fact.  Upon being admitted to Carswell, for example, the Defendant made statements to the effect that she does "not need meds," that she was found psychologically competent, and that she is not psychiatrically ill – statements which may have accounted, in part, for Dr. Kempke's initial impression that the Defendant appeared delusional.  Yet even these statements are not entirely irrational, nor do they arise out of "whole cloth," given the mixed medical record in this case; indeed, certain aspects of the Defendant's mental health record, if credited, can be interpreted as supportive of her statements.  (Tr. 141-43.)

I find that Dr. Powers persuasively spoke to this point when she stated:

> ... Ms. Armstrong makes very sensational comments about this case that really are not that farfetched.  This is a high profile case, and to someone who is not familiar with the case, it does sound like she's sort of delusional and grandiose in her thinking.  But when you get to the bottom of it, there is a lot of that she's saying that holds some truth because this is such a high profile case.

(Tr. 31.)

Dr. Dattilio also felt that the Defendant was delusional based on the fact that she is displeased with her current counsel.  Dr. Dattilio stated that the Defendant "doesn't even listen to her counsel's advice, she has her own line of thinking about what should be done."  (Tr. 218-29.)  However, as I have already explained, the Defendant's displeasure with her counsel is not in itself evidence of psychotic thought.  Her displeasure springs from her belief that current counsel is not doing things as she would like, not communicating sufficiently with her, and not being aggressive enough,

especially when compared to her previous defense attorney in a separate criminal matter (see Ex. 5, 1/5/09).  Although the Defendant's dissatisfaction with her attorney may be very misguided and factually unfounded, it appears to be rooted in her own personal frame of reference based on her own past experiences and, therefore, it is not entirely divorced from reality.  Accordingly, I am not persuaded by Dr. Dattilio's testimony that he observed the Defendant engage in delusional thinking.

Moreover, I found Dr. Dattilio's testimony to be somewhat confused and ambiguous insofar as he opined that the Defendant is psychotic.  I find that, on cross-examination, his report was revealed to contain an internal inconsistency which was not persuasively accounted for:

> Q.     Doctor, you just testified that you were claiming that she was psychotic, you[r] report conflicts, in one instance you say she's just delusional, she's so delusional and psychotic, and here on the next page you say ["]while it is reported that she has displayed some psychotic features in the past,["] and you just admitted that she wasn't exhibiting psychotic features in the present?

> A.     Thank you.  That puts it in a nutshell.  This is complex, there is incongruities, there is, you know, this just concretizes how mixed this picture is.  You see it and you don't.  It changes, and she's over here and she's over there.  Very, very complex picture.  And this is why I have no doubt that her attorney has difficulty working with her.  Because she's really a mixed bag.

> Q.     It's an interesting response when you would say that that highlights the complexity, but that wasn't my question, it wasn't what I was highlighting for the court.  What I'm highlighting for the court is not that this is complex, but that in one page of your report you indicate that she is psychotic.  And that on another page of your report ... you indicate that she is not currently suffering from psychotic features.

> A.     Correct.

> Q.     How is that correct, either she is or she is not –

> A.     No, again, it's not always as dichotomist as you want to put into, we can't always do that.  There's some, if I can use the word semi-psychotic, psychotic like, she pulls herself back.

> Q.     Doctor, you didn't do this, I'm not asking you to look at the complexities of her explanation of her condition.  I'm asking you to look at the conflict in your own examination.  You didn't say she seems semi-psychotic but somewhat delusional.  You said ... that her delusions were so significant that she was psychotic.  Then on the next page it says she was not...

> ***

> Q.     ... Isn't it true, Doctor, that what she exhibited to you was ... some paranoia related to other people being out to get her, but not delusions that rose to the level of psychosis?

> A.     That's right, that's why she is also diagnosed with borderline personality.

57

Q.      Okay.  So what you just indicated is that she did not exhibit psychosis, she exhibited paranoia.  And if you look at the next sentence there on page 14, it reads as follows.  "While it is reported that she has displayed some psychotic features in the past," and you've already testified that means she was not currently suffering from psychotic features, "the more predominant aspect of her illness has always been her variable mood that has ranged from depression to manic symptoms?"

A.      That's correct.

Q.      But currently she was not in a period of mania, was she?

A.      I felt so, I felt that she was.

(Tr. 210-13.)

I agree with the Government's suggestion that Dr. Dattilio's testimony was seemingly self-contradictory and his explanation that the case is "complicated" fails to satisfactorily resolve that conflict.  In the end, Dr. Dattilio's testimony left me with the impression that he was equivocating on his initial suggestion that the Defendant displayed psychotic features.  In addition, his opinion that the Defendant was delusional is undermined by the fact that he seemed to lack a full understanding of the background facts and context of this criminal case.

b)      *Dr. Sadoff*

Dr. Sadoff is an extremely well credentialed and experienced forensic psychiatrist and, in my previous findings, I credited his opinion that the Defendant's bipolar disorder was rendering her incompetent to the extent that she could not properly assist her attorney in preparing a defense.  While I still view Dr. Sadoff as a well qualified expert, I am not persuaded by his current opinion that the Defendant's bipolar disorder continues to make her incompetent.  Several factors cause me to reach this conclusion.

