**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA )
                         )
            v.           )         Case No. 1:07-cr-26-SJM-1
                         )
MARJORIE DIEHL-ARMSTRONG )

## MEMORANDUM ORDER

McLAUGHLIN, SEAN J., District J.,

Presently pending before the Court in this matter is the Defendant's Motion for Change of Venue and Venire and for the Sequestration of Jurors, as set forth in her omnibus pretrial motion [143]. For the reasons set forth below, the motion will be denied without prejudice to be reasserted at the time of *voir dire*.

## I. BACKGROUND

At approximately 2:28 p.m. on August 28, 2003, an individual by the name of Brian Wells entered the PNC Bank at 7200 Peach Street in Erie, Pennsylvania and, after selecting a lolly-pop from one of the teller stations, handed a bank teller a note. As he entered the bank, Wells was in possession of a gun disguised as a walking cane. Affixed to his neck and torso via a metal, locking collar was an improvised explosive device. After Wells handed the note to the teller and showed her the collar bomb under his shirt, the teller gathered approximately $8,702.00 from various cash drawers and provided it to Wells.

Wells then left the bank and retrieved another note from under a rock on the grounds of a nearby McDonalds restaurant. Minutes later, he was stopped in his vehicle by Pennsylvania State Police troopers near the Peach Street entrance to the Eyeglass World parking lot near the bank. As troopers awaited the arrival of a bomb squad, the explosive device detonated, killing Wells.

On September 21, 2003, while investigation of the collar bomb robbery was on-

going, Pennsylvania State Police were contacted by one William Rothstein, who informed them that the body of James Roden, the Defendant's then-boyfriend, was being stored in a freezer in Rothstein's garage. Rothstein told police that the Defendant had shot Roden with a 12-gauge shotgun at her Erie home and that she had enlisted Rothstein's help in moving and storing the body. After police officers responded to the call at Rothstein's home, they arrested Defendant and charged her with Roden's murder. In January of 2005 Defendant pleaded guilty but mentally ill to the third-degree murder of Roden and was sentenced to 7-to-20 years of imprisonment.

Meanwhile, the criminal investigation into the August 2003 collar bomb robbery eventually came to focus on the alleged collaborative activities of the Defendant, Rothstein, and their mutual acquaintance Kenneth Barnes. Investigators also began to theorize that Wells may have been, to some extent, a willing participant in the robbery.

The investigation culminated in the July 9, 2007 filing of this criminal indictment, which charges the Defendant and co-Defendant Barnes with conspiracy to commit bank robbery, bank robbery, and using and carrying a firearm during and in relation to a crime of violence. Both Wells and Rothstein (who died of cancer in July of 2004) are seemingly identified in the indictment, through their initials, as unindicted co-conspirators.

In essence, the indictment charges that the Defendant and Barnes, together with the other co-conspirators, planned the robbery such that it would appear that Wells was merely a hostage who had to "unwittingly follow [a] series of instructions in order to perpetrate the robbery and safely deactivate the destructive device." (Indictment ¶ 4.) It is alleged that the Defendant and other co-conspirators "contrived a series of notes for use in the bank robbery," (*id* at ¶ 3), first as apparent instructions for Wells and, second, as instructions for employees of PNC Bank to follow in giving Wells the money. The purpose of the collar bomb, it is alleged, was to ensure that Wells would turn over the proceeds of the robbery to the other co-conspirators prior to completing the series of instructions that would allow him to deactivate the bomb. That way, the Government

theorizes, if Wells were caught, he would no longer have the money and could claim to authorities that he was a hostage and an unwilling participant in the robbery; if Wells died, he could not be a witness.

According to the indictment, the Defendant, Barnes, and the other co-conspirators met at Rothstein's house at 8645 Peach Street on August 27, 2003 to discuss their plans to rob the PNC Bank the following day.  On the afternoon of August 28, it is alleged, the Defendant, Barnes and Rothstein met at a Shell gas station located at 8228 Peach Street.  From there, the indictment claims, Rothstein used a pay phone to order two pizzas, directing that they be delivered to a tower site located at the end of a dirt driveway at 8631 Peach Street, just next to his home.  The call was made to Mama Mia's Pizzeria, where Wells was then working as a delivery driver.

At approximately 2:00 p.m. on August 28, 2003, Wells and the other co-conspirators allegedly assembled in the area of the tower site whereupon the collar bomb was affixed to Well's neck and torso.  The indictment charges that, during the course of the ensuing robbery, the Defendant and Barnes acted as lookouts while sitting in a vehicle parked at a location across from the shopping center where the bank was situated; upon seeing that Wells had been stopped by state police troopers, the two drove away.

The indictment further charges numerous overt acts allegedly committed by the Defendant and/or Barnes in furtherance of the conspiracy.  Most notably, it is alleged that, in and around July of 2003, the Defendant solicited Barnes to kill her elderly father and that the proceeds from the bank robbery were intended to be used as a payment to Barnes.  It is further alleged that the Defendant killed her live-in boyfriend, Roden, sometime in August of 2003 (but prior to the date of the robbery) in order to keep him from disclosing the bank robbery plan that was then being formulated by the co-conspirators.

## II. DISCUSSION

In light of the bizarre events that are alleged to have occurred relative to the August 28, 2003 robbery, there has been considerable media coverage of the story. Defendant contends that the extensive pretrial publicity surrounding this case has rendered the prosecution of this matter in the Erie Division of the Western District of Pennsylvania "grossly unfair to Defendant and oppressive upon the litigants to this matter, their representatives, and witnesses." (Def.'s Pretrial Motions [143] at ¶ 82, p. 14.) By way of relief, she originally requested that either: (1) the trial of this matter be transferred to the Pittsburgh Division of this Court with jurors being drawn either from the Northern District of West Virginia or the Middle District of Pennsylvania or (2) the trial be moved to the Middle District of Pennsylvania using a venire panel drawn from that District. During oral argument on this motion, the Defendant refined her request such that she now seeks to keep the trial in the Erie Division of this Court but asks that we use a venire panel drawn from the Pittsburgh Division.

Rule 18 of the Federal Rules of Criminal Procedure governs the place and prosecution of a trial. It provides that:

> [u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

Fed. R. Crim. P. 18.

Beyond the considerations enumerated in Rule 18 are certain constitutional mandates which we are obliged to follow. As general matter, the federal constitution's place-of-trial prescriptions require only that a defendant be tried in the state and district where the offense was committed; they do not grant the defendant the right to be tried in any particular division of a district court, as the Defendant concedes. *See* U.S. Const. art. III, § 2, cl. 3 and amend. VI; *Zicarelli v. Gray*, 543 F.2d 466, 479 (3d Cir. 1976) ("When a federal judicial district has been carved into divisions, the accused has

no right to a trial held in a particular division."). *See also* Def.'s Pretrial Motions [143] at ¶ 85 (p. 15) (citing authority acknowledging no right to be tried in a particular division of a district court). However, the Sixth Amendment to the U.S. Constitution also guarantees the accused the right to a trial by "an impartial jury," *id*. amend. VI, while the Fifth Amendment ensures that no person shall "be deprived life, liberty, or property, without due process of law." *Id*. amend. V. Accordingly, "[t]he Constitution's place-of-trial prescriptions ... do not impede transfer of the proceedings to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial." *United States v. Skilling*, 561 U.S. ----, 130 S. Ct. 2896, 2913 (2010).

