**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　 )　　　Case No. 1:07-cr-26-SJM-1
　　　　　　　　　　　　　　　　)
MARJORIE DIEHL-ARMSTRONG　　 )


## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**


McLAUGHLIN, SEAN J., District J.,

　　　　Defendant, Marjorie Diehl-Armstrong is charged in this criminal matter with one count each of bank robbery, conspiracy, and using a firearm in connection with a crime of violence.  These charges stem from the August 28, 2003 collar-bomb robbery in Erie, Pennsylvania, which resulted in the death of Brian Wells.

　　　　Presently pending before the Court in the above-captioned case is the Defendant's motion to suppress certain statements she made to law enforcement officers in the course of the criminal investigation leading to these charges.  The Defendant has argued that her various statements should be suppressed either because:  (1) she was mentally incompetent at the time she made them; (2) she was not given proper *Miranda* warnings before making them; (3) the lawyer who was present during many of her pre-indictment meetings with law enforcement was either (a) not acting as her lawyer or (b) acting under a conflict of interest and/or otherwise deficiently, thereby depriving her of her right to effective assistance of counsel; or (4) she was induced into making the statements by promises of a prison transfer, immunity and/or other benefits or consideration.

　　　　The Government has filed a brief in opposition to this motion, and the Court held an evidentiary hearing on October 4, 2010.  At the hearing, the Court received numerous exhibits into evidence and heard testimony from Special Agent Gerald Clark

of the FBI, Captain Robert Rogers of the State Correctional Institution at Cambridge Springs, Lawrence D'Ambrosio, Esq., and Bruce A. Antkowiak, Esq. The matter is now ripe for disposition.

Based upon the relevant testimony and evidence presented during the suppression hearing and applicable law, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d). For the reasons that follow, the Defendant's motion will be denied.

## FINDINGS OF FACT

In January of 2005 Defendant pleaded guilty but mentally ill to the third-degree murder of her former boyfriend, James Roden. She was sentenced to a term of 7-to-20 years of imprisonment. Following mental health treatment at the Mayview State Hospital, she was transferred to SCI-Muncy to serve out the term of her imprisonment.

On April 7, 2005, during the course of her incarceration at SCI-Muncy, Defendant was interviewed by Corporal David M. Gluth of the Pennsylvania State Police concerning information she had supplied relative to a 1989 homicide in Venango County, Pennsylvania. Upon completion of that interview, the Defendant indicated that she had some information to offer concerning the Brian Wells case. She disclosed that an individual by the name of William Rothstein was involved in the incident and described him as being consumed with the news accounts of the case. She also spoke of an individual with the name "Stockton" as someone she thought was involved in the robbery. In addition, the Defendant stated that Brian Wells was known by Rothstein and had actually been to Rothstein's house prior to the collar-bomb incident. During this interview, Defendant's information about the Wells case was vague and she appeared to be very nervous when pressed for details. She showed a reluctance to discuss any information concerning Roden and his possible involvement in the case. Though the interview was cut short due to time constraints, the Defendant told Cpl.

Gluth that she would entertain another interview in the future, if necessary.  (Govt. Ex. 1.)

Defendant was subsequently visited at SCI-Muncy on April 20, 2005 by FBI Special Agent Gerald C. Clark, Jr., the lead investigator in charge of the Wells case, and Special Agent Jason Wick of the Bureau of Alcohol, Tobacco, and Firearms and Explosives.  This interview was held in the basement of the security office at SCI-Muncy upon the arrangement of Lt. Sisley, a Muncy prison official.  The Defendant arrived on her own at the security office, having walked freely from her housing unit to the assigned location for the interview.  During the course of the meeting, the Defendant stood closest to the door, which remained ajar, with Lt. Sisley present in the adjacent office.  The demeanor of all parties was calm.

During the course of this interview, the Defendant disclosed that Rothstein had told her he was involved in the Wells case.  She reiterated that Rothstein and Wells had been acquainted with one another, and she attributed to Rothstein both a financial motive for the robbery and the capability of building explosives.  She claimed that Rothstein had talked Wells into participating in the robbery and wearing the explosive device.  She also mentioned the name of her attorney, Larry D'Ambrosio, and identified him as someone who knew Wells and Rothstein to be friends.  Defendant denied being with Rothstein during the afternoon of August 28, 2003 and stated that she had been at the Kentucky Fried Chicken on Peach Street during the time of the collar-bomb incident.  The interview ended with the Defendant indicating that she had more information to share, but she wanted a transfer to SCI-Cambridge Springs and asked that the agents check into that for her.  (Govt. Ex. 2.)

Approximately two days later, the Defendant sent a handwritten letter to the Pennsylvania State Police in which she recounted her recent cooperation with law enforcement on a variety of matters, including the Wells case, and her desire to be transferred to the State Correctional Institution in Cambridge Springs, Pennsylvania. Defendant's letter requested assistance from the officers with whom she had spoken in

effectuating the transfer so that she could be closer to her power of attorney and family and keep in better contact with them.   (Govt. Ex. 3.)

Defendant sent additional correspondence to Cpl. Gluth on or around May 18, 2005 pertaining to her continued desire to effectuate a transfer from SCI-Muncy to SCI-Cambridge Springs.  In this letter, the Defendant discussed the fact that a counselor and unit manager were upset that Special Agent Clark had contacted the prison administration to discuss the possibility of a transfer.  She suggested that Cpl. Gluth might try contacting the prison superintendent, and she urged him to not give up and not "let these underlings hold [her] up here."  (Govt. Ex. 4.)   She professed her hatred of SCI-Muncy and the fact that she has to be around "crazy people."  She also referenced her desire to get off medication but states that she "will take medication if it is necessary to go to Cambridge Springs, anything to go there."  (Id.)  She closed her letter by expressing thanks to Cpl. Gluth and Agent Clark for their efforts.  (Id.)

