**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 1:07-cr-26-SJM-1 |
| ) | |
| MARJORIE DIEHL ARMSTRONG ) | |

## **MEMORANDUM ORDER**

Pending before me is the Government's Second Motion in Limine to Preclude Testimony of Dr. Robert Sadoff concerning the opinions set forth in Dr. Sadoff's report of October 11, 2010. The Government objects to the report on the grounds that the opinions set forth in it amount to no more than a diminished capacity defense of the sort precluded by the Insanity Defense Reform Act of 1984, 18 U.S.C. § 17(a).

In his most recent report, Dr. Sadoff discusses the Defendant's diagnosis of bipolar disorder and personality disorder, not otherwise specified, with paranoid and borderline features. Dr. Sadoff states that the purpose of his report is "to explain the parameters of these illnesses and how they affect people in general, and Ms. Diehl-Armstrong in particular." (Sadoff Report, Ex. A to Govt.'s Second Mot. in Limine to Preclude Testimony of Dr. Robert Sadoff [216-1], at p. 2.) Dr. Sadoff then goes on to make the following assertions, to which the Government takes exception:

* "[O]n several occasions [the Defendant] has been found incompetent to stand trial because of her psychotic mental illness." (Sadoff Report at p. 1.)

* "[Dr. Sadoff] observed these traits [associated with bipolar disease and personality disorder, not otherwise specified, with paranoid and borderline features] when [the Defendant] was with her prior attorney, Mr. Patton, and could not follow his advice because she could not trust that he was working in her behalf." (*Id*. at p. 6.)

* "Because she is paranoid, [the Defendant] has great difficulty cooperating with and working with others." (*Id*.)

* "She also has great difficulty in exercising control of her impulses with respect to her behavior." (*Id*.)

- * "When she is manic, [the Defendant] is likely to act impulsively in order to achieve her personal goals, which may not be shared by others." (*Id*.)

- * "[The Defendant] tends to see things, because of her illnesses and her personality disorders, in her own idiosyncratic way, rather than as others may see the reality of the situation." (*Id*.)

- * "All of [the Defendant's] traits, including her psychotic behavior when she was manic and therefore not in touch with reality, must be considered when assessing her state of mind with respect to the charges against her." (*Id*.)

- * "[The Defendant] is currently on no medication and, therefore, her potential for psychotic thinking and impulsive behavior is present and at risk." (*Id*.)

- * "[A] person with [a bipolar diagnosis] must take medication for an indefinite period of time in order to remain stable." (*Id*.)

- * "[H]aving all three of these conditions is a very serious combination that can lead to impulsive behavior, loss of control and irrational thinking and unpredictable behavior." (*Id*. at p. 7.)

The Government contends that these opinions amount, covertly, to a variation of the diminished capacity defense precluded by the Insanity Defense Reform Act of 1984, codified at 18 U.S.C. § 17(a). That act states, in relevant part:

> **(a) Affirmative defense.** – It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. *Mental disease or defect does not otherwise constitute a defense.*

18 U.S.C. § 17(a) (emphasis supplied).

As an initial point, this dispute is effectively mooted by the fact that Dr. Sadoff now appears to be unavailable to testify in this case. According to defense counsel, Dr. Sadoff is scheduled to leave the country early tomorrow morning and is not expected to arrive back in the United States and be available to testify until on or after November 5, 2010. Dr. Sadoff was apparently either unwilling or unable (perhaps due to uncertainties about the anticipated length of the prosecution's case) to make travel plans so as to be present in Erie for this trial at the start of the Defendant's case in chief. Further, despite the Court having advised defense counsel that Dr. Sadoff should

be available to testify this afternoon, by video conference if necessary, the Court has learned that Dr. Sadoff has not made such arrangements. In light of this situation, the defense has asked that the Court hold trial in abeyance following Dr. Sadoff's return to the United States.