For one, Dr. Sadoff's testimony suggested that, in reaching his conclusion about competency, he was applying an inaccurate standard.  He referred several times throughout his testimony to the Defendant's inability to form a "rational defense" (Tr. 234, 235, 236, 239), although he ultimately agreed on cross-examination that this

language did not articulate the proper inquiry, which is whether the Defendant is able to consult with her attorney with a "reasonable degree of rational understanding."

Second, Dr. Sadoff's opinion that the Defendant is presently incompetent appears to be premised largely on his view that she is psychotic for wanting to handle defense matters her own way. As he testified most recently:

> The bottom line for me is that she cannot work with you in preparing a rational defense. She will not listen to you. You tell her do not talk to the reporters, she knows better. She talks to them, she tells them things. She's hurting her case. She doesn't believe she is because she is smarter than you are or at least she believes she is. It's part of her narcissism, it's also part of her hypomania.
>
> ***
>
> ... The real test comes down to can she sit with you and listen to you. You are her attorney, you are there to help her with this case. She can't listen to you and won't listen to you and won't work with you to prepare a rational defense, then she's not competent, in my opinion. Even though she knows what's going on, perhaps better than 90 percent of the people in this room.

(Tr. 235-36.)

However, I am not persuaded at this juncture that the Defendant's described behavior is necessarily indicative of mental incompetence or a detachment from reality. As I have previously discussed in some detail, the Defendant's refusal to heed the advice of her lawyer may be unwise in the extreme, but it does not necessarily demonstrate an inability to consult with her lawyer with a reasonable degree of rational understanding. On the contrary, the Defendant's many recorded conversations suggest that she has been quite capable over the last year of formulating a defense strategy, albeit one that may be inferior to that of her current counsel. That the Defendant's strategy may be less effective is therefore not an indicator of incompetency. I credit Dr. Powers' testimony in this regard:

> [I]t's not the result of a mental disease or defect. It's the result of someone who is very strong willed, somebody that is inflexible and believes that she knows more about he case than anybody else and can defend it as good as or better than anybody else. So if it does play a role in her mental health, it's a personality disorder, not a mental health issue that allows her to act that way.

59

(Tr. 61.)

I also note that Dr. Sadoff's testimony at this most recent hearing was less definitive than before concerning the Defendant's competency.  When asked to opine whether the Defendant is current competent, he indicated that he was going to "modify" his answer "a bit," and basically stated that when the Defendant is manic and psychotic, she is not competent, but he then went on to say that she is not always manic.  (Tr. 238-39.)  He agreed that the Defendant's competency, even on the day of the hearing, was episodic and "ebbed and flowed" (Tr. 240), such that she was incompetent at (unspecified) times during the hearing.  (Tr. 239-40.)  Having sat through the hearing and finding now, for reasons previously stated, that the Defendant's outburst was not reflective of psychotic behavior, I decline to credit this aspect of Dr. Sadoff's testimony.

Finally, I note that Dr. Sadoff agreed during his testimony that the Defendant's relationship with her attorney is a source of psychological tension for her and he even suggested that removing current counsel from the case may be a solution to her problems.  (Tr. 243-44, 247.)  Yet the idea that the Defendant is enduring an active state of mania to the point of being psychotic strikes me as inconsistent with the notion that she could be restored to competency merely by substituting new counsel.  In sum, while I previously credited Dr. Sadoff's opinion that the Defendant's bipolar disorder was rendering her incompetent, I no longer believe that to be the case.

9.      The Results of the MMPI Do Not Persuade Me That the Defendant is Incompetent.

During the hearing, Dr. Dattilio testified that the Defendant's performance on the MMPI-2 showed a clinically significant elevation on the hypomanic scale.  (Tr. 179; Ex. 6.)  Dr. Dattilio interpreted these results as supportive of his view that the Defendant's bipolar disorder is active and preventing her from properly assisting her attorney.  (Tr. 183-85.)

Nevertheless, a number of points were developed at the hearing concerning this

60

evidence which I find notable.  First, the significance of the test must be placed in proper context, as the MMPI is a personality test and there was testimony from the defense experts that one would never render a diagnosis of bipolar disorder on the basis of the MMPI alone.  (Tr. 180; 233.)  Dr. Dattilio therefore spoke of "convergent validity" and, while I would agree that there is such validity supporting the conclusion that the Defendant's bipolar disorder has rendered her psychotic in the past, I am not persuaded that the record convergently validates the theory that she was manic during the period of her restoration to competency.