In this case, both the prosecution and the Defendant are presently in agreement that the trial should be held within the Erie Division of the Western District of Pennsylvania. This Court is inclined to agree, since: (i) the events giving rise to these criminal proceedings occurred within the Erie Division; (ii) the family of Brian Wells is located here, and the Wells family is quite naturally concerned with the outcome of these proceedings; (iii) the Government agents' investigative offices are located here; (iv) the Government has indicated that it intends to call as many as fifty witnesses in its case in chief, most of whom are from the Erie area and some of whom are incarcerated and would have to be transferred and housed elsewhere, perhaps in the same prison facility as the Defendant, if this case were moved to a different venue; and (v) it appears that a trial in Erie would suit the Defendant's best interests, as she has been housed for some time at the Erie County Prison and reportedly would prefer to remain there. Given all of these facts, this Court agrees with the parties that the relevant Rule 18 considerations – *i.e.*, the convenience of the Defendant, the witnesses and any victim and the prompt administration of justice – are best served by holding trial within the Erie Division of the Western District of Pennsylvania.

The disagreement at this point concerns only the location from whence the venire panel is drawn. Because of the extensive media coverage this case has engendered, Defendant contends that the venire panel must be drawn from the

Pittsburgh Division of this District. This argument appears to be grounded both on Rule 18 concerns relative to the prompt administration of justice as well as constitutional concerns stemming from the Defendant's Fifth Amendment due process rights and her Sixth Amendment right to trial by an impartial jury. In essence, the Defendant is contending that the extent of pretrial publicity relative to this case has so tainted the prospective jury pool within the Erie Division that we cannot fairly rely on the *voir dire* process to ferret out prejudice among the individual venire persons but should instead presume it to exist.

The Supreme Court developed the "presumed prejudice" standard in a line of cases beginning with *Rideau v. Louisiana*, 373 U.S. 723 (1963), and continuing with *Estes v. Texas*, 381 U.S. 532 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).[1] The Court recently summarized those cases in the following manner:

> Wilbert Rideau robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them. Police interrogated Rideau in jail without counsel present and obtained his confession. Without informing Rideau, no less seeking his consent, the police filmed the interrogation. On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Rideau moved for a change of venue, arguing that he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people. The trial court denied the motion, and a jury eventually convicted Rideau. The Supreme Court of Louisiana upheld the conviction.
>
> We reversed. "What the people [in the community] saw on their television sets," we observed, "was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnaping, and murder." *Id.*, at 725, 83 S. Ct. 1417. "[T]o the tens of thousands of people who saw and heard it," we explained, the interrogation "in a very real sense was Rideau's trial – at which he pleaded guilty." *Id.*, at 726, 83 S. Ct. 1417. We therefore "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that "[t]he kangaroo court proceedings" trailing the televised confession violated due process. *Id.*, at 726-727, 83 S. Ct. 1417.
>
> We followed Rideau's lead in two later cases in which media

---

[1] Although these cases, and their progeny, generally concern motions for a change of venue – a request not technically at issue here, I consider these cases instructive insofar as they establish the legal standard for assessing whether prejudice within a prospective jury pool should be presumed to exist.

coverage manifestly tainted a criminal prosecution. In *Estes v. Texas*, 381 U.S. 532, 538, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and "bombard[ed] ... the community with the sights and sounds of" the pretrial hearing. The media's overzealous reporting efforts, we observed, "led to considerable disruption" and denied the "judicial serenity and calm to which [Billie Sol Estes] was entitled." *Id*., at 536, 85 S. Ct. 1628.

Similarly, in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death. "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities." *Id*., at 353, 355, 86 S. Ct. 1507. Pretrial media coverage, which we characterized as "months [of] virulent publicity about Sheppard and the murder," did not alone deny due process, we noted. *Id*., at 354, 86 S. Ct. 1507. But Sheppard's case involved more than heated reporting pretrial: We upset the murder conviction because a "carnival atmosphere" pervaded the trial, *id*., at 358, 86 S. Ct. 1507.

In each of these cases, we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"...

*Skilling v. United States*, 130 S. Ct. 2896, 2913-14 (2010).

Consistent with this precedent, our own circuit court of appeals has stated that, "[w]here media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992), *overruled on other grounds* by *Brecht v. Abrahamson*, 507 U.S. 619 (1993). To warrant such a presumption, however, "[t]he community and media reaction... must have been so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury." *Id*.

Perhaps not surprisingly, the Third Circuit has admonished that cases of presumed prejudice are "exceedingly rare." *Id*. at 1253; *Flamer v. State of Delaware*, 68 F.3d 736, 754 (3d Cir. 1995) (*en banc*). *See also Skilling*, 103 S. Ct. at 2914 ("A presumption of prejudice, our decisions indicate, attends only the extreme case.");

*Murphy v. Florida*, 421 U.S. 794, 798-99 (1975) (stating that the rulings in *Rideau*, *Estes*, and *Sheppard* "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process."); *United States v. De Peri*, 778 F.2d 963, 972 (3d Cir. 1985) ("It is the rare case in which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors' assurances that they can be impartial.").

Because the doctrine of presumed prejudice is given such rare application, courts have expressed a preference for deferring ruling on change-of-venue motions until after potential prejudice can been meaningfully assessed via the *voir dire* process. *See United States v. Green*, 983 F.2d 100, 102 (8th Cir. 1992) ("This court has often stated that it is preferable for the trial court to await *voir dire* before ruling on motions for a change of venue.") (citation omitted); *United States v. Peters*, 791 F.2d 1270, 1296 (7th Cir. 1986) (holding that "[a] court in its discretion may defer a determination of a pretrial venue motion until after the voir dire of the prospective jurors when the effects of pretrial publicity can be fully assessed") (citing cases), *superseded on other grounds, as stated in United States .v Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990); *United States v. Nicolo*, 523 F. Supp. 2d 303, 319 (W.D.N.Y. 2007) ("[W]hether a change of venue is warranted due to prejudicial pretrial publicity depends to a great extent on the actual jury pool and the difficulty at trial of selecting an impartial jury. Courts have therefore held that a motion for change of venue based on pretrial publicity is usually premature prior to *voir dire*."); *United States v. Ayala-Martinez*, 24 F. Supp. 2d 165, 168 (D.P.R. 1998) ("[S]ince the jury selection process in this case has not yet commenced, we need not determine whether defendant can establish a presumption of prejudice by attributing impartiality of part of the jury to the whole venire."); *United States v. Eskridge*, 818 F. Supp. 259, 263 (E.D. Wis. 1993) (*voir dire* examination is the preferable time for determining whether pretrial publicity necessitates a change of venue). *Accord Hetzel v. Lamas*, No. 09-3043, 2010 WL 1063896 at *2 (3d Cir. Mar.