Defendant was interviewed again by Agents Clark and Wick on May 23, 2005 while she was at the Erie County Jail on unrelated state court matters.  Although the agents were not responsible for Defendant's presence in Erie on that date, they decided to make contact with her in an attempt to gather more information concerning the collar-bomb incident.

During this meeting, the Defendant again expressed her desire to be transferred from SCI-Muncy to SCI-Cambridge Springs.  She continued to provide certain information concerning the Wells matter.  She again referenced Larry D'Ambrosio as a friend and attorney and stated that he wanted to speak with investigators as he had information about the case.  She spoke of another party who had reportedly seen Rothstein carrying a cane gun in a grocery store prior to the collar-bomb incident. She stated that Rothstein hated Roden.  Defendant did not wish to respond to questions regarding materials involved in the explosive device that Rothstein purchased, nor did she respond when asked about timers.  She indicated to the agents that she had more information to share about the case but was withholding it in exchange for a transfer to

SCI Cambridge Springs. She also expressed concern about people thinking that she was involved in the case and newspapers printing headlines suggesting that she had made the bomb. (Govt. Ex. 5.)

During the course of this interview, the Defendant remained calm. The agents were likewise calm and neutral in their tone toward her. The interview was ended nonchalantly by the Defendant.

The following day, the agents contacted Mr. D'Ambrosio and arranged an afternoon meeting to discuss his information about the Wells case. Also that day, the agents had a follow-up contact with the Defendant, at which time she inquired whether any progress had been made toward effectuating her transfer to SCI-Cambridge Springs. She was advised that attempts were being made to facilitate her transfer. This meeting with the Defendant was once again low key and was terminated by mutual agreement with the understanding that the agents would meet with Mr. D'Ambrosio later that day. (Govt. Ex. 6.)

On June 2, 2005, Defendant sent another letter addressed to Cpl. Gluth outlining her recent conversations with Agents Clark and Wick and requesting that both Gluth and Clark write her back concerning the status of her transfer request. In this letter, the Defendant advised Cpl. Gluth that the officers might have more success pursuing her transfer request with the prison Superintendent rather than with her unit manager. (Govt. Ex. 8.)

In fact, Special Agent Clark did take steps to secure the requested transfer. On June 22, 2005, the Defendant was transferred to SCI-Cambridge Springs and remained there for approximately two months until being transferred back to SCI-Muncy. The Department of Corrections Transfer Petition indicates that she was sent to Cambridge Springs in order "to facilitate a criminal investigation." (Def.'s Ex. A.) She was returned to Muncy in late August due to the fact that Muncy is higher security institution and SCI-Cambridge Springs officials wanted the Defendant transferred back to a more secure prison setting.

During the interim, while the Defendant was at SCI-Cambridge Springs, Agent Clark contacted Mr. D'Ambrosio as well as Captain Robert Rogers, the liaison between the prison and outside law enforcement, in order to arrange another meeting with the Defendant. Agents Clark and Wick met with the Defendant at SCI-Cambridge Springs on July 5, 2005, this time in the presence of Mr. D'Ambrosio, who accompanied the agents to the prison.

Upon the agents' and Mr. D'Ambrosio's arrival, Captain Rogers placed a call to the Defendant's housing unit, and the Defendant walked freely across the prison courtyard to the interview site without handcuffs or an escort. The meeting took place in the security office in an area generally secluded from other inmates.

Prior to the commencement of the interview, the Defendant had a conversation with Mr. D'Ambrosio in the presence of Agent Clark during which she expressed concern about being charged in the collar-bomb case with conspiracy or as an accessory and inquired of Mr. D'Ambrosio whether she needed an immunity letter. She indicated that she did not want to "hang herself" with her statements and was worried about her own involvement in the plot through knowledge and assistance to others. Despite her concerns, Mr. D'Ambrosio encouraged the Defendant to share what she knew about Rothstein's involvement in the case. During this interview, the Defendant indicated for the first time that James Roden had been killed due to an argument between Roden and Rothstein whereby Roden had threatened to reveal the collar-bomb plot. Defendant did not want to discuss whom Roden was supposedly going to tell and she declined to talk about the details of his death for fear that her knowledge about the matter would implicate her. The Defendant further stated in this interview that Roden and Rothstein were jealous of each other because of their mutual interest in her. When asked about timers utilized in the explosive device, Defendant turned to D'Ambrosio and asked, "Is it okay?" and D'Ambrosio indicated "Yes." Defendant then revealed that she had provided Rothstein with two relatively new kitchen/egg timers sometime in June of 2003 at his request. When asked why she had not provided this

information initially, Defendant replied that she did not want to hurt herself.  The Defendant also spoke of Rothstein purchasing shotgun shells at K-Mart and claimed to have witnessed him open and empty the contents of several shells on two occasions. She denied any knowledge as to what he did with the contents of the shells.   (Govt. Ex. 9.)

In the meantime, the criminal investigation into the collar-bomb robbery had become extremely active and the agents continued to gather information implicating the Defendant in the plot.  On July 15, 2005, Agent Clark had a conversation with Mr. D'Ambrosio concerning the Defendant's attempt to obtain immunity from the U.S. Attorney's office.  However, as an investigating officer, Agent Clark was not in a position to offer the Defendant immunity and, moreover, he was aware that the U.S. Attorney's Office was not going to be making any offers of immunity to her.