To the extent the Defendant's oral request constitutes a motion for continuance of trial, it will be denied. The decision to grant or deny a continuance is within the sound discretion of the trial court. *In re Leonetti*, 28 B.R. 1003, 1008-09 (Bankr. E.D. Pa. (1983) (citing *Lamb v. Globe Seaways, Inc.*, 516 F.2d 1352 (2d Cir.1975); *Krodel v. Houghtaling*, 468 F.2d 887 (4th Cir.), *cert. denied*, 414 U.S. 829 (1972); *Ruiz v. Hamburg-American Line*, 478 F.2d 29, 31 (9th Cir.1973)). *See also United States v. Khorozian*, 333 F.3d 498, 507 (3d Cir. 2003) (reviewing for abuse of discretion the district court's denial of defense motion for a continuance of trial premised on the unavailability of a witness). "Although a 'myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality,' denying a request for a continuance constitutes an abuse of discretion only when it is 'so arbitrary as to violate due process.'" *Khorozian*, 333 F.3d at 507 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). Moreover, it has been said that, "when the request for continuance is made in the midst of trial and the party requesting the continuance knew of the trial date and the problems to be encountered in locating and procuring the attendance of a witness, the trial court's denial of a continuance in the midst of trial can hardly be considered an abuse of discretion." *In re Leonetti*, 28 B.R. at 1009 (citing *Fairway Center Corp. v. U.I.P. Corp.*, 502 F.2d 1135 (8th Cir.1974); *Lehman v. United States*, 313 F. Supp. 249 (E.D. Pa.1970)).

In this case, the parties have been on notice of the scheduled commencement of this trial for some time, and ample opportunity existed for the defense to secure Dr. Sadoff's testimony for use at trial, by videotaped deposition if necessary. The trial has now progressed to the point that the prosecution has completed its case. If the continuance were granted, the jury would be forced to wait more than a week to

complete its service, increasing the risk that they might be exposed in the interim to outside sources concerning the case and likely leading to at least some diminishment in their collective recollection of the evidence. In light of these circumstances, the request for a continuance will be denied. Given this ruling, the Government's Second Motion in Limine is technically moot.

Nevertheless, even if Dr. Sadoff were not unavailable to testify for the defense, I would grant the Government's motion in limine inasmuch as Dr. Sadoff's proffered testimony is prohibited by the Insanity Defense Reform Act. The leading case to which we turn for guidance is *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987). In that case, the Third Circuit Court of Appeals considered the extent to which, under the Insanity Defense Reform Act, evidence of a criminal defendant's mental abnormality is admissible to prove the defendant's lack of specific intent to commit an offense. The court concluded that Congress intended, through the Act, to prohibit the defenses of diminished responsibility and diminished capacity but "distinguished those defenses from the use of evidence of mental abnormality to negate specific intent or any other mens rea, which are elements of the offense." 827 F.2d at 890. The court explained:

> While the contours of the doctrines of diminished responsibility and diminished capacity are unclear, the defenses that Congress intended to preclude usually permit exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection; however, these matters do not strictly negate mens rea."
>
> [W]e agree that the Congressional prohibition of diminished responsibility defenses requires courts to carefully scrutinize psychiatric defense theories bearing on mens rea. Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires."

*Id.*

The *Pohlot* court went on to discuss, in depth, the "diminished responsibility" defenses that Congress intended to prohibit through the Insanity Defense Reform Act. It began by distinguishing the use of evidence of mental abnormality to negate mens

rea. Though sometimes inappropriately referred to as a "diminished capacity" defense, the court explained, this evidentiary doctrine is not a defense at all but rather a rule of evidence, and it does not run afoul of the Act. 827 F.2d at 903.

The second strain of "diminished capacity" identified by the *Pohlot* court allows a defendant to show "not only that he lacked the mens rea in the particular case but also that he lacked the *capacity* to form the mens rea." 827 F.2d at 903 (emphasis in the original). The court explained why this evidence is problematic:

> Whether a defendant has the capacity to form mens rea is, of course, logically connected to whether the defendant possessed the requisite mens rea. Commentators have agreed, however, that only in the most extraordinary circumstances could a defendant actually lack the capacity to form mens rea as it is normally understood in American law. ... Even the most psychiatrically ill have the capacity to form intentions, and the existence of intent usually satisfies any mens rea requirement. Commentators have therefore argued that permitting evidence and arguments about a defendant's capacity to form mens rea distracts and confuses the jury from focusing on the actual presence or absence of mens rea. ...

*Id.* at 903-04 (citations omitted).

A third type of "diminished capacity" evidence identified by the *Pohlot* court is the "pure" diminished responsibility defense wherein the jury is permitted to "mitigate the punishment of a mentally disabled but sane offender in any case where the jury believes that the defendant is less culpable than his normal counterpart who commits the same criminal act." 827 F.2d at 904. This type of evidence is also barred by the Insanity Defense Reform Act. *Id.* at 905 ("Only the first of our typology of 'defenses' is permissible, namely the use of evidence to prove that a defendant actually lacked mens rea.").