Second, notwithstanding Dr. Dattiliio's testimony that the hypomania category showed a clinically significantly elevation at 68, Dr. Powers opined that she would expect to have seen a higher score for someone in an actively manic state.  (Tr. 157.)  Thus, Dr. Powers felt it was relevant to examine the supplemental scales to gain further insight as to why the hypomanic scale was elevated.  (*Id.*)

Third, in doing so, Dr. Powers noted that the only sub-scale which showed elevation was the ego-inflation scale which, she felt, was also a hallmark of the Defendant's narcissism, and this sub-scale was significantly elevated at 80.  (Tr. 159-60.)  Other sub-scales for opportunism, psychomotor acceleration, and imperturbability were notably not inflated.  (Tr. 158-59.)  Thus, Dr. Powers viewed the test results as

> a statistical picture of what I saw for four months.  In that when you first look at her and she's got run-on speech and she has pressured speech, you think oh, this appears, as Dr. Kempke said, this appears like hypomania.  And then the more you get to know her, the more you kind of rule out these other things and kind of tie it all into more ego inflation.  Tie it into more grandiosity and narcissism, that is really the hallmark of a personality disorder.

(Tr. 160-61.)

Dr. Dattilio viewed it as naive to attempt to parse out a single sub-scale from the composite score.  (Tr. 179-80.)  He testified that ego inflation is also one of the hallmarks of bipolar disorder and therefore felt that the Defendant's ego-inflation should not be attributed solely to the Defendant's personality disorder.  (*Id*. at 180-81.)

61

Nevertheless, Dr. Dattilio did interpret the MMPI results as indicating a number of elevations in the realm of personality disorder, evidencing the existence of borderline, paranoid and narcissistic traits.  (Tr. 178.)

On balance, I view the probative value of the MMPI scores as being somewhat ambivalent.  While the Defendant's score on the hypomanic scale, taken at face value, suggests the presence of active mania, I am not persuaded that the present record as a whole convergently validates that theory, especially in light of credible evidence that the Defendant did not manifest active mania while at FMC Carswell.  Thus, I am not persuaded that the Defendant's MMPI scores conclusively demonstrate the presence of mania, nor do I believe the scores undermine my conclusion that the Defendant is presently competent to proceed to trial.

C.      The Defendant is Competent.

Having carefully reviewed the record of the Defendant's mental status over the last year, I conclude that the Defendant continues to display problems in her inter-personal relationships, including her relationship with her attorney, but I do not believe that this is the result of an active bipolar condition which is rendering her psychotic or otherwise incapable of operating with a reasonable degree of rational understanding.  To the extent these inter-personal problems continue, I am persuaded that, at least at present, they are primarily a result of her personality disorder.  Further, while I recognize that her borderline, paranoid, and narcissistic traits are enduring and pervasive and significantly impair the Defendant's ability to communicate effectively, it also appears that she presently maintains some degree of control over her maladaptive behaviors such that she can frequently, if not uniformly, be redirected.

In my prior findings, I discussed the fact that Axis II disorders – including personality disorders – are not generally considered serious mental diseases or defects for purposes of competency determinations.  (*See* Findings of Fact and Conclusions of Law [82] at 41-42.)  Although defense counsel challenges that generalization, all three

experts appeared to validate the distinction that personality disorders, unlike Axis I disorders, are not considered to be a major mental disease or defect.  (Tr. 132-34, 178, 254-56.)  I therefore continue to adhere to my previous finding that the Defendant's personality disorder is not a "mental disease or defect" for purposes of rendering her incompetent under 18 U.S.C. 4241.

However, I also find that what is most important for present purposes is not the Defendant's diagnosis but rather her mental capabilities.  Accordingly, even if the Defendant's personality disorder constitutes a "mental disease or defect" for purposes of § 4241(e), I find that the Defendant retains sufficient mental capability to consult with her lawyer with a reasonable degree of rational understanding.  Moreover, while I fully recognize the Defendant's bipolar illness to be a "mental disease or defect" within the meaning of the statute, I find that it is not presently rendering her mentally incompetent to the extent that she is unable to assist properly in her defense.


### III.  CONCLUSION

Needless to say, my present analysis involves only conclusions relative to the Defendant's current mental state, and I fully recognize that that state may change in the future.  I do credit, to an extent, Dr. Sadoff's testimony that the Defendant's mental profile is very complex and that her competency involves a degree of fluidity.  I continue to credit past medical evidence suggesting that stress, when severe enough, may cause the Defendant to lose a degree of control over her mental state.  For present purposes, however, I find by a preponderance of the evidence that the Defendant has recovered to such an extent that she is able to understand the nature and

consequences of the proceedings against her and to assist properly in her own defense.

An appropriate order follows.

s/    Sean J. McLaughlin

Sean J. McLaughlin
United States District Judge

Dated:        September 8, 2009

cm:        All counsel of record.