24, 2010) (stating that, in determining whether pretrial publicity violated a defendant's right to an impartial jury, courts may look to the record of voir dire to examine the effect of the publicity on the venire).

Where claims of presumed prejudice are entertained, courts have found a number of considerations to be relevant, such as: (i) the size and characteristics of the community in which the crime occurred, *see Skilling*, 130 S. Ct. at 2915 and *Rideau, supra*; (ii) the general content of the news coverage (including factors such as whether the stories referenced the defendant's confession or other similarly blatantly prejudicial information, whether the news account was factual and objective versus sensational, inflammatory, or slanted toward the prosecution, and whether the stories focus on the defendant personally as opposed to the crime itself), *see Skilling, supra*, at 2916 and *id*. n. 17, *Hetzel, supra*, at *4, *Flamer*, 68 F.3d at 755; (iii) the timing of the media coverage relative to the commencement of trial, *Skilling, supra*, at 2916, *Patton v. Yount*, 467 U.S. 1025, 1034 (9814), *Hetzel, supra*, at *4, *Flamer*, 68 F.3d at 755; and (iv) whether there was any media interference with actual courtroom proceedings. *See Skilling*, 130 S. Ct. at 2915 n. 14 (observing that defendant made no allegation of media influence on the jury after it had been empaneled, and contrasting the cases of *Estes* and *Sheppard*, both of which "involved media interference with courtroom proceedings *during* trial") (emphasis in the original).

### (i) *Size and Characteristics of the Community*

With regard to the first factor – the size and characteristics of the community in which the crime occurred, we note that the Erie Division of the Western District of Pennsylvania is comprised of seven counties with a total population of approximately 545,615 and covering a geographic area of approximately 5,610.9 square miles. *See* http://quickfacts.census.gov. Although defense counsel portrays this Division as very much a small and rural population, it is considerably more populous than the communities at issue in *Rideau*, *supra (*prospective jurors drawn from a Louisiana

parish of about 150,000 citizens who had been repeatedly exposed to the defendant's televised confession to extremely violence crimes), or *Irvin v. Dowd,* 366 U.S. 717 (1961) (prospective jurors for a trial involving six different murders were drawn from a county of about 30,000 people and the defendant's confession had been highly publicized within the area). *Cf. Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1044 (1991) (plurality opinion) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals) (cited in *Skilling v. U.S.*, 130 S. Ct. at 2915).

### (ii) and (iii) Content and Timing of News Coverage

With regard to the second and third factors – the content and timing of the news coverage, I note that the Defendant has presented evidence which may broadly be grouped into three categorizes: local news sources; regional and national news sources; and YouTube links/postings. We will consider the relevant characteristics of the pretrial publicity as they pertain to these three groups of items.

1. <u>Local News Sources</u>

(a)

A primary source of pretrial publicity in this case comes from articles published by the Erie Times News ("ETN"), the only major print newspaper with daily publications serving the greater Erie area. Since August 28, 2003, the day on which the subject robbery occurred, ETN has run over 300 news articles concerning this case. Though the volume of coverage devoted to this case has been considerable, several observations must be made.

First, as a general matter, both the frequency and intensity of the coverage have abated substantially over time. For example, of the 319 ETN publications contained in

Defendant's Ex. C (*see* "Erie Times News Articles" folder),[2] about one third were published in the four month period immediately following the subject robbery. By this Court's estimation, the breakdown of publications by year is as follows:

| | | |
|---|---|---|
| 2003 | = | 103 articles |
| 2004 | = | 25 articles |
| 2005 | = | 22 articles |
| 2006 | = | 19 articles |
| 2007 | = | 52 articles |
| 2008 | = | 56 articles |
| 2009 | = | 32 articles |
| 2010 | = | 10 articles |
| | | ———————— |
| total | = | 319 articles |

Jury selection in these proceedings is scheduled to commence on October 12, 2010 and thus, the vast majority of articles published about this case will have predated the *voir dire* process by many months, if not years. *See Skilling*, 130 S. Ct. at 2916 (no presumption of prejudice where, despite persistent news coverage over four year period leading to the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse."); *Hetzel, supra*, at **4 (no error by state court in refusing change of venue in murder case where the intensity of news coverage diminished between the discovery of the victim's body and the trial and jurors were at most exposed to approximately three articles a month for the nine months

---

[2] This folder purports to contain every article published by the Erie Times News concerning the Defendant or this case from the date of the bombing through the date of the Court's hearing on the pending motion for change of venire. This 319-figure is not precisely accurate, because at least eleven (11) of the documents are not newspaper articles published by the Erie Times News but, rather, comment pages published on the website "www.goerie.com," which we discuss in more detail *infra*. Nevertheless, for present purposes we have considered Defendant's evidence as it has been offered.

preceding the trial; "[T]he passage of time and the sporadic nature of the coverage in the months proceeding the trial suggest that any prejudice that may have been presumed around the time of [the victim's] death and [the defendant's] arrest may have dissipated by the next year.").

Second, many of the articles, particularly the earliest ones which were generated at the height of the media coverage, did not focus on the Defendant (who was not yet a suspect) but focused rather on details of the underlying robbery/bombing and the criminal investigation as it was unfolding. Numerous other articles report on players other than the Defendant or on various aspects of the court proceedings. *See Skilling*, 130 S. Ct. at 2916 n. 17 ("[W]hen publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact.") (alteration in the original) (citation omitted).

Third, the overall tone and content of the news articles have, on balance, been factual and objective, as opposed to overtly hostile to the Defendant or slanted in favor of the Government. Having reviewed the articles in question, I do agree that the pretrial publicity in this matter generally portrays the Defendant in an unflattering light. In addition to reporting on the Government's chilling allegations concerning the collar-bomb bank robbery, the news stories have at one time or another covered many aspects of the Defendant's troubled life, including her acquittal on charges of murdering her boyfriend, Robert Thomas, in the mid-1980s, her history of mental illness, her conviction on charges of third-degree murder in the case of James Roden, and her troubled relationship with her elderly father, which has involved legal disputes over her inheritance and the Government's claim that she wanted to have him killed.

That having been said, however, I find that the coverage as a whole has been about as factual and objective as it could be under the circumstances. Given the inherently bizarre nature of the underlying crime and the chaos which has pervaded the Defendant's adult life, it is not surprising that the medial would report on the Defendant's history of mental illness, her involvement in the Roden murder, and her

alleged desire to have her father killed, as these are all matters touching on either the Government's theory of the case or the Defendant's mental competency to stand trial – matters, in other words, inherent to these legal proceedings. Overwhelmingly, the ETN articles have focused on factual, albeit salacious, information derived from official sources, court documents and proceedings, or other publically available records rather than on conjecture, innuendo, or editorial content. See *Hetzel, supra,* at **4 (no evidence that media coverage had an extensive, sustained, or pervasive effect on the jury where articles were largely "factual and objectively reported" and focused on the victim's death, the police investigation, the arrest of the defendants, and the court proceedings before the trial); *Flamer*, 68 F.3d at 755 (no presumption of prejudice where news stories were accurately described as "indisputably factual in nature, but prejudicial and inflammatory only to the extent arising from the normal and natural reaction to any purely factual news item about a very serious crime.").