Agent Clark spoke with Mr. D'Ambrosio again on January 9, 2006.  At that point, the criminal investigation was progressing rapidly and the agents were continuing to get information from a co-conspirator in the plot that incriminated the Defendant.  Agent Clark contacted Mr. D'Ambrosio for the purpose of sharing this information and verifying that he was continuing to represent the Defendant.  Mr. D'Ambrosio confirmed that he was still representing the Defendant and indicated to Agent Clark that he would contact his client concerning these matters and let the agents know about setting up a meeting as quickly as possible.

That meeting took place on February 10, 2006 when Agents Clark and Wick again met with the Defendant for an interview coordinated through Mr. D'Ambrosio.  On that date, the agents met with the Defendant and Mr. D'Ambrosio at the Erie County Prison, where the Defendant was being housed in conjunction with civil proceedings pending in the Erie County Court of Common Pleas.  The parties initially gathered in one of the prison's several attorney-client rooms adjacent to the visitors' room.  The attorney-client room is a locked, secured area enclosed by thick glass.  The room offers limited privacy because while individuals outside of the room can see in, the sound

would generally be muted at normal conversational level. Consistent with normal prison policy, it is likely that the Defendant was shackled inside the room.

At the outset of this meeting, the Defendant was Mirandized. She signed an Advice of Rights form acknowledging her rights which was witnessed by Agent Wick and Mr. D'Ambrosio. (Govt. Ex. 11.) The purpose of this meeting, from Agent Clark's perspective, was to confront the Defendant with the fact that the agents had developed leads through their investigation bearing on her role in the collar-bomb plot which, they felt, were strong enough to lead to her indictment even without the benefit of any statements she had given. The agents communicated this to the Defendant and advised her that, if she was going to give information concerning her involvement in the matter, now was the time to do so. During this meeting, Agent Wick's tone was more confrontational and aggressive. At some point during the conversation he stated to the Defendant that she could be facing the death penalty.

All of this caused the Defendant to become upset to the point that she became loud and boisterous toward the agents. She began pounding on the conference table, using expletives, and yelling at them as well as her attorney. Because others in the surrounding area were beginning to take notice, prison officials decided to move the parties to a more private location in a conference room at the north end of the building. Mr. D'Ambrosio wanted Agent Wick excluded from the room because of his behavior and the fact that he was upsetting the Defendant.

Once inside the north-end conference room, the Defendant calmed down and she invited Agent Wick to come inside as well. Nevertheless, she remained anxious, and she began to explain that the reason she may have been seen at locations associated with the Wells case was because she had been directed by Rothstein to be at those places. She claimed that he was trying to set her up so that, if he got caught, she would also be implicated. Her theory was that he loved her and was jealous and did not want anyone else to have her if he could not. During this interview, the

Defendant appeared to have more information to offer but withheld it, indicating that she felt she had to "hold back some information for [herself]." (Govt. Ex. 10.)

In May of 2006, the Defendant was back at the Erie County Prison pursuant to a federal writ of habeas corpus ad testificandum which the U.S. Attorney's office had secured in connection with grand jury proceedings related to this case. (Govt. Ex. 17.) Agents Clark and Wick contacted the Defendant at the prison on May 5, 2006 for the sole purpose of determining whether she would comply with the grand jury subpoena calling for fingerprints, handwriting exemplars and head hair samples. Also present during this visit were Cpl. Gluth of the Pennsylvania State Police and Mr. D'Ambrosio. Mr. D'Ambrosio also talked to the Defendant about complying with the subpoenas.

In addressing the matter of the subpoenas, Defendant stated that she did not comply with them because she did not trust that the investigators would not falsify documents. Throughout this meeting, she was still anxious about her prior discussion with the agents but her demeanor was calm. She began to discuss certain aspects of the Wells case but was told by the agents that they did not wish to interview her and were only interested in her compliance with the subpoenas. Nevertheless, the Defendant asked the agents to sit back down and proceeded to make additional statements about the case before terminating the interview. (Govt. Ex. 12.)

Agent Clark returned to the Erie County Prison on May 9, the date of the Defendant's scheduled appearance before the grand jury, to discuss her compliance with the grand jury subpoena. On this date, the Defendant agreed to comply with the subpoena and was escorted to the prison intake room by a corrections officer, as that was the location most conducive to providing the exemplars. Following this, the Defendant, through her attorney, requested to speak with Agent Clark concerning information related to the Wells case. After being Mirandized and signing an Advice of Rights form that was witnessed by Mr. D'Ambrosio (Govt. Ex. 16), the Defendant discussed her whereabouts on the day of the robbery and reiterated her theory that Rothstein had directed her to be in certain places in order to frame her so that noone

else would ever be able to have her. She gave statements concerning Kenneth Barnes' alleged interest in having her father killed and discussed an argument between herself and Rothstein concerning the disposition of Roden's body. She also indicated that she was interested in going with investigators on a drive-around to some of the sites on Peach Street in order to refresh her memory of the events of August 28, 2003. (Govt. Ex. 13.)

The following day, Agents Clark and Wick, along with Cpl. Gluth, met with the Defendant and Mr. D'Ambrosio at the Erie County Prison. After being Mirandized, the Defendant signed an Advice of Rights acknowledgment form which was witnessed by Mr. D'Ambrosio and Agent Clark. (Govt. Ex. 16.) The agents signed her out of the prison and the Defendant agreed to voluntarily accompany them to the upper Peach Street area in order to recount her whereabouts and actions during the afternoon of August 28, 2003. During the ride-around, the Defendant was seated next to her attorney in the back seat of an unmarked police cruiser while the agents remained up front. The rear doors of the cruiser were secured such that they would not open from the inside and the Defendant could not get out. She directed the agents as to where they should drive and which sites they should visit as she retraced her actions on the day in question. The atmosphere of the ride-around was cordial and, at one point, they all stopped for a snack and Agent Clark provided the Defendant with a coke and pretzels. Toward the end of the drive-around, the Defendant indicated that she had more details to share about the incident but would need immunity in order to provide any further information. (Govt. Ex. 15.)