Apart from these "explicit doctrines of diminished responsibility," the *Pohlot* court observed, "courts may permit juries to excuse a defendant's criminal conduct because of mental abnormality and thereby covertly create a 'partially diminished capacity' defense when they admit evidence of mental abnormality that does not truly negate mens rea." 827 F.2d at 904. However, given that "[m]ens rea is generally satisfied... by

any showing of purposeful activity, regardless of its psychological origins," *id.,* this type of evidence may mislead the jury about the mens rea requirements of a crime. *Id.*

Of all the foregoing variations on "diminished capacity," only the first type is permissible under the Insanity Defense Reform Act, "namely, the use of evidence to prove that a defendant actually lacked mens rea." *Pohlot*, 827 F.2d at 905. The court noted, however, that "strict use of psychiatric evidence to negate mens rea may easily slide into wider usage that opens up the jury to theories of defense more akin to justification." *Id.*

Accordingly, in light of the "strong danger of misuse" of this type of evidence, *id.*, the *Pohlot* court admonished that district courts should "examine proffered psychiatric testimony carefully 'to determine whether the proof offered is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in deciding the ultimate issues.'" 827 F.2d at 905 (citing *United States v. Bennett*, 539 F.2d 45, 53 (10th Cir. 1976)). "Notions of intent, purpose, and premeditation," the court noted, "are malleable and at their margins imprecise. But the limits of these concepts are questions of law." *Id.* Trial courts should admit evidence of mental abnormality relative to the issue of mens rea "only when, if believed, it would support a legally acceptable theory of lack of mens rea," *id.* at 905-06, and, in arriving at this determination, trial courts should evaluate the proposed psychiatric testimony outside of the jury's presence. *Id.* at 906.

Here, the Defendant contends that the opinions expressed in Dr. Sadoff's October 11, 2010 report are necessary in light of the prosecution's theory, which includes allegations of accomplice liability and criminal conspiracy. Under the theory of accomplice liability, 18 U.S.C. § 2, a person may be guilty of an offense because of the fact that he or she aided and abetted another person in committing the offense. According to § 7.02 of the Third Circuit Model Criminal Jury Instructions, the government must prove the following elements beyond a reasonable doubt in order for a jury to find the defendant guilty of aiding and abetting in the commission of an

offense:

1. That one of the defendants committed the offenses charged in the Indictment, by committing each of the elements of the offenses charged.

2. That the defendant **knew** that the offenses charged were going to be committed or were being committed by another defendant.

3. That the defendant **knowingly** did some act for the purpose of aiding, assisting, facilitating or encouraging another defendant **with the intent** that the offenses be committed.

4. That the defendant's acts did, in some way, aid, assist, facilitate, or encourage another defendant to commit the offenses.

Thus, to defend against a theory of accomplice liability consistent with the Insanity Defense Reform Act, the defense must offer evidence of a mental abnormality which, if credited, could *negate* a finding that the defendant: (i) knew the principal was or would be committing an offense and (ii) knowingly performed some act with the intent of aiding the principal in the commission of the offense.

None of the opinions expressed in Dr. Sadoff's October 11, 2010 report tends to negate these elements of mens rea. To paraphrase Dr. Sadoff's report, he describes the Defendant as someone who is generally non-trusting of others, non-cooperative, impulsive, black-and-white in her thinking, extreme in her views, self-destructive, egocentric, and, by history, psychotic. Having all three of the diagnosed conditions – *to wit*, bipolar disorder and personality disorder not otherwise specified with paranoid and borderline features – presents, according to Dr. Sadoff, a "very serious combination that can lead to impulsive behavior, loss of control and irrational thinking and unpredictable behavior." (Sadoff Report, *supra*, at p. 7.) Even if these opinions are credited by a fact-finder, however, they do not logically negate the type of mens rea required for accomplice liability. They do not make any less likely the Defendant's alleged knowledge that an offense was going to be committed, nor do they tend to negate either the Defendant's knowledge and awareness of her own acts or her alleged intent to facilitate or assist the commission of the underlying crimes.