Particularly in recent months, the news coverage has focused on factual accounts of events that have transpired during court proceedings or positions taken by the parties in their respective court filings. Frequently, these more recent stories have referenced the Defendant's protestations of innocence, her theory that she has been framed for the charges she is now facing, her insistence that she is mentally competent, and her eagerness to have her day in court. Some of the stories have alluded to the Wells family's support of the Defendant and their belief that both Brian Wells and the Defendant stand wrongly accused by the Government. In sum, the news coverage may have generally been unflattering from the Defendant's perspective, but it has not been overtly hostile to her or unfairly slanted in favor of the prosecution.

Fourth, the news coverage in this case has not involved the kind of blatantly prejudicial information which would justify a presumption that the prospective jury pool has been irreparably tainted. In *Rideau*, *e.g.*, the prospective jury pool was exposed on three different occasions to televised news broadcasts of the defendant's detailed confession to a crime involving kidnaping and murder. As the Supreme Court observed

in that case, "this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial – at which he pleaded guilty to murder." 373 U.S. at 726. *See also Hetzel, supra*, at **4 ("Obviously, watching the defendant confess to a crime is likely to have the effect of persuading community members that the defendant is, in fact, guilty of committing the crime."). Similarly, in *Irvin v. Dowd*, *supra*, the jury pool had been irreparably tainted by a press which repeatedly reported on, among other things, the defendant's alleged confession to six murders, his extensive criminal history in unrelated matters, and his offer to plead guilty. *See* 366 U.S. at 725-26.

No similar practices have occurred in this case. Although the Government's theory is premised, to some extent, on alleged statements attributed to the Defendant, this case, unlike *Rideau* or *Irvin*, does not involve a confession by the Defendant or similar evidence of a "smoking gun variety." *Skilling*, 130 S. Ct. at 2916.[3] And, while there have been references on multiple occasions to co-Defendant Barnes' guilty plea and sentence and the expectation that he will testify against the Defendant, there has

---

[3] In addition to considering the totality of evidence bearing on this motion, the Court has paid particularly close attention to some sixteen (16) publications highlighted by defense counsel as illustrative of the type of publicity that counsel felt to be particularly objectionable and/or demonstrative of the fact that the media coverage has saturated the community. The articles are as follows, all found in Exhibit C, "Erie Times News Articles" folder, at the indicated Bates numbers: (1) Trial ordered in case of frozen body (1/21/04) (# 000261-262); (2) Memories linger at scene of Wells' death (7/12/07) (#003573-3574); (3) Plot unfolds (7/12/07) (#003575-3581); (4) Prosecutors: Wells case took a long time because of elaborate scheme (7/12/07) (#003582-3583); (5) Labyrinth of lies (7/15/07) (#003590-3596); (6) Diehl-Armstrong 'manic' (7/17/07) (#003597-3598); (7) Code of silence crumbles (7/22/07) (# 003610-3617); (8) Diehl-Armstrong's cycle of trouble (10/19/07) (#004933-4939); (9) 'I don't think I am crazy' (1/25/08) (#005039-5040); (10) Barnes aids feds in Wells probe (7/25/08) (# 005682-5683); (11) Witnesses seal fate (video) (9/4/08) (#005731-5733); (12) Witnesses seal fate - comment page (9/5/08) (#005805-5806); (12) Special Report: Brian Wells - comment page (9/8/08) (#005807-5811); (13) Diehl-Armstrong found competent, will return soon (2/2/09) (#005861); (14) Diehl-Armstrong found competent, will return soon - comment page (2/2/09) (#005862-5863); (15) Diehl-Armstrong: 'I am competent' (2/3/09) (#005864-5865); (16) Diehl-Armstrong: 'I am competent' - comment page (2/4/09) (#005866-5867).

also been countervailing publicity setting forth the Defendant's position that Barnes is a liar motivated to assist the Government in order to have his own sentence reduced.

This case is further distinguishable from *Rideau* in another respect. In *Rideau*, as the Supreme Court has described it, "trial swiftly followed a widely reported crime." *Skilling*, 130 S. Ct. at 2916 (distinguishing *Rideau*). In this case, by contrast, the most intense media coverage seems to have spiked in the early stages of the criminal investigation and/or around July of 2007 when the indictment was filed. As for the sixteen (16) articles highlighted by defense counsel at oral argument (*see* n. 3, *supra*), I note that six of them were published in July of 2007 and most of the rest were published in the latter part of 2008 or early 2009, a full year and a-half or more prior to the scheduled commencement of jury selection. The timing of these stories is significant because the fact "[t]hat time soothes and erases is a perfectly natural phenomenon, familiar to all." *Patton*, 467 U.S. 1025, 1034 (1984) (no prejudice to the defendant where extensive and prejudicial media coverage occurred four years before the defendant's retrial; during that time, "the community sentiment had softened.")

Similarly, most of the publicity concerning Barnes seems to have peaked in mid-to-late 2008, around the time of his plea and sentence. In *Skilling, supra*, the Supreme Court acknowledged that the co-defendant's well-publicized decision to plead guilty shortly before trial created a danger of juror prejudice in Jeffrey Skilling's trial. However, the Court found that the trial judge had taken appropriate steps to reduce that risk by delaying Skilling's proceedings for two weeks, thereby "lessening the immediacy of that development," and asking jurors during voir dire about their exposure to the recent news about the co-defendant. 130 S. Ct. at 2917. The lapse in time here is far greater.

Fifth, it is important to consider the source of the pretrial publicity. Despite the notoriety of this case, the Government has, as a general matter, maintained a decidedly low-profile position throughout these proceedings. Some exceptions to this must be noted, as when the United States Attorney for the Western District held a press

conference following the return of the indictment in this matter.  In addition, limited public comments were made following the plea and sentencing of Kenneth Barnes. These limited incidents, however, have been the exception rather than the rule, and numerous news accounts reflect that the Government has repeatedly declined opportunities to comment on the case outside of positions stated in open court or in official court papers.

By contrast, a significant extent of the publicity in this matter has been generated by the Defendant herself.  She has made numerous telephone calls from prison to an Erie Times News reporter covering the case and, as the Government's Exhibit 2 demonstrates, she has repeatedly asserted through the press her innocence and her theory that she has been framed for the events of August 28, 2003.[4]  One fairly recent example is an April 11, 2010 article[5] generated by the Defendant's telephone interview with the press wherein she discusses her recent cancer diagnosis.  The story references the fact that the Defendant has denied any involvement in the collar-bomb robbery and has claimed that she was framed on her current charges by Rothstein.  It attributes to her a statement that she remains committed to clearing her name at trial. While the story notes that the government has cited some of her statements to law enforcement as evidence against her, the story also reports the Defendant's counter-argument that she never admitted to being part of the plot and only spoke to investigators in order to help them solve the Wells murder.  *See United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("In deciding whether to presume prejudice

---

[4] One telephone conversation in particular, recorded on January 15, 2009, indicates the Defendant's belief that the Erie Times News articles are being read by members of her prospective jury pool, suggesting it may be part of her agenda to influence the jury pool by repeatedly asserting her innocence to the newspaper. (*See* Govt.'s Exhibit 3, previously admitted as Govt.'s Exhibit 5 to the 4/27/09 competency proceedings.)