With the exception of the meeting which was held at the Erie County Prison on February 10, 2006, wherein Agent Wick became more animated and confrontational toward the Defendant, the demeanor of the agents throughout the course of their meetings with the Defendant was consistently cordial and calm. Agent Clark, in particular, maintained a uniformly calm demeanor at least in part because he realized that it would not serve his investigative purposes to escalate matters with her.

Moreover, there is no evidence in the present record to suggest that the Defendant ever complained to anyone about her treatment at the hands of Agent Clark and Agent Wick.  On the contrary, the Defendant's letters to law enforcement contain expressions of gratitude toward Agent Clark for his attempts to assist her relative to her desired prison transfer.

Although the Defendant's various meetings with the agents caused her to be in places that varied from her normal prison routine, these meetings did not in any meaningful way increase the conditions of the Defendant's confinement.  To the extent additional restraints on the Defendant's liberty were imposed in connection with her transportation to the interview sites, this was done in accordance with standard prison security policy and not as a result of additional restraints imposed or required by the agents themselves.  The additional restraints, to the extent there were any (e.g., shackling the Defendant while in the Erie County Prison attorney-client room, having a correctional officer escort her to the prison intake area), were consistent with what any inmate serving a state prison term would have had been required to endure while being transported to or from a particular meeting area, irrespective of the circumstances of the meeting.

Although the federal agents appear to have been responsible for helping effectuate the Defendant's temporary transfer to SCI-Cambridge Springs and, in that sense, exercised influence over her and controlled her movement, this was done as a quid pro quo for the Defendant's cooperation – not as a means by which law enforcement put restraints on her freedom of movement.

**CONCLUSIONS OF LAW**

The Fifth Amendment to the U.S. Constitution provides that "[n]o person... shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amend V. To ensure the protection of that right, the Supreme Court held, in its seminal case, *Miranda v. Arizona*, 384 U.S. 436 (1966), that any person "questioned by law

enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*quoting Miranda,* 384 U.S. at 444). *Miranda* thus prohibits the use of statements that are the product of police coercion as evidence against an accused. *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

Individuals can give up their Miranda rights through a knowing, intelligent, and voluntary waiver. *Miranda*, 384 U.S. at 436. To make such a determination, two factors must be shown: (i) first, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; (ii) second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Even where Miranda warnings are not implicated by the existence of a custodial interrogation, a statement may not be admitted into evidence at a criminal trial unless it was voluntarily given. *Swint*, 15 F.3d at 288-89. In making such a determination, "we must satisfy ourselves that the confession was 'the product of an essentially free and unconstrained choice by its maker,' that it was 'the product of a rational intellect and a free will,' and that the [maker's] will was not overborne.'" *Swint*, 15 F.3d at 289 (citing *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir.1975)).

To determine whether a statement made by a defendant is voluntary, courts examine the totality of the circumstances, including the existence of any police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, her level of education, her physical condition, her mental health, and whether the individual was advised of her rights to remain silent and to have counsel present during custodial interrogation. *Swint*, 15 F.3d at 289. The crucial factor, however, is whether there was police coercion. *Colorado v. Connelly*, 479 U.S. at 167 ("coercive

police activity is a necessary predicate to the finding that a confession is not voluntary"); *Swint*, 15 F.3d at 289 ("[A] court will not hold that a confession was involuntary unless it finds that it was the product of "police overreaching.").

The government has the burden of proving these matters – valid waiver of Miranda rights and the voluntariness of a statement –  by a preponderance of the evidence.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46 (1983) (plurality opinion); *see also United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir.1994).

To trigger the need for Miranda warnings, the defendant must have been subject to a custodial interrogation.  *Thompson v. Keohane*, 516 U.S. 99, 102 (1995) ("Miranda warnings are due only when a suspect interrogated by the police is 'in custody.'" ). Normally, to determine whether a suspect is in custody for *Miranda* purposes, courts have asked whether "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *Maryland v. Shatzer*, 130 S. Ct. 1213, 1224 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)).

Of course, this standard becomes impracticable in a prison setting:  "[a]pplied literally, the rule would operate to require that every question directed to a prison inmate in connection with what ultimately may prove to be criminal activity be prefaced with Miranda warnings because a prisoner is always 'in custody' in the purest sense." *United States v. Conley*, 779 F.2d 970, 972 (4th Cir. 1985).  Such an interpretation of *Miranda* would lead "to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart."  *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir. 1978).

Accordingly, numerous courts of appeals have espoused the view that prison inmates are not, by virtue of their confinement, necessarily in "custody" within the meaning of *Miranda*.  *See Garcia v. Singletary*, 13 F.3d 14987, 1491 (11th Cir. 1994); *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988); *Conley*, 779 F.2d at 973; *United States v. Scalf*, 725 F.2d 1272, 1275 (10th Cir. 1984); *Cervantes*, 589 F.2d at 427.

*Accord Maryland v. Shatzer*, 130 S. Ct. 1213, 1224 (2010) ("Our cases make clear...

that the freedom-of-movement test identifies only a necessary and not a sufficient

condition for *Miranda* custody. We have declined to accord it 'talismanic power,'

because *Miranda* is to be enforced 'only in those types of situations in which the

concerns that powered the decision are implicated.'") (citation omitted).

Courts within this circuit have likewise embraced this view. In *Burkholder v.