The Government has also charged the Defendant with responsibility for the

substantive offenses under a theory of co-conspirator liability (sometimes referred to as
*Pinkerton* liability).  Pursuant to § 7.03 of the Third Circuit Model Jury Instructions, to
establish the Defendant's guilt under this type of theory, the following must be proved
beyond a reasonable doubt:

1. That the defendant was a member of the conspiracy charged in the Indictment;

2. That, while the defendant was still a member of the conspiracy, one or more of the other members of the conspiracy committed the offenses charged in the Indictment by committing each of the elements of those offenses;

3. That another member of the conspiracy committed these offenses within the scope of the unlawful agreement and to help further achieve the objectives of the conspiracy; and

4. That these offenses **were reasonably foreseeable to or reasonably anticipated by the defendant** as a necessary and natural consequence of the unlawful agreement.  The government does not have to prove that the defendant specifically agreed or knew that these offenses would be committed.  However, the government must prove that **the offenses were reasonably foreseeable to that defendant, as a member of the conspiracy, and within the scope of the agreement as he or she understood it.**

In addition, pursuant to § 6.18.731E of the Model Jury Instructions, the
Government must prove the following with regard to the Defendant's mental state
concerning the alleged conspiracy:

1. That the Defendant **knew** of the objective or goal of the conspiracy;

2. That she joined the conspiracy **intending to help further or achieve that goal or objective**; and

3. That the Defendant and at least one other alleged conspirator shared a **unity of purpose** toward that objective or goal.

Defendant contends that the opinions offered in Dr. Sadoff's October 11, 2010
report are relevant to a determination of whether she possessed actual mens rea to join
a conspiracy.  Again, I disagree.

In *Pohlot*, the Third Circuit admonished that "[c]riminal responsibility must be
judged at the level of the conscious."  827 F.2d at 906.  Quoting Professor Stephen
Morse, the court observed that the lack of self-reflection by a defendant does not

equate to a lack of intent and does not negate mens rea. 827 F.2d at 906 (where "the defendant knows at some level what he is doing and intends to do it," yet "on the other hand, he is not fully conscious of his actions in the usual sense," this type of situation is "better handled as a matter of affirmative defense," since "[m]ens rea is present but the usual control structures are compromised.")(citation omitted). The court explained that:

> [i]f a person thinks, plans and executes the plan at [the conscious] level, the criminality of his act cannot be denied, wholly or partially, because, although he did not realize it, his conscious was influenced to think, to plan and to execute the plan by unconscious influences which were the product of his genes and his lifelong environment.

827 F.2d at 906 (quoting *State v. Sikora*, 44 N.J. 453, 210 A.2d 193, 202 (1965)).

Dr. Sadoff's opinions that the Defendant's mental conditions make her predisposed to impulsive and unpredictable behavior, a loss of control, and irrational thinking do not logically negate the allegation that she knew of the objective or goal of the conspiracy or that she purposefully joined the conspiracy intending to further its objective. Similarly, these opinions do not logically negate the allegation that the Defendant shared a unity of purpose with another alleged conspirator. Moreover, none of the mental traits or defects set forth in Dr. Sadoff's report tend to establish that the underlying criminal offenses alleged in the Indictment were *not* reasonably foreseeable to the Defendant as a necessary and natural consequence of the alleged conspiracy. As the Government notes, any suggestion that the Defendant did not intend to participate in or aid and abet the conspiracy – because of the fact that her mental conditions cause her to act impulsively in order to achieve her personal goals, which may not be shared by others, or cause her to see things in her own idiosyncratic way rather than as others may see the reality of the situation – focuses not on the Defendant's conscious mind, but on her unconscious. This is contrary to *Pohlot's* admonishment that criminal responsibility must be judged at the conscious level. *Pohlot*, 827 F.2d at 906.