[5] See ETN article entitled "Diehl-Armstrong: 'I have cancer'" (published 4/11/10).

based on pre-trial publicity, a court can consider the source of the publicity."); *U.S. v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990) (in assessing a defendant's Rule 21(a) motion for change of venue, the district court may take into account the extent to which the government is responsible for generating the publicity, as well as other factors; upholding district court's denial of Rule 21(a) motion where court found, among other things, that government's press release had contained authorized factual material and were not prejudicial and some of the pretrial publicity had been generated by the defendants themselves); *United States v. Burge*, No. 08 CR 846, 2009 WL 2386147 at *5 (N.D. Ill. July 29, 2009) (in considering whether prejudice among the jury pool should be presumed, court can consider, among other things, "whether the government was responsible for the publication of objectionable material, or if it emanated from independent sources"); *United States v. Jamieson*, 264 F. Supp. 2d 603, 605 (N.D. Ohio 2003) (factors to be considered in determining whether pre-trial publicity has been so "inherently prejudicial" as to presume a tainted trial proceeding may include, among other things, the source of the publicity).

Sixth, it is relevant to consider the reach of the ETN coverage as it pertains to the prospective jury pool. The Erie Division of the Western District of Pennsylvania is comprised of seven Pennsylvania Counties: Erie, Crawford, Warren, McKean, Venango, Forest, and Elk. The Government's Exhibit 1 shows that there is a considerable disparity between Erie County and the remaining six counties of the Erie Division insofar as circulation of the Erie Times News is concerned. For example, while the Sunday edition of the Erie Times News reaches 58.8% of the occupied households in Erie County, it reaches only 14.2% of the occupied households in Crawford County and less than 10% of the occupied households in the remaining counties.[6] The

---

[6] The Government's evidence shows that the percentage of occupied households which receive the Sunday edition of the Erie Times News is only 9.7% in Forest County, 8.7% in Venango County, 8.5% in Warren County, 3.1% in McKean County, and 2.8% in Elk County.

newspaper's weekday circulation is more limited still, reaching some 47.8% of occupied households in Erie, but only 7.9% of the occupied households in Crawford County and only about 2% of the occupied households in Venango and Warren Counties. The weekday newspaper has no circulation at all in Elk, Forest, and McKean Counties. Moreover, there is no evidence of record to suggest that the local newspapers serving the other six counties have widely covered this case. Thus, it may well be, as the Government suggests, that a significant percentage of the jury pool will have heard little about this case.

Defendant counters, however, with evidence showing that about half of the jurors on the current "qualified wheel" [7] for the Erie Division are being drawn from Erie County. To be specific, as of August 16, 2010, there were 6,626 jurors in the qualified juror wheel for the Erie Division and some 3,397 of those jurors, or approximately fifty-one percent (51%), are being drawn from Erie County. (*See* Affidavit of Terri Morder, Jury Supervisor for the Western District of Pennsylvania, attached as Ex. A to Def.'s reply to Govt.'s Response to Def.'s Pretrial Motions [183-1], at p. 2.) Approximately 3,229, or forty-nine (49%) are being drawn from counties other than Erie. Assuming that the qualified jurors from Erie County are more likely to have been exposed to pretrial publicity concerning this case, the numbers still leave ample room for the possibility that a fair and impartial jury can be picked in this Division of the District Court. As the Supreme Court recognized in *Murphy v. Florida*, "jurors need not... be totally ignorant of the facts and issues involved." 421 U.S. at 799-800.

---

[7] Pursuant to the Plan of the United States District Court for the Western District of Pennsylvania for the Random Selection of Grand and Petit Jurors, jurors for the Erie Division are randomly selected based on a percentage of registered voters in each of the seven counties comprising the Erie Division. (*See* Affidavit of Terri Morder, Jury Supervisor for the Western District of Pennsylvania, attached as Ex. A to Def.'s reply to Govt.'s Response to Def.'s Pretrial Motions [183-1], at p. 1.) For the current Master Wheel, the total number of potential jurors was approximately 20,000. (*Id*.) From this total, a list of qualified jurors (or "qualified wheel") is developed following the receipt of responses to the Court's questionnaire. (*Id*.)

(b)

Another major source of local news coverage has been the website "www.goerie.com," which is considered the on-line presence of the Erie Times News. (*See* Affidavit of Laurel Lane, Def.'s Ex. J, at p.1.)  This website basically carries the same news content as the Erie Times News newspaper (*id*.) and, in fact, most of the ETN articles submitted by the defense as exhibits are publications obtained from the goerie.com website.  Since the content of the print newspaper and the online news publications is generally identical, I need not repeat here my discussion on the content of the news articles themselves.  More relevant for present purposes is the reach of the publications, the viewer commentary which often accompanies them, and the potential influence of all this on the prospective jury pool within the Erie Division.

Unlike the ETN print newspaper, www.goerie.com provides news articles via the internet and requires no subscription fee relative to articles published within the most recent 30-day period.  In addition, visitors to the website are able to access any article ever posted on the site; however, to access postings that are more than thirty days old, a subscription fee must be paid.  (*Id*.) [8]

---

[8]  According to the website's advertisements, "[t]he GoErie.com's archive contains staff-written and other selected articles from 1996 to the present."  *See* www.goerie.com/archives.html.  Articles may be obtained at the following prices:

* **Single Article**:    $2.95

* **Week Pass**
    3 articles:  $6.95

* **Month Pass**
    10 articles: $21.95
    25 articles: $49.95
    40 articles: $79.95

* **One-Year Passes**
    500 articles:  $995
    1,000 articles:  $1995

According to Laurel Lane, Vice-President of Interactive Media for the Times Publishing Company, www.goerie.com has at least 670 articles concerning the Wells case and/or the Defendant since 2005 as "reflected in [the company's] analytics." (Affidavit of Laurel Lane, Ex. J to Motion Hrg. [193-3] at p. 1.)  Those articles have received approximately 135,000 page views and 104,000 "unique visits."  (*Id*. at pp. 1-2.)  Ms. Lane further states that, during the month of July, 2010, www.goerie.com posted twenty-one (21) articles concerning the Wells case and/or the Defendant, and those articles received 3,216 page views during that month.  (*Id*. at p. 2.)[9]

What is equally significant, however, is what this information does *not* reveal about the extent to which the prospective jury pool in this case has been irreparably tainted by pretrial publicity.  First, because www.goerie.com is accessible to any person in the world with internet access, we have no way of knowing (and Ms. Lane's affidavit make no mention of) the number of viewers who reside within the Erie Division.  Given Ms. Lane's representation that, as of July 2010, goerie.com and its affiliated websites had approximately 525,000 unique visitors and 4,800,000 page views *(see* Ex. J at p. 1), one might infer that a considerable portion of the viewing audience actually resides outside of this Division.[10]

---

*See* www.goerie.com/archivesfees.html.