Newton*, 116 Fed. Appx. 358 (3d Cir. Nov. 24, 2004), the Third Circuit Court of Appeals

affirmed the dismissal of a § 1983 claim premised on an alleged *Miranda* violation in the

prison setting, finding that the plaintiff, a state inmate, was not in a custodial setting.

The court noted that a "custodial interrogation is an 'inquiry conducted by officers who

are aware of the potentially incriminating nature of the disclosures sought' and that is

held in 'custodial settings that have inherently coercive pressures that tend to

undermine the individual's will to resist and to compel him to speak.'" 116 Fed. Appx. at

361 (quoting *Miranda*, 384 U.S. at 467). Relying on *Conley, supra*, the court went on to

state that:

> Miranda warnings are not required prior to all prisoner interrogations, but
> only when there is a "change in the surroundings of the prisoner which
> results in an added imposition on his freedom of movement." *United
> States v. Conley*, 779 F.2d 970, 973 (4th Cir.1985) (*quoting Cervantes v.
> Walker*, 589 F.2d 424, 428 (9th Cir.1978)); *accord Flittie v. Solem*, 751
> F.2d 967 (8th Cir.1985); *United States v. Scalf*, 725 F.2d 1272 (10th
> Cir.1984); *Garcia v. Singletary*, 13 F.3d 1487 (11th Cir.1994). Such a
> change in surroundings could include the imposition of handcuffs or being
> taken to a locked room to be questioned by correctional officers. *See
> Conley*, 779 F.2d at 970.

*Id. See also Bruce v. United States*, 439 F. Supp. 2d 364, 370-71 (M.D. Pa. 2006)

("[J]ust because [the plaintiff] was already in prison does not mean that he was in a

custodial setting.") (quoting *Burkholder, supra*, at 361).

Consistent with this view, the district court in *United States v. Holmes*, Criminal

NO. 3:2007-13, 2008 WL 5335018 (W.D. Pa. Dec. 19, 2008), applied the factors

outlined by the *Cervantes* court for purposes of determining whether a prisoner was

placed in "custody" within the meaning of *Miranda*, namely: "the language used to

summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him." *Id.* at *7 (citing *Cervantes*, 589 F.2d at 428). *Accord Garcia v. Singletary*, 13 F.3d at 1492 (approving *Cervantes*' approach whereby courts consider the "totality of the circumstances surrounding the alleged interrogation"); *Leviston v. Black*, 843 F.2d at 304 (same); *Conley*, 779 F.2d at 973 (same).

The U.S. District Court for the Middle District of Pennsylvania has articulated the relevant factors this way:

> [A] Court should consider the language or means used to summon the prisoner to the interrogation, the prisoner's freedom to leave the scene of the interrogation, the purpose, place and length of the interrogation, any added imposition on the prisoner's freedom of movement and whether circumstances suggest any measure of compulsion above and beyond confinement.

*Bruce v. United States*, 439 F. Supp. 2d at 371 (alteration in the original) (quoting *United States v. Caro*, No. 06-CR-0001, 2006 WL 1594185 at *1 n. 1 (W.D. Va. June 2, 2006)).

Applying the foregoing principles, I conclude that the Defendant was not in custody within the meaning of *Miranda* when she made statements about the case on April 7, 2005, April 20, 2005, May 23, 2005, May 24, 2005, July 5, 2005, May 5, 2006, and May 9, 2006.

Although the record pertaining to the April 7, 2005 interview is somewhat sparse, the evidence indicates that the Defendant was interviewed by Cpl. Gluth on that day about a matter unrelated to the Wells case concerning which the Defendant had previously supplied information. There is no suggestion in the record that the Defendant was the target of any investigation on that date and she appears instead to have been interviewed merely in the capacity of a person with potentially relevant information. At the conclusion of that interview, she indicated that she had some information to offer concerning the Wells case. Because the Defendant had to be other places within the prison, the interview was cut short, suggesting that the duration of the

interview was neither open-ended nor within the control of Cpl. Gluth.  The portion of the police report devoted to the Wells matter is also relatively brief, suggesting that this aspect of the interview was not unduly lengthy.  The report also indicates that the Defendant remained vague and avoided discussing certain topics, suggesting an awareness on her part that she could exercise her right not to speak.  Finally, the police report together with the letter exhibits suggest that the Defendant talked to Cpl. Gluth freely and knowingly as a possible means of effectuating a transfer to another prison. In fact, she informed Cpl. Gluth that she would be willing to entertain another interview in the future.

On April 20, 2005 interview, the interview was held in a location arranged not by the agents but by Lt. Sisley. Defendant was contacted via a call to her housing unit and she walked freely across the grounds to the security office unescorted and unrestrained.  The door to the interview room remained open at all times with the Defendant being located closest to the door and Lt. Sisley present in the adjacent room. The demeanor and tone of all parties was calm.  The Defendant was not treated as a suspect but was interviewed as a person with information to share.  She provided some details about the case[1] but deliberately withheld certain information because she was still angling for a transfer.  The interview terminated upon her request and with her asking that the agents check into a transfer for her.  Correspondence from the Defendant post-dating this interview suggests that she had no complaints about the treatment by the agents and, in fact, she thanked them for their efforts in assisting with the prison transfer.

The interview on May 23, 2005 occurred in a room at the Erie County Prison while the Defendant was housed there for pending state court matters.  It is not clear

---

[1] Agent Clark's report indicates that the Defendant referenced Mr. D'Ambrosio as "her attorney," but the context does not bespeak any invocation of the right to counsel. Rather, the report indicates that she referenced Mr. D'Ambrosio as someone who also possessed information concerning the case.

whether the Defendant was wearing any handcuffs or shackles at this interview; however, to the extent she may have been, this would have been done as a matter of routine prison policy and not as an incident of the interview itself.  *See Conley, supra,* at 973-74 (prisoner not in custody despite having worn handcuffs and, at some points, full restraints during interrogation, as this was standard procedure for transferring inmates in the maximum security prison).  Although the Defendant agreed to provide further information about the case,[2] she expressly declined to talk about certain subjects pertaining to the investigation.  She also deliberately withheld information as a bargaining chip for the transfer she desired.  The tone throughout this meeting was calm and neutral and the meeting was terminated upon her request.