Defendant nevertheless contends that her deep-rooted distrust of people and her

inability to get along or cooperate with others is relevant to negating an element of one or more of the charged offenses in that it establishes doubt "that she could agree or work with anyone to join and participate in a conspiracy or be a team player in the commission of any of the offenses charged in this matter." (Def.'s Response to Govt.'s Second Mot. in Limine to Preclude Testimony of Dr. Robert Sadoff [220] at p. 9.) During argument on this point in open court, defense counsel expounded on this theory, agreeing, in effect, that it does not generally negate the mens rea required for conspiracy or accomplice liability. Instead, the defense's theory seems to be that, although the Defendant might generally possess the mental capability to commit conspiracy, her mental condition makes it unlikely that she would have engaged in a conspiracy with so many different people over such a long period of time involving the degree of detail alleged in the Indictment.[1]

To the extent this theory relates not to mens rea but to actus reus – i.e., the question as to whether the Defendant joined in the alleged conspiracy at all – it is not at all clear whether such a use of evidence pertaining to mental abnormality is permitted under the Insanity Defense Reform Act. The Government takes the position that it is

---

[1] To the extent Dr. Sadoff would render an opinion consistent with this line of argument, we agree with the Government's assertion that it represents yet another variation on what has been a seemingly amorphous opinion by Dr. Sadoff. The Government previously objected to Dr. Sadoff's testimony, as it was originally proposed, on the ground that the opinions he intended to proffer violated Fed. R. Evid. 704 by determining for the jury the ultimate issues concerning the Defendant's mens rea. This Court sustained the Government's objection and granted the motion in limine as it related to Dr. Sadoff's original report.

Thereafter, Dr. Sadoff submitted a revised report dated October 11, 2010, which serves as the basis for the pending motion in limine. In this report, Dr. Sadoff appears once again to be opining on the Defendant's mental culpability, stating that "[a]ll of [the Defendant's] traits, including her psychotic behavior when she was manic and therefore not in touch with reality, must be considered when assessing her state of mind with respect to the charges against her." (Sadoff Report, p. 6.) To the extent defense counsel's latest articulation of the manner in which he would propose to utilize Dr. Sadoff's report represents a new theory, we agree that it is unreasonable to expect the Government to defend against an expert opinion which is constantly in a state of flux.

not, and we are without any legal authority, much less binding authority from this circuit, suggesting otherwise. We do note, however, that the *Pohlot* court cautioned against the use of psychiatric testimony which does not strictly negate mens rea on the grounds that it might cause unnecessary confusion for the jury about the controlling legal principles. *See* 827 F.2d at 890 ("Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires."); *id*. at 904 ("[C]ourts may permit juries to excuse a defendant's criminal conduct because of mental abnormality and thereby covertly create a 'partially diminished capacity' defense when they admit evidence of mental abnormality that does not truly negate mens rea.").

Beyond all this, however, it is not even clear that Dr. Sadoff's opinions could be used to logically support the Defendant's stated theory. The mere fact that the Defendant tends to distrust other people and has a difficult time working in an agreeable and cooperative manner with others is not necessarily at odds with the allegation that she was part of a conspiracy. As the Third Circuit's Model Criminal Jury Instructions set forth, a conspiracy is nothing more than a knowing and intentional agreement or meeting of the minds between two or more persons to achieve an overall objective, alleged in this case to be the offense of bank robbery. The Government does not need to prove an express agreement spelling out all the details of the understanding, nor does it need to prove that all the members of the conspiracy directly met or discussed between themselves their unlawful objective, or that they agreed to all the details, or that they agreed to what the means were by which the objective would be accomplished. "What the government must prove beyond a reasonable doubt is that two or more persons in some way or manner arrived at some type of agreement, mutual understanding, or meeting of the minds to try to accomplish a common and unlawful objective." Third Circuit Model Criminal Jury Instructions, § 6.18.371C.

In light of the foregoing, I agree with the Government's assertion that the opinions proffered in Dr. Sadoff's most recent report would not aid the jurors in deciding

the ultimate issues in this case but would, if permitted, serve instead to confuse them by sidetracking them with evidence of the Defendant's mental disorders which, by definition, have no bearing on the mens rea at issue in this case. Accordingly, even if the pending motion were not moot, this Court would grant the relief requested by the Government and would preclude Dr. Sadoff from testifying as to the opinions set forth in his report of October 11, 2010.

Based upon the reasons set forth above, the following order is entered:

AND NOW, to wit, this 25th day of October, 2010, upon consideration of the Defendant's oral motion for a continuance,

IT IS ORDERED that said motion be, and hereby is, DENIED. In light of this ruling, IT IS FURTHER ORDERED that the Government's Second Motion in Limine to Preclude Testimony of Dr. Robert Sadoff [216] be, and hereby is, DENIED as moot.

s/ Sean J. McLaughlin
SEAN J. McLAUGHLIN
United States District Judge

cm: All counsel of record.