[9] Notwithstanding the number of articles referenced in Ms. Lane's affidavit, no information has been provided by which the stories can be individually identified.  We note that, despite the representation that www.goerie.com is the on-line presence of the Erie Times News and has most of the same news content as the newspaper, the website purports to have more than three times the number of articles published by ENT since 2005 concerning this case.  In addition, while goerie.com has reportedly published twenty-one (21) articles about this case in July of 2010 alone, Defendant's Exhibit C – which purports to contain every ETN article published in this case up to the time of the court's hearing on this pending motion – contains only three articles published in the month of July.  No explanation is provided as to these apparent discrepancies.

[10] The evidence gathered anecdotally from a review of certain goerie.com comment pages supports this inference, as we discuss further, *infra*.

Second, the evidence is somewhat ambiguous insofar as it relates to the number of individuals who actually view the website's content.  Although Ms. Lane does not explain the meaning of the term "unique visitors" in her affidavit, she does acknowledge that the term "does not necessarily reflect an accurate number of people/individuals that came/come to the site."  (Ex. J at p. 1.)  Because it is highly possible that a person interested in this case may have viewed a particular page more than once, there is seemingly no way to account for multiple viewings by the same individual, at least based on the evidence presently before us.  In the same vein, the term "page view" indicates that a particular page was accessed by a computer, but it does not necessarily indicate that the page or article was read.  (Ex. J at p. 1.)  In sum, then, though we might generally surmise from the foregoing data that goerie.com has a sizeable viewing audience and that the website would hold particular interest for individuals residing in or around the Erie area, there is no way to accurately discern from the present record the number of individuals who actually sat down and read the articles in question, much less is it clear that they are residents of the seven counties comprising the Erie Division of the Western District of Pennsylvania.

Also of some relevance are the various goerie.com comment pages that have been included as part of the Defendant's Exhibit C.  Having reviewed the folder designated "Erie Times News Articles," the Court has located eleven (11) documents that consist of comment pages dating from January 22, 2008 through March 10, 2009.[11]

---

[11] These pages are as follows:  (i) Legal moves in Wells case (7 comments) (#005033-5034) (dated 1/22/08); (ii) Diehl-Armstrong believes she's unfit for trial (18 comments) (#005071-5074) (dated 4/2/08);(iii) Diehl-Armstrong's mental state:  Experts disagree (1 comment) (#005111) (dated 5/23/08); (iv) Witnesses seal fate (video) (4 comments) (#005805-5806) (dated 9/5/08); (v) Special Report:: Brian Wells (14 comments) (005807-5810) (dated 9/8/08); (vi) Death of Wells' friend was "complicating factor" in probe (showing 20 of 24 comments) (#005817-5823) (dated 9/8/08); (vii) Diehl-Armstrong ready for showdown (1 comment) (#005829) (dated 9/23/08); (viii) Is she fit to stand trial? (3 comments) (#005844-5863) (dated 1/6/09); (ix) Diehl-Armstrong found competent, will return soon (4 comments) (#005862-5863) (dated 2/2/09); (x) Diehl-Armstrong:  'I am competent' (3 comments) (#005866-5867)

Presumably, this evidence is meant to demonstrate that news stories concerning this case continue to generate public interest and/or that the public has fixed opinions about the Defendant's guilt or innocence. However, a review of the comments quickly dispels any notion that the Erie community as a whole remains fixated on this case or that public opinion on the matter is settled.

For one, the number of comments being made relative to the given ETN articles is, anecdotally speaking, not particularly impressive. Many of the articles in question yielded only one or a few comments. The most widely commented-upon articles in the batch yielded, respectively, fourteen (14), eighteen (18) and twenty-four (24) comments. (*See* n. 11 below.) Moreover, even those numbers are not particularly impressive when compared to the number of comments posted at or around the same time on unrelated articles. With regard to the article "Diehl-Armstrong believes she's unfit for trial," which generated 18 comments posted on April 2, 2008, it appears that 149 comments were posted relative to a story covering the local Catholic Bishop's decision not to attend the graduation ceremony to be held at a local area college. (See Ex. C at Bates # 005073.) With regard to the article "Special Report :: Brian Wells," which generated 14 comments on September 8, 2008, it appears that another forum under the topic "State clears air on smoking ban" generated 82 comments, while another designated "AFC Rankings" generated 383 comments. (*See id.* at # 005807.) With respect to the article "Death of Wells' friend was 'complicating factor' in probe," which generated 24 comments on September 8, 2008, it appears that a topic designated "Call of duty" generated 76 comments, while another designated "Conservative Break Room Part II" generated 330 comments. With respect to a January 22, 2008 article entitled "Legal moves in Wells case," seven comments were posted; however, 278 comments were posted relative to the topic "Cheney targeted for impeachment." (*Id*. at #005034.)

---

(dated 2/4/09); (xi) Hearing likely to be postponed (2 comments) (#005876-5877) (dated 3/10/09).

Though the foregoing evidence is somewhat anecdotal, it arguably suggests that public interest in this case may have waned over time, particularly in the last two years. It is perhaps also worth noting that the time period covered by these comment pages (January 2008 - March 2009) coincided with an historical presidential election year, a major crisis within the country's financial industry, and the on-set of a severe recession – matters which we may reasonably assume were of greater interest and concern to most residents within the Erie Division than were the criminal proceedings in this case.

For what it is worth, however, the Court also notes that many, if not most, of the entries set forth in the eleven (11) comment pages were made by individuals who appear to reside outside of the Erie Division. By way of example, I note that the April 2, 2008 article "Diehl-Armstrong believes she's unfit for trial" generated 18 comments, but only three of those were made by individuals ostensibly residing within the Erie Division. A May 23, 2008 article, "Diehl-Armstrong's mental state: Experts disagree," generated only one comment (i.e., "She's crazy like a fox.") from a resident of Mogadore, Ohio, outside of this Division. (*See* Ex. J at # 005111). The article "Witnesses seal fate (VIDEO)" generated four comments, only one of which was made by a resident of this Division. (*See id.* at # 005805.) The September 8, 2008 article "Death of Wells' friend was 'complicating factor' in probe" generated 24 comments, 20 of which are shown in the pages submitted by the Defendant. These 20 comments were, in turn, generated by nine different individuals, many of whom commented more than once, and only two of whom appear to reside within the Erie Division. In fact, a review of these comment pages shows that entries are being posted by individuals as far away as North Carolina, South Carolina, Virginia, Florida, Georgia, New Jersey, Maryland, and California. Whether or not these individuals have ties to the Erie area is unclear; what is clear, however, is that they do not form a part of the prospective jury pool.