On May 24, 2005, the agents had a very brief, follow-up meeting with the Defendant for the purpose of advising her that they had set up a meeting with Mr. D'Ambrosio for later that day.  She immediately inquired about the status of her transfer and was advised that the agents were attempting to facilitate it.  The meeting ended by mutual agreement with the Defendant having shared two seemingly innocuous pieces of information about herself and Rothstein concerning their respective pets.

Collectively, these circumstances establish that the setting of the Defendant's April 7, April 20, May 23 and May 24, 2005 interviews was not custodial.  The physical surroundings of the interrogation suggest a degree of privacy, but not a coercive atmosphere.  There is nothing in the record to suggest that the agents were aggressive toward Defendant or that they tried to intimidate her or pressure her for statements during these early meetings.  *See Garcia*, 13 F.3d at 1492 (inmate not in custody where, among other things, officer did not isolate, intimidate, coerce, or otherwise

---

[2] In this interview, the Defendant again referenced Mr. D'Ambrosio as her friend and attorney.  Again, this reference did not constitute an invocation of her right to counsel, as she merely mentioned his name in the context of advising the agents that Mr. D'Ambrosio shared some knowledge concerning the case and wished to speak to the investigators himself.

pressure inmate into making statement).  In fact, apart from the incident on February

10, 2006 involving Agent Wick, it is undisputed that the agents were consistently

cordial, calm and decent toward the Defendant.  Moreover, they did not approach the

Defendant during these early meetings for the purpose of confronting her with evidence

of her guilt but rather to gather information pertinent to the case.  *See Conley, supra*, at

974 (no custody where, among other things, prisoner was questioned as a witness to,

rather than a suspect in, the subject murder investigation).  The interviews do not

appear to have been especially lengthy.  Nor does the evidence suggest that the

meetings were unwelcome.  To the contrary, the evidence suggests that the Defendant

voluntarily shared information with the agents because she sought to use this as a

means to obtain a benefit she desired.  Toward this end, the Defendant controlled the

flow as well as the topics of information she provided and she felt comfortable

concluding the interviews when she wanted to be done.  Under these circumstances, a

reasonable person in the Defendant's position would not have felt that she was

compelled to stay and submit to the agents' questions.

The Court reaches the same conclusion with respect to the Defendant's

statements given on July 5, 2005, May 5, 2006 and May 9, 2006.

The July 5, 2005 statement was made at SCI-Cambridge Springs.  The

Defendant was summoned to that meeting when Captain Rogers contacted her housing

unit.  She arrived at his office after walking freely across the courtyard without physical

restraints or an escort.  Defendant was present during that interview with Mr.

D'Ambrosio and she spoke freely about the case, avoiding topics that she did not want

to address.  The agents were cordial and calm, and the meeting ended with the

Defendant stating that she did not wish to talk any longer.

The meeting of May 5, 2006 was undertaken for the sole purpose of attempting

to secure the Defendant's compliance with a grand jury subpoena for physical

evidence.  The agents had no intention of interviewing the Defendant on that date and

told her so, but she asked that they sit back down with her.  She then proceeded to

initiate conversation about the Wells case and eventually terminated the interview when she was done.

Similarly, on May 9, 2006, the agents returned to the Erie County Prison for the sole purpose of obtaining the physical evidence. In the prison intake area, an open area where new inmates are processed, the Defendant asked to speak with the agents. She then gave statements concerning the case.

Under these circumstances, the Defendant cannot be said to have been in custody for *Miranda* purposes. The totality of circumstances indicates that a reasonable person in the Defendant's position would have felt free to terminate the interviews at will. *See Leviston, supra*, at 304 (defendant could not have reasonably believed he was in custody in light of the fact that he initiated policy inquiry and both interviews arose out of his desire to speak with police, he voluntarily went to prison interview room, was free to end the conversation at any time, and was allowed to leave upon his own request).

To the extent the Defendant may have been in custody on July 5, 2005, February 10, 2006, May 5, 2006, May 9, 2006, or May 10, 2006, I conclude that her Fifth Amendments rights were either adequately protected or validly waived.

As to the July 5, 2005 and May 5, 2006 interviews, the fact that Mr. D'Ambrosio was present and that the Defendant had an opportunity to consult with him prior to any discussions with the agents is sufficient to safeguard the Defendant's Fifth Amendment rights even in the absence of Miranda warnings. The *Miranda* court itself recognized that warnings are not the only permissible way to protect a suspect's right against self-incrimination in the custodial setting and that "other fully effective means ... to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it" would also suffice. *See Miranda,* 384 U.S. at 444. The Court went on to state that "[t]he presence of counsel ... would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege. His presence would insure that statements made in the

government-established atmosphere are not the product of compulsion." *Id*. at 466.

*See also United States v. Guariglia*, 757 F. Supp. 259, 264 (S.D.N.Y. 1991) ("As a matter of simple logic, if *Miranda* warnings are meant to protect a defendant until he can consult counsel, *Minnick v. Mississippi*, 498 U.S. 146 ... (1990), they are not necessary when counsel is present."); *United States v. Thevis*, 469 F. Supp. 490, 407-08 (D. Conn. 1979) (statement made by defendant in the presence of counsel was admissible under *Miranda*) (citing cases), *aff'd without opinion*, 614 F.2d 1293 (2d Cir. 1979); 2 W.R. Lafave, J.H. Israel, N.J. King, & O.S. Kerr, Criminal Procedure § 6.8(a) at 800 (3d ed. 2007) ("It is generally accepted that if the attorney was actually present during the interrogation, then this obviates the need for the warnings.").