It should also be noted that many of the entries posted on these pages come from individuals who have posted more than one comment. This duplicity must be accounted for in assessing the degree to which the public remains engaged with these

proceedings.  It may suggest that certain individuals have taken a particular interest in the case that is not necessarily shared by the average resident within this judicial district.

Many of the comments, it must be acknowledged, are unkind toward the Defendant.  Some of them, in fact, appear not only to prejudge her guilt, but also opine on what her punishment should be.  However, it is also important to note, for what it is worth, that the comments are not uniform in the sense of expressing a community-wide fixed opinion.  Some of the comments are random content having nothing particular to do with the Defendant's guilt or innocence.  Other comments express skepticism toward the Government's theory and even some outright support for the Defendant.

In sum, then, I acknowledge the considerable publicity which has been generated via www.goerie.com relative to this criminal matter.  However, I do not view this evidence as a persuasive indicator that the jury pool in this Division has been irreparably tainted by the local news coverage.


(c)

To a lesser extent, media attention has come from the local television news sources.  Defendant's Exhibit C in support of her change-of-venue motion includes a folder denominated "Media attention to case," which includes eleven (11) stories run by local television news sources on their internet sites between July of 2007 and September of 2009.[12]

_____

[12] These include the following:  (1) "Harold Diehl Speaks About Daughters [sic] Plot to Kill Him" (WSEE, with video link) (dated 7/13/07); (2) "Marjorie Diehl-Armstrong Breaks her Silence - Exclusive Report" (WSEE, with video link) (dated 10/26/07); (3) "Barnes Plea Scheduled" (WICU) (dated 8/29/08); (4) "Barnes enters plea" (WJET) (dated 9/3/08); (5) "What Barnes' Plea Means for Marjorie" (WSEE) (dated 9/3/08); (6) "Breaking News  - Barnes Pleads Guilty" (WSEE) (dated 9/3/08); (7) "Ken Barnes Pleads Guilty" (WICU) (dated 9/3/08); (8) "Collar Bomb Sentencing" (WICU-TV) (dated 12/3/08); (9) "Wells' Family Reaction" (WJET-TV) (dated 12/3/08); (10) "Diehl Armstrong Competency Hearing") (WICU) (dated 4/27/09); (11) "Diehl-Armstrong:

Perhaps the most potentially prejudicial article is the one entitled "Harold Diehl Speaks About Daughters [sic] Plot to Kill Him," in which the Defendant's father expresses a lack of surprise over the Government's allegation that this served as a motive for the collar-bomb robbery.  Mr. Diehl also is quoted commenting on her mental state and indicating that he desires no contact with his daughter.  However, this story was published over three years ago on July 13, 2007 and has not been a prominent feature in the local news coverage.

Another story, run in October of 2007, purports to be an exclusive interview with the Defendant.  In that publication, the Defendant professes her innocence, claims that she has been framed, and accuses Barnes of being "the scum of the earth," a "crack head pimp" and a liar.  (*See* "Marjorie Diehl Armstrong Breaks Her Silence - Exclusive Report" (published 10/26/07).)

Most of the remaining publications occurred in the latter part of 2008 and concern Barnes' plea and sentence, the possibility that he could earn a sentence reduction if he testifies against the Defendant, and the reaction of the Wells family to Barnes' conviction and sentence.  Once again, to the extent this information is prejudicial to the Defendant, it is nearly two years old.  The two most recent articles, published in April and September of 2009, are basically factual accounts of the most recent aspects of the competency proceedings.

In general, the content of these news accounts mirrors the type of information reported in the Erie Times News and www.goerie.com.  On balance, the information is factual, objective, and not unduly hostile or slanted toward the Government.  The fact that the more potentially prejudicial stories ran approximately two years or more prior to the date on which jury selection is scheduled to commence is important because this significant lapse in time may well diminish or eliminate altogether any prejudicial effects that might have otherwise existed.

Mentally Competent" (WICU) (dated 9/8/09).

2. <u>Regional and National News Sources</u>

In this same folder denominated "Media attention to case" (*see* Def.'s Ex. C), Defendant has provided a non-exhaustive sampling of news accounts of this case that have run in the Pittsburgh Region and nationally.[13] Included within this sampling are approximately thirty-one (31) stories apparently obtained from the websites of CNN, ABC, FOX News, MSNBC, the New York Times, the Pittsburgh Post Gazette and the Pittsburgh Tribune Review, among others.[14] Some of these appear to have aired on national television.

For the most part, the information discussed in these stories mirrors the same type of content contained in the ETN articles, *i.e.*, the details of the underlying crime, aspects of the unfolding investigation, the nature of the criminal charges, the identities of the accused, the alleged link between Roden's murder and the bank robbery scheme, and the Defendant's alleged motive relative to the killing of her father. Though not favorable to the Defendant, this information, as we have noted, is factual and intrinsically related to the underlying case. To the extent the coverage includes information which is arguably gratuitous and/or inadmissible, this type of material is generally limited to news accounts appearing in and around July of 2007, more than three years ago. Moreover, there are numerous references throughout these stories to the Defendant's protestations of innocence made either directly by her or through her counsel.

It should also be noted that, although these regional and national stories span a time frame covering September of 2003 to September of 2009, the vast majority of the

---

[13] This folder also contains numerous ETN articles which are duplicative of those contained in the folder "Erie Times News Articles."

[14] By the Court's calculation, the break down of these news stories is as follows: CNN = 3, CNN-KDKA (Pittsburgh) = 1, New York Times = 2, Fox News = 4, MSNBC = 2, ABC = 2, Associated Press (Pittsburgh) = 1, Las Vegas Sun = 1, The Daily Item (Sundbury, PA) = 1, Pittsburgh Tribune Review = 5, Pittsburgh Post Gazette = 9.

stories submitted by the Defendant were published in and around July 11, 2007, when the indictment was returned in this case, or prior to that date. This may be because of the fact that one of the most newsworthy revelations in the case, perhaps even more so than the identity of the Defendants and the nature of the crimes being charged, was the Government's theory concerning Wells' alleged involvement in the underlying conspiracy. Many of these news accounts therefore focus on the Government's theory that Wells was, to a limited degree, involved in the plotting of the scheme as well as the Wells family's vociferous denial of that claim.

To the extent this sampling of news coverage is a valid representation of the entirety of regional and national coverage pertaining to this case, it shows a marked waning of interest over time. The most recent samples submitted by the Defendant are factual accounts focusing primarily on the Defendant's mental competency proceedings. The accounts are, for the most part, fairly brief and are neither sensationalized nor slanted toward the Government. They consist of approximately a half-dozen articles published by various sources between January of 2008 and September 2009. On the whole, the evidence as to regional and/or national news coverage suggests that this case originally generated wide-spread interest, but that interest seems to have peaked in mid-2007 and diminished substantially over time.