Defendant has asserted in her motion that Mr. D'Ambrosio was not acting as her attorney during these interviews and/or that he performed deficiently so as to deprive her of her right to effective assistance of counsel; however, these arguments lack merit. There is ample evidence in the record to support a finding that Mr. D'Ambrosio functioned as legal counsel during the interviews in question. The evidence shows, for example, that Mr. D'Ambrosio was the Defendant's power of attorney, that he had acted as her lawyer in the past on matters related to her personal finances and properly holdings, that she referred to him as her "attorney" when identifying him to Agents Clark and Wick, and that he confirmed to Agent Clark on January 9, 2006 that he was still representing the Defendant. In addition, during portions of her interviews with the agents, the Defendant stopped to confer with Mr. D'Ambrosio about whether she should answer particular questions. Moreover, at various times Mr. D'Ambrosio, acting on behalf of the Defendant, broached the topic of immunity with agents of the government. No other attorney was ever formally retained by the Defendant or identified by her to the agents during the time period involving these meetings. Accordingly, the record as a whole supports a finding that Mr. D'Ambrosio was acting in the capacity of the Defendant's legal counsel relative to her statements given on July 5, 2005, February 10, 2006, May 5, 2006, May 9, 2006, and May 10, 2006.

Defendant's argument that her statements should be suppressed on the ground that she was deprived of her right to effective assistance of counsel[3] is also without merit. It is well established that the Sixth Amendment right to counsel, including the right to effective assistance of counsel, does not attach prior to the initiation of formal judicial proceedings. *See Brewer v. Williams*, 430 U.S. 387, 398 (1977). Because the statements in question were given prior to the institution of formal charges, her Sixth Amendment rights were not implicated by the government's actions. Moreover, I am aware of no case holding that the right to effective assistance of counsel applies in the Fifth Amendment context. Indeed, the Seventh Circuit Court of Appeals has stated that, "as far as [it] can tell, the Supreme Court has not mentioned effective assistance of counsel (in the *Strickland* sense) and the Fifth Amendment in the same breath, let alone set forth a clearly established right to that effect. To the contrary, the Court has been at pains in the Sixth Amendment context to note that the right to counsel attaches only at the initiation of adversary criminal proceedings." *Sweeney v. Carter*, 361 F.3d 327, 333 (7th Cir. 2004). The two rights are analytically distinct:

> While *Miranda v. Arizona* holds that a suspect who is subject to custodial interrogation is entitled to counsel "to protect the Fifth Amendment privilege against self-incrimination rather than to vindicate the Sixth Amendment right to counsel," *United States v. Gouveia*, 467 U.S. at 188 n. 5, 104 S. Ct. at 2297 n. 5, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S. Ct. 515, 523, 93 L. Ed.2d 473 (1986). Accordingly, an attorney who ensures that his client has not been compelled to speak effectively performs the role that the Supreme Court envisioned for him in Miranda.

*Claudio v. Scully*, 791 F. Supp. 985, 988 (E.D.N.Y. 1992) (rejecting claim that defendant's confession, which was given prior to the institution of formal charges, should have been suppressed because it was the result of his attorney's ineffective advice), *rev'd on other grounds*, 982 F.2d 798 (2d Cir. 1992). *See also United States v.*

---

[3] Although the Defendant has asserted in her suppression motion that Mr. D'Ambrosio was acting under a conflict of interest, she has not introduced evidence or provided any explanation to clarify the nature of the alleged conflict. Accordingly, we do not address this argument further.

*You Hong Chen*, 104 F. Supp. 2d 329, 333 (S.D.N.Y. 2000) ("Under *Miranda*, a criminal suspect who is subject to custodial interrogation before his Sixth Amendment right has attached is entitled to counsel "'to protect the Fifth amendment privilege against self-incrimination rather than to vindicate his Sixth Amendment right to counsel.'") (citing *United States v. Gouveia*, 467 U.S. 180, 188 n. 5 (1984)). Were we to accept the Defendant's view by, in essence, incorporating the right to effective assistance of counsel into the Fifth Amendment, "law enforcement agents would be put in the uncertain and untenable situation of having to evaluate a suspect's attorney's performance before interrogating that suspect, destroying the advantage of the clarity of the *Miranda* rule." *Id*. I find no basis in the law supporting such a result and, accordingly, I conclude that Mr. D'Ambrosio's allegedly ineffective performance is not grounds for suppressing the Defendant's statements.[4]

With respect to the statements the Defendant made on February 10, May 9, and May 10, 2006, I conclude that the Defendant's Fifth Amendment right to remain silent was validly waived and that her right to have counsel present was secured by Mr. D'Ambrosio's attendance at the meetings. As I have noted above, to establish the knowing, intelligent, and voluntary waiver of *Miranda* rights, two factors must be shown, *i.e.:* (i) the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (ii) the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly

---

[4] At the suppression hearing, this Court allowed Bruce Ankowiak, Esq. to testify as an expert witness regarding Mr. D'Ambrosio's allegedly deficient performance relative to the statements in question. In light of my legal ruling, I find that Mr. Ankowiak's testimony is irrelevant to the suppression inquiry and, accordingly, I do not consider it in rendering these findings of fact and conclusions of law.

conclude that the *Miranda* rights have been waived. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Here, the record shows that the Defendant possessed the requisite level of comprehension. As to the three interviews in question, the evidence credibly establishes that, on each occasion, the Defendant was read each line of her *Miranda* warnings, she acknowledged her understanding of those rights in writing, and she had her attorney present through the interview process. The Defendant is an intelligent, educated, middle-aged woman with substantial prior experience in the criminal justice system. At no time throughout the interview process did she indicate that she was confused in any respect as to the nature of her rights. Quite to the contrary, she demonstrated an understanding of those rights on numerous occasions by refusing to discuss certain topics or by terminating the interviews altogether. She also showed an awareness of the consequences of waiving those rights, as she repeatedly expressed concern that her statements might result in charges being filed against her. There is thus ample evidence here to support the conclusion that the Defendant comprehended her Fifth Amendment rights and the consequences of waiving them.