    3.    <u>YouTube Postings and Links/ Wikipedia Entry</u>

Finally, the Defendant has submitted evidence showing that several videos depicting actual footage of Wells' death have been posted on YouTube. Perhaps not surprisingly, these unfortunate postings have generated commentary of their own. (*See* Def.'s D-1, D-2, E-1, E-2, F, G, and H.) One video posting in particular, entitled "Brian Douglas Wells" (Ex. D1, D2), has generated enough commentary to fill 53 pages. (Ex. D2.) The evidence shows that this latter posting has received 339,671 "views." Another posting, entitled "Brian Douglas Wells (R.I.P.) (Ex. G1, G2), is accompanied by

several pages of commentary and has received 20,746 views.  The others have respectively received anywhere from 1,647 views to 5,254 views.

Here again, the Defendant posits that the evidence shows the amount of interest this case has generated and the degree to which the public has formed fixed opinions about the case.  Perhaps more to the point, the Defendant posits that these comments contain theories and statements about the case that are purely conjectural, based on hearsay, or otherwise inadmissible in a court of law, yet this information is readily available to anyone with internet access.  As such, she argues, it serves as a potentially corrupting source of information to the prospective jury pool.

Having reviewed and considered the foregoing evidence, the Court makes the following observations.  First, much of this content concerns the underlying event or Brian Wells rather than the Defendant.

Second, it is hard to tell from the evidence what audience this type of web information is reaching.  Unlike the goerie.com comment pages, the YouTube pages do not indicate the general location of the persons posting comments.  To a very limited extent, the individual's general location can be inferred from his or her commentary, but that is by far the exception.  Defense counsel at oral argument pointed to an example in Ex. D2 where an individual ostensibly from Erie comments that he knew Brian Wells.  However, many other comments are written in a foreign language, suggesting the possibility that they may be coming from viewers overseas.  In fact, the individual who posted the video describes the content as "some American sick [f- - - ers]" having "attacked this dude," suggesting that the video itself was posted by a non-American.  In any event, given the fact that this information is accessible to anyone in the world who has access to the internet – and considering that the population of the United States alone is over 300 million and the world population figures in the billions, the number of "views" and comments which each of these postings have generated are not necessarily impressive.

Third, it should also be noted that a relatively small number of these comments

appear to have been recent posts that were added within several days or weeks prior to August 24, 2010, when they were apparently obtained.  Notably, the overwhelming majority of the comments (particularly with respect to Ex. D2) were made 2 to 3 years prior to that time.  To the extent these posting continue to generate interest in the viewing public, the evidence suggests that the public interest has waned significantly.

Fourth, it seems reasonable to infer that postings like the ones shown in Ex. D-H appeal to a certain select audience.  In reviewing the comments, one can find frequent examples of certain individuals who have posted multiple entries and who may well be repeat "viewers."  It is also noteworthy that on the first page of each Wells posting are links to other videos advertising similarly macabre or sensational content, which suggests that this type of web content may appeal to a particular viewing audience.  The Court is reluctant to assume that information such as this, notwithstanding its accessibility, is being voraciously sought out and consumed by the general population of the Erie Division.

Defendant has also supplied a Wikipedia entry for "Brian Douglas Wells," which discusses details about the collar-bomb robbery, the ensuing criminal charges and court proceedings, and the media attention which this case has generated.  (Ex. I.)  This webpage provides links to numerous news sources concerning the case which can be found elsewhere on the web.  Again, Defendant expresses concern as to the accessibility of this information and the corrupting effect it could have on the jury pool.

It is hard to tell from this exhibit how widely the Wells Wikipedia page has been viewed.  Regardless, however, the same considerations that I have discussed relative to the YouTube evidence apply here.  Like the YouTube information, this Wikipedia web page is literally available to anyone in the world who has internet access and a particular interest in the story.  While it is certainly possible that potential jurors might avail themselves of this information, the Court declines to draw any conclusions about that likelihood in a vacuum.  To the extent such a danger exists, I believe it can be adequately ferreted out through a careful *voir dire* and cautionary instructions.

*(iv)  Media Interference With Courtroom Proceedings*

As we noted earlier, one factor for consideration in determining the extent to which a venire panel is prejudiced is the extent to which there is media interference with actual courtroom proceedings.  In the *Estes* and *Sheppard* cases, the media actually interfered with courtroom proceedings *during* trial to the extent that the proceedings "entirely lack[ed] ... the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy,* 421 U.S., at 799.  Here, of course, trial has not yet occurred, so this factor cannot be definitively assessed.  To the extent past proceedings are any indication, however, this Court anticipates no problems in maintaining the dignity, decorum, and solemnity that is befitting a criminal trial.

## III.  CONCLUSION

As our discussion of the foregoing evidence shows, media coverage in this case has been extensive and has taken various forms.  But "pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial."  *Skilling*, 130 S. Ct. at 2916 (*quoting Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)).  *See also Murphy v. Florida*, 421 U.S. 794, 798-99 (1975) (the rulings in *Rideau*, *Estes*, and *Sheppard* "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.")

In assessing the likely affect of the pretrial publicity on the prospective venire panel, I have considered the volume as well as the overall content, tenor and timing of the coverage.  Having done so, I conclude that the media stories generally have tended to be factual accounts of the underlying crime, the allegations being made by the Government, issues being litigated in these criminal proceedings, or positions taken by the respective parties as stated in open court or in official court papers.  The more temporally proximate news coverage has focused largely on issues such as the

Defendant's mental competence, her recent cancer diagnosis, her requests for new counsel, and issues raised by her pretrial motion – all of which relate directly to these proceedings. While much of the factual information portrays the Defendant in an unflattering light, the coverage as a whole has not been overtly hostile or slanted in favor of the Government, and it has frequently served as a means for the Defendant to voice her own position. Moreover, while the news coverage of this case has been sustained over the years, it is has become considerably less intense and probing over time.

As the Supreme Court long ago recognized, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-156 (1879). That may be particularly true in today's "information age," where the internet and other technologies make information more widely available and easily accessible than ever before. Yet, an event's "[p]rominence does not necessarily produce prejudice, and juror *impartiality*... does not require *ignorance*." *Skilling*, 130 S. Ct. at 2914-15 (emphasis in the original) (citation omitted). *See also Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.").

Based on the foregoing, I conclude that the published reports and news accounts concerning this case do not warrant a presumption of prejudice relative to the prospective jury pool of this District Court's Erie Division. Nonetheless, I will revisit this issue if it becomes evident during jury voir dire that the pretrial publicity has compromised the Court's ability to empanel a fair and impartial jury. Accordingly, the following order is entered:

AND NOW, to wit, this 20th day of September, 2010, for the foregoing reasons, IT IS ORDERED that the Defendant's motion for change of venire be, and hereby is, DENIED without prejudice to be reasserted, if appropriate, at the time of *voir dire*.[15]


s/    Sean J. McLaughlin

Sean J. McLaughlin
United States District Judge


cm:    All counsel of record.

---

[15] The Court finds that it is premature at this time to address the issue of sequestration of jurors.