The record is equally strong in establishing that the Defendant's various statements were voluntarily made. "The voluntariness of a waiver of this [Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. at 170. "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. at 421. Thus, courts will not hold that a confession was involuntary unless it was the product of "police overreaching." *Connelly*, 479 U.S. at 164.

Here, the record is devoid of any evidence showing police overreaching relative to the Defendant's various statements. Rather, the record reflects that the agents were generally very cordial, low-key, and "decent" toward the Defendant, as Mr. D'Ambrosio

phrased it.  There is no evidence in the record to suggest that the Defendant ever complained of her treatment at the hands of Special Agent Clark, the lead investigator on the case.  Quite to the contrary, the record includes letters expressing the Defendant's gratitude for his efforts toward facilitating a transfer for her.

The only meeting between the parties which was less than cordial occurred on February 10, 2006.  On that date, Agent Wick became more confrontational toward the Defendant.  The investigators presented her with evidence which implicated her in the collar-bomb plot, and she was candidly advised that this was the time for her to make full disclosures about what she knew.  According to Mr. D'Ambrosio, Agent Wick referenced the possibility that the government might seek the death penalty in connection with criminal charges.  Tensions escalated and the Defendant began yelling at the agents and using profanity to the point that prison officials relocated the parties to a more private area.  Notwithstanding this escalation, however, the Defendant eventually calmed down and even invited Agent Wick back into the interview room where she agreed to continue her discussion about the case.  Although Agent Wick's conduct on this date might have been more aggressive and confrontational than on other occasions, it was not an act of coercion or overreaching which caused the Defendant's will to be overborne, given the Defendant's mature age, her intellect, her level of education, her familiarity with the criminal justice system, her relationship with the agents, and the fact that her attorney remained present throughout the entire event.

Defendant has asserted in her motion that the various statements were involuntary because she was mentally incompetent at the time they were made.  This is not borne out in the record, however.  In actuality, the Defendant was found competent to stand trial on September 9, 2004; after pleading guilty but mentally ill, she was sentenced on January 7, 2005.  She was treated at Mayview State Hospital thereafter for a period of three months, and she was transferred to SCI-Muncy on March 16, 2005 to serve her sentence.  It was not until April of 2005, well after her competency issues

had been resolved, that law enforcement agents first made contact with her concerning the collar-bomb matter.

Moreover, even if the Defendant did suffer from a mental illness during this period, her mental condition alone would not be the basis for finding her statements involuntary, except insofar as they are tied to official coercion. *See Connelly*, 479 U.S. at 164 (a defendant's mental condition by itself and apart from its relation to official coercion should not dispose of the inquiry into constitutional voluntariness). As I have already concluded, the record here does not evidence police coercion.

Defendant has also asserted that she was induced into making the statements through promises of a prison transfer, use immunity, a reduction of charges or penalties and/or other benefit. Because this factual assertion is not borne out by the record, it cannot serve as a basis for concluding that her statements were involuntary. There is no credible evidence to suggest that the Defendant was ever promised anything along the lines of immunity or a reduction of charges or penalties, although there is evidence that she sought such guarantees. With respect to the Defendant's temporary transfer to SCI-Cambridge Springs, the evidence indicates that the Defendant desperately wanted to be transferred from SCI-Muncy to SCI-Cambridge Springs and that she sought to use her information relative to the Wells case to achieve that end. Rather than establishing the involuntariness of her statements, the evidence actually establishes that she was a willing participant in the agents' interviews because she saw this as a means to achieve her own desired transfer.

Finally, the Defendant has asserted that her statements were made in the course of plea negotiations. This allegation is similarly unsubstantiated by the record. As the government points out, her discussions with law enforcement agents were not plea discussions, and the Defendant was not even indicted until more than a year after her May 10, 2006 ride-around. Furthermore, the Defendant's challenged statements were made to law enforcement agents, not government counsel, and they therefore fall outside the scope of Fed. R. Crim. P. 11(f) or Fed. R. Evid. 410.

In sum, the totality of evidence establishes that all of the Defendant's statements were made voluntarily as a product of a free and deliberate choice rather than as a result of government intimidation, coercion, or deception.  For all the foregoing reasons, I conclude that the Government has satisfied its burden of proving that the statements made by the Defendant on the dates in question did not violate her Fifth Amendment rights.

## CONCLUSION

Based upon these findings of fact and conclusions of law, the Defendant's motion to suppress will be denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,      )

             v.                )      Case No. 1:07-cr-26-SJM-1

MARJORIE DIEHL-ARMSTRONG   )

# <u>O R D E R</u>

AND NOW, to wit, this 8th day of October, 2010, for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law,

IT IS ORDERED that the Defendant's motion to suppress statements, included within her pretrial motions [143], be, and hereby is, DENIED.

                                       s/    <u>Sean J. McLaughlin</u>

                                       SEAN J. McLAUGHLIN
                                       United States District Judge

cm:    All counsel